THE METROPOLITAN BANK and THE SHOE AND LEATHER BANK *v.* VAN DYCK, Superintendent of the Bank Department: MEYER *v.* ROOSEVELT.

The act of Congress passed February 25, 1862 (ch. 33), making certain treasury notes of the United States a legal tender in payment of debts between private persons, is constitutional and valid.

The power to borrow money on the credit of the United States carries with it, it seems, the power to attach the quality of a legal tender to the notes issued, when, in the judgment of Congress, it is necessary to make them effectual for the purpose of borrowing.

The validity of this provision, as an exercise by Congress of the power to regulate commerce, discussed and maintained by MARVIN, J.

The provision of the Constitution of this State (art. 8, § 6), that the legislature shall require the redemption in specie of all bills and notes put in circulation as money, is not self-executing, so that the refusal of a bank to redeem its bills in specie authorizes the Bank Superintendent to sell the securities deposited with him.

Until the legislature shall require the redemption of bank bills in specie, an offer to pay in treasury notes made a legal tender by act of Congress is sufficient under the general banking law (ch. 260 of 1838, § 4), which only authorizes a sale of the securities upon default in paying such bills in "lawful money of the United States."

THE respondents in the first above entitled cause are banking associations, organized under the general banking law of this State, and the several acts amendatory thereof, and are located and doing business in the city of New York. By the provisions of those acts, the said banks were required to deposit securities with the bank department for the redemption and payment of the bills or circulating notes issued by such banks respectively. Upon default of any such bank, upon lawful demand, to pay any such note or bill "*in the lawful money of the United States,*" the holder of such note was authorized to cause the same to be protested, and the superintendent of the bank department, on receiving such protest, is directed to take the proceedings prescribed by said act, to compel payment thereof, out of the securities so deposited with him for that purpose, and if need be to sell the same. (Chap. 260 of 1838, § 4.) On the 26th of March, 1863, one D. Valentine, being the owner and holder of a bill or note issued by each of the respondents, of the denomination of ten dollars, presented the same at their several banks, and demanded payment thereof in the gold or silver coin of the United States, which was refused by the respondents, but each tendered to him, and offered to pay the said note or bill in a note of the denomination of ten dollars, issued by the secretary of the treasury, upon the credit of the United States, under and by virtue of the act of the Congress of the United States, entitled "an act to authorize the issue of United States

notes, and for the redemption or funding thereof, and for funding the floating debt of the United States," approved February 25, 1862. Thereupon Valentine caused the notes to be protested, and the protest thereof to be filed with the appellant, and the appellant gave notice, requiring said respondents to pay their respective notes, within fifteen days, in gold or silver coin, or in default the appellant would proceed to sell the securities so deposited with him, and also proceed to make redemption thereof, pursuant to the requirements of said acts. Upon an agreed case, pursuant to section 372 of the Code of Procedure, the following questions were submitted to the Supreme Court at general term, for decision:

1. Whether the aforesaid act of Congress, approved February 25, 1862, is constitutional and valid, and also, whether the refusal of the plaintiffs to redeem their said notes so issued by them, upon demand, in the gold or silver coin of the United States, and their offer to redeem their said notes in the notes of equal denomination issued as aforesaid, by authority of Congress, was a failure or refusal to redeem their notes in the lawful money of the United States.

2. If the court be of the opinion that the said act is constitutional, and that the plaintiffs offered to redeem their notes in the lawful money of the United States, then judgment is to be entered restraining the defendant, as superintendent, from taking any further steps from redeeming any of the notes of the plaintiffs, in cases where the plaintiffs have offered to redeem in the legal tender notes of the United States, and that he be restrained from taking any steps towards the sale of the stocks or trust funds in his hands belonging to the plaintiffs. But if, on the contrary, the court be of the opinion that the said act of Congress is unconstitutional, and that a refusal to redeem in gold or silver coin of the United States, is a refusal to redeem in the lawful money of the United States, then a judgment was to be entered dismissing the complaint of the plaintiffs.

In this action, the Supreme Court, in the third judicial district, held the said act of Congress to be constitutional and

valid, and that a tender made in the treasury notes issued by virtue and in pursuance of said act, was a good and legal tender for all debts mentioned therein, and that the tender made by the plaintiffs to redeem their circulating notes in the said above described treasury notes, was a tender and offer to redeem their said notes in the lawful money of the United States. The court thereupon gave to the plaintiffs the relief asked for in their complaint.

In the second above entitled cause, the facts agreed upon, in the case submitted to the Supreme Court under the same section of the Code, were: That the plaintiff, Lewis H. Meyer, had become the owner in fee, in May, 1861, of certain premises, subject to a mortgage to the defendant to secure the sum of $8,000. On the 23d of August, 1854, one Samuel Bowne was the owner in fee of said premises, and procured a loan from the defendant of the sum of $8,000, to secure the payment of which, on the 23d of August, 1857, he made and executed to the defendant his bond in the penal sum of $16,-000, "lawful money of the United States of America," conditioned for the payment of the just and full sum of $8,000, on said 23d of August, 1857, with interest thereon at the rate of seven per cent, payable semi-annually. To secure the payment of his said bond, the said Bowne and his wife made and executed a mortgage on said premises, bearing even date with said bond, which recited that said Bowne was justly indebted to the defendant "in the sum of eight thousand dollars lawful money of the United States of America." The mortgaged premises were conveyed to the plaintiff, and he assumed the payment of said mortgage.

On the 11th of June, 1862, the plaintiff desiring to pay off and cancel said mortgage, tendered to the defendant the sum of $8,170, being the amount due for principal and interest on said mortgage up to the said 11th of June, 1862, in notes of the United States, issued under and by virtue of the act of Congress, approved February 25, 1862. The defendant refused to receive the same as a legal tender, and claimed that the repayment of said money should be made in gold coin of the United

States.  It was thereupon agreed between the parties, that the defendant should receive, and he did receive the said sum of $8,170, in said notes, conditionally, and that the question, whether the said notes of the United States are and were a legal tender in payment of said mortgage debt and interest, should be submitted to the Supreme Court, and if such court should decide that said notes were and are a legal tender and discharge of said bond and mortgage, that then the said defendant should deliver up said bond and mortgage, and acknowledge satisfaction thereof and discharge the same of record ; but if the court should decide that said notes were not and are not a legal tender in payment of said mortgage debt, that then the plaintiff should pay to the defendant the further sum of $326.78, with interest thereon from June 11, 1862, and that upon payment of said last mentioned sum, with interest, the defendant was to deliver up the bond and mortgage to be canceled, and acknowledge satisfaction thereof and cancel the same of record.

In this last mentioned action the Supreme Court in the first judicial district gave judgment for the defendant, and that the plaintiff should pay to the defendant the additional sum of $326.78, and interest from June 11, 1862, and that on payment of the same, the defendant acknowledge satisfaction of said bond and mortgage, and discharge the same of record, and deliver the same up to be canceled.

From the judgment in the first above entitled action the defendant appealed, and from the judgment in the second case the plaintiff appealed to this court.  The cases were argued together.

*J. V. W. Doty* and *George T. Curtis*, for the appellant; *John K. Porter* and *Lyman Tremain*, for the respondents—in first action.

*Bernard Roelker* and *William C. Noyes*, for the appellant; *George T. Curtis*, for the respondent—in second action.

Davies, J.  The question presented for our determination in these actions is one of the gravest importance, and chal-

lenges our most careful consideration. We are called upon to annul and set aside an act of the Congress of the United States, passed in conformity with the forms of the fundamental law, after grave deliberation by both houses of Congress, and which has assumed the form of a law, with the approval of the executive. Two departments of the government have therefore united, and all which by the provisions of the Constitution are required to unite, in the enactment of a law. The responsibility of determining whether these two depart· ments have violated the Constitution is now cast upon the third department, that of the judiciary, and however great that responsibility may be, we have, in the discharge of the duties imposed upon us, to meet it, and decide whether or not the Constitution has been violated. Before proceeding to the discussion of the precise question presented for adjudication in the present cases, it will greatly aid us in arriving at a correct and intelligent conclusion to advert briefly to the system of government organized by the Constitution of the United States, the principles which should govern in the construction of that Constitution, and the decisions which have been made, touching the powers of Congress under various provisions of that Constitution.

We are all familiar with the fact, that the first system of a general or national government, formed by the colonies in this country, upon their separation from the crown of Great Britain, and assuming the position of independent states, was that of a confederation of the several states. "Articles of confederation and perpetual union" were entered into between the several states; and the style of the confederacy was that of "The United States of America." Each state retained its sovereignty, freedom and independence, and every power, jurisdiction and right which were not by the articles of that confederation, expressly delegated to the United States, in Congress assembled. The ratification clause of the articles solemnly declared, that "whereas it has pleased the great Governor of the world, to incline the hearts of the legislatures we respectively represent in Congress to approve of and

to authorize us to ratify the said articles of confederation and *perpetual union:* Know ye, that we, the undersigned delegates, by virtue of the power and authority to us given for that purpose, do by these presents, in the name and in behalf of our respective constituents, fully and entirely ratify and confirm each and every of the said articles and *perpetual union.* And we do further solemnly plight and engage the faith of our respective constituents, that . . . *the articles thereof shall be inviolably observed by the States we respectively represent; and that the union shall be perpetual.*" History informs us of the defects and the weakness of the articles of confederation, and of the conviction of the whole country that a different and more efficient system of government must be devised to insure to the people of the several states, their common defence, the security of their liberties, and their mutual and general welfare. A convention assembled in Philadelphia in 1787, which framed a Constitution that received the sanction of the people of the several states, and under which a government was organized in 1789, which has challenged the admiration of the world, and under the benign administration of which we have become a great and powerful nation, among the first of the earth.

The address of the convention to the people on submitting the result of their labors for approval, which was signed by George Washington, its President, says: "The friends of our country have long seen and desired that the power of making war, peace and treaties, that of coining money, and regulating commerce, and the correspondent executive and judicial authorities should be fully and effectually vested in the general government of the Union. . . . . In all our deliberations on this subject we kept steadily in view that which appears to us the greatest interest of every true American—the consolidation of our Union—in which is involved our prosperity, felicity, safety, perhaps our national existence. This important consideration, seriously and deeply impressed upon our minds, led each State in the Convention to be less rigid on points of inferior magnitude than might have been otherwise

expected; and thus the Constitution which we now present is the result of a spirit of amity and of that mutual deference and concession, which the peculiarity of our political situation rendered indispensable."

The Constitution, thus prepared, was submitted to the people of the several States in conventions assembled, and they aggregately declared, in ordaining and establishing the said Constitution for the United States of America, that "the people of the United States, in order to form *a more perfect Union*, establish justice, ensure domestic tranquility, provide for the common defence, promote the general welfare and secure the blessings of liberty to ourselves and to our posterity," did ordain and establish the same.

A perpetual Union was thus established by the articles of confederation; to render that Union more perfect was the object to be attained by the Constitution. It was to secure to the framers thereof, and to their posterity, the blessings enumerated. The consolidation of the Union and its perpetuity were not all that was contemplated. Absolute sovereignty and complete supremacy in the exercise of all governmental powers confided to the national government were intended to be secured, and it is believed that such intention was accomplished.

All legislative powers thereby granted were vested in the Congress, and the powers so granted to Congress are specifically enumerated in the eighth section of article first; and lest there might be doubts suggested as to the fullness of the authority granted, to such specific enumeration this clause is added, "and to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

The omnipotence of the British Parliament is not more absolute than is the supremacy of the Congress of the United States upon all subjects which are either expressly or impliedly delegated to it. The President of the United States, upon his

induction into office, is sworn to "preserve, protect and defend the Constitution of the United States." He is the only officer in the national or state governments who is required to take that oath, and all executive, legislative and judicial officers, both of the United States and of the several states, are required to be bound by oath or affirmation to support the Constitution of the United States. (Sec. 3 of art. 6.) It is made the duty of the President, from time to time, to give to Congress information of the state of the Union, and to recommend such measures as he shall judge necessary and expedient, and it is the duty of Congress, within the powers delegated to it, to pass such laws as may be necessary and proper to aid the President in fulfilling the high and imperative trust reposed in him, and to enable him to preserve, protect and defend the Constitution. To accomplish all these purposes, and for the execution of the powers thus conferred on the government of the United States, and for its own protection and preservation, and its own defence, the Congress of the United States has absolute control over all the citizens thereof, and of the property and resources of the nation, subject only to that accountability which a representative in a free government owes to his constituents; and that ordeal, happily, in our favored land, is of frequent recurrence. That there might not be any misapprehension as to the fact of this absolute and perfect supremacy, the Constitution emphatically declares that "this Constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, *and the judges of every state shall be bound thereby;* anything in the Constitution or laws of any state to the contrary notwithstanding."

The judges of every state are expressly declared to be bound by the Constitution and the laws of the United States, made in pursuance thereof, and as they have all taken an oath to support that Constitution, every safeguard would seem to have been provided to ensure their fidelity to that Constitution and the laws made under it. Such laws overrule

the state constitutions, and the laws of every state, and if the latter conflict with the former, they are void and nugatory, and it is the imperative duty of the judges so to declare.

These views, it is believed, are fully sustained by learned commentators, as well as by the authoritative decisions of the Supreme Court of the United States, the final arbiter of the powers of that government. (Story's Com. on the Constitution, §§ 354, 355, 356, 360.) In *Marvin* v. *Hunter* (1 Wheat., 304, 324), the Supreme Court said: "The Constitution of the United States was ordained and established, not by the states in their sovereign capacity, but emphatically, as the preamble of the Constitution declared, by the people of the United States." Chief Justice MARSHALL, in delivering the unanimous opinion of the court in the case of *McCulloch* v. *Maryland* (4 Wheat., 416), observed: "From the conventions called to ratify it the Constitution derives its whole authority. The government proceeds directly from the people, 'is ordained and established' in the name of the people, and is declared to be ordained 'in order to form a more perfect union, establish justice, ensure domestic tranquillity and secure the blessings of liberty to themselves and to their posterity.' The assent of the states in their sovereign capacity, is implied in calling a convention, and thus submitting that instrument to the people. But the people were at perfect liberty to accept or reject it, and their act was final. It required not the affirmance, and could not be negatived by the state governments. The Constitution, when thus adopted, was of complete obligation and bound the state sovereignties. It has been said that the people had already surrendered all their powers to the state sovereignties, and had nothing more to give. But, surely, the question whether they may resume and modify the powers granted to governments, does not remain to be settled in this country. Much more might the legitimacy of the general government be doubted, had it been created by the states. The powers delegated to the state sovereignties were to be exercised by themselves. To the formation of a league, such as was the confederation, the state sovereignties were certainly

competent. But when, 'in order to form a more perfect union,' it was deemed necessary to change this alliance into an effective government, possessing great and sovereign powers, and acting directly on the people, the necessity of referring it to the people and of deriving its powers directly from them was felt and acknowledged by all. The government of the Union, then, is emphatically and truly a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them and for their benefit. . . . It is the government of all, *its powers are delegated by all, it represents all, and acts for all.*" These quotations are thus liberally made, because of their pertinency to the present investigation, and for the reason that they are authoritative expositions of the objects and purposes of the Constitution, and of the source of its power, and are to be recognized and accepted as such by all tribunals. The government thus formed, is supreme and self-supporting and self-perpetuating. It cannot be dependent for its life or existence upon other governments or sovereignties, but has given to itself vigor and strength sufficient for its own preservation and perpetuity. This point was directly resolved in the case of *McCulloch* v. *Maryland* (*supra*), in which Chief Justice MARSHALL said : " If any one proposition could command the universal assent of mankind, we might expect it would be this, that the government of the Union, though limited in its powers, is supreme within its sphere of action. . . . Though any one state may be willing to control its operations, no state is willing to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind the component parts. But this question is not left to mere reason; the people have, in express terms, decided it by saying, 'this Constitution, and the laws of the United States which shall be made in pursuance thereof, shall be the supreme law of the land,' and by requiring that the members of the state legislatures and the officers of the executive and judicial departments of the states, shall take the oath of fidelity to it."

The same doctrine was distinctly enunciated by Chief Justice TANEY, in the case of *Ableman* v. *Booth* (21 How., 506, 516), where he says: "The powers of the general government and of the states, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereign- ties, acting separately and independently of each other within their respective spheres; and the sphere of action appropriated to the United States, is as far beyond the reach of the judicial process issued by a state judge or a state court, as if the line of division was traced by landmarks and monuments visible to the eye."

Again, we are to give to the various provisions of the Con- stitution such a construction as will most effectually subserve the great purposes of its formation, and best promote the gene- ral welfare of the grantors of the powers contained in it, the people, the source and fountain of all power. The grant of power is to be construed most favorable to the grantor, espe- cially where the power is granted, or the agency created, for the benefit and welfare of the grantor, or principal. The rule which should govern in such a case is clearly laid down by Story (Com. on Const., § 413). He says: "But in construing a constitution of government framed by the *people*, for their own benefit and protection, for the preservation of their rights and property and liberty, where the delegated powers are not and cannot be used for the benefit of their rulers, who are but their temporary servants and agents, but are intended solely for the benefit of the people, no such presumption, to use the words in the most restricted sense, necessarily arises. The strict or the more extended sense both being within the letter, may be fairly held to be within their intention, as either shall best promote the very objects of the people in their grant, as either shall best promote or secure their rights, property or liberty."

This court, in the case of *The People* v. *New York Central Railroad Company* (24 N. Y., 485, 486), approved of the rule enunciated by JOHNSON, J., in *Newell* v. *People* (3 Seld., 93), that a constitution is an instrument of government, made and

adopted by the people for practical purposes, connected with the commerce, business and wants of human life. For this reason, pre-eminently, every word should be expounded in its plain, obvious and common sense, and Judge DENIO, *arguendo,* in the same case, stated the principle of interpretation, which, while it commends itself to the good sense of all, is abundantly supported by authority, that a written constitution, framed by men chosen for the work by reason of their peculiar fitness, and adopted by the people upon mature deliberation, implies a degree of carefulness of expression proportioned to the importance of the transaction; and the words employed are to be presumed to have been used with the greatest possible discrimination. Chief Justice MARSHALL, in *Gibbons* v. *Ogden* (9 Wheat., 188), in interpreting a provision of the Constitution of the United States, says: "As men whose intentions require no concealment generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who adopted it must be understood to have employed words in their natural sense, and to have intended what they said."

We are now prepared to enter upon the inquiry, what powers have been conferred by the Constitution upon Congress, and whether any such powers authorize the enactment by that body of the act passed February 25, 1862.

The express powers needful to be referred to, thus specifically delegated to Congress, are:

1. To levy and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States.

2. To borrow money on the credit of the United States.

3. To regulate commerce with foreign nations, and among the several States and with the Indian tribes.

4. To coin money, regulate the value thereof, and of foreign coin.

5. To provide for the punishment of counterfeiting the securities and current coin of the United States.

6. To declare war, grant letters of marque and reprisal.

7. To raise and support armies.

8. To provide and maintain a navy.

9. To provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions.

10. The United States having guaranteed to every State in this Union a republican form of government, and engaged to protect each of them against invasion and against domestic violence, Congress has power to fulfill those engagements.

11. Congress has also power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by the Constitution in the Government of the United States, or in any department or officer thereof.

We are to apply to the construction of the powers thus delegated, the rule as settled in the case of *McCulloch* v. *Maryland* (*supra*), that the Government of the United States can claim no powers which are not granted to it by the Constitution; and the powers actually granted must be such as are expressly given, or given by necessary implication. On the other hand, this instrument, like every other grant, is to have a reasonable construction, according to the import of its terms, and where a power is expressly given in general terms, is not to be restrained to particular cases, unless that construction grows out of the context, expressly or by necessary implication.

Chief Justice MARSHALL, in *Gibbons* v. *Ogden* (*supra*), in delivering the opinion of the court, says: " This instrument contains an enumeration of powers expressly granted by the people to their government. It has been said that these powers ought to be construed strictly. But why ought they to be so construed? Is there one sentence in the Constitution which gives countenance to this rule? In the last of the enumerated powers, that which grants expressly *the means* for carrying all others into execution, Congress is authorized to make all laws which shall be necessary and proper for the purpose. But this limitation in the means which may be used is not extended to the powers which are conferred; nor is there one sentence in the Constitution, which has been pointed out by

the gentlemen of the bar, or which we have been able to discern, that prescribes this rule. . We do not, therefore, think ourselves justified in adopting it. What do the gentlemen mean by a strict construction? If they contend only against that enlarged construction which would extend words beyond their natural and obvious import, we might question the application of the terms, but should not controvert the principle. If they contend for that narrow construction which, in support of some theory not to be found in the Constitution, would deny to the government those powers which the words of the grant, as usually understood, import, and which are consistent with the general views and objects of the instrument— for that narrow construction which would cripple the government and render it unequal for the objects for which it is declared to be instituted, and to which the powers given, as fairly understood, render it competent—then we cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the Constitution is to be expounded. . . If, from the imperfection of human language, there should be serious doubts respecting the extent of any given power, it is a well settled rule, that the objects for which it was given, especially when those objects are expressed in the instrument itself, should have great influence in the construction. We know of no reason for excluding this rule from the present case. The grant does not convey power which might be beneficial to the grantor, if retained by himself, or which can inure solely to the benefit of the grantee; but is an instrument of power for the general advantage, in the hands of agents selected for that purpose; which power can never be executed by the people themselves, but must be placed in the hands of agents or lie dormant. We know of no rule for construing the extent of such powers, other than is given by the language of the instrument which confers them, taken in connection with the purposes for which they were conferred."

No apology is necessary for quoting thus liberally from this profound jurist and learned expounder of the purposes and objects of the Constitution, and of the powers conferred by it

upon the Congress of the United States, upon the departments and officers thereof.

We should be doing great injustice 'to the framers of the Constitution, and a great wrong to the people who adopted it, to secure to themselves and their posterity the blessings of liberty, if we give to it such a construction as will cripple the government, and render it unequal to the objects for which it was instituted. We must also bear in mind that no interpretation of the words, in which those powers are granted can be a sound one, which narrows their ordinary import, so as to defeat the objects for which that Constitution was made. That would be to destroy the spirit and to cramp the letter of the Constitution itself. Mr. Justice STORY, in delivering the opinion of the court in *Martin* v. *Hunter* (1 Wheaton, 304, 326, 327), says: " This instrument (the Constitution) like any other grant, is to have a reasonable construction according to the import of its terms; and when a power is expressly given in general terms, it is not to be restrained to particular cases, unless that construction grows out of the context expressly or by necessary implication. The words are to be taken in their natural and obvious sense, and not in a sense unreasonably restricted or enlarged. The Constitution unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liberties, to provide for minute specification of its powers, or to declare the *means* by which those powers should be carried into execution. It was foreseen that this would be a perilous and difficult, if not impracticable task. The instrument was not intended to provide merely for the exigencies of a few years, but was to endure through a long lapse of ages, the events of which were locked up in the inscrutable purposes of Providence. It could not be foreseen what new changes and modifications of power might be indispensable to effectuate the general objects of the charter; and restrictions and specifications, which at the present might seem salutary, might in the end prove the overthrow of the system itself. Hence its powers are expressed in general terms, leaving to the legislature, from time to time,

to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers as its own wisdom and the public interests should require."

We have had pressed upon us, with much force and eloquence, the tenth amendment to the Constitution, as containing a restriction upon the powers of the government of the United States. Its language is: The powers not delegated to the United States, nor prohibited by it to the states, are reserved to the states or to the people. The same reservation, in substance, was contained in the second article of the articles of confederation, except that the word "expressly" was there placed before the word "delegated." The omission of this word in the tenth amendment is most significant, and shows the object was not to interfere with or restrict any of the powers delegated to the United States by the Constitution, whether expressly delegated or not. This is the view taken by the Supreme Court in the case of *McCullough* v. *Maryland* (*supra*), where it is said, in the opinion, that "there is no phrase in the instrument which, like the articles of confederation, excludes incidental or implied powers, and which requires everything granted shall be expressly and minutely described. Even the tenth amendment, which was formed for the purpose of quieting the excessive jealousies which had been excited, omits the word 'expressly,' and declares only that the powers 'not delegated to the United States, nor prohibited by it to the states, are reserved to the states or to the people," thus leaving the question whether the particular power which may become the subject of contest, has been delegated to one government or prohibited to the other, to depend on a plain construction of the whole instrument. The men who drew and adopted this instrument had experienced the embarrassment resulting from the insertion of the word in the articles of confederation, and probably omitted it to avoid those embarrassments. A constitution to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of

a legal code and could scarcely be embraced by the human mind. It would probably never be understood by the public. Its nature, therefore, requires that only its great outlines should be marked, its important objects designated, and the minor _ngredients which compose those objects be deduced from the nature of the objects themselves. That this was entertained by the framers of the American Constitution, is not only apparent from the nature of the instrument, but from the language." And it is emphatically asked, if this were not so, " Why else were some of the limitations found in the ninth section of the first article introduced ? There was no express delegation of any of these powers to the Congress of the United States and the prohibition has no significance or meaning, unless it had been supposed that the powers thus prohibited could have been exercised, unless such prohibition had been made." So also the first eight amendments to the Constitution, are all in restraint of powers, which it was supposed could have been exercised by Congress without such prohibitions. None of them are applicable to any of the express powers delegated to Congress, but embrace an enumeration of certain implied powers, which it was assumed Congress might exercise under the general delegation of powers, unless specially prohibited from so doing. The omission in the ninth section of article first, and in any of these amendments, of any restraint upon or prohibition to Congress to legislate upon the subject, of what should or should not be a legal tender, possesses great significance and importance, as we shall hereafter see, when we come to consider that precise point more attentively. It is sufficient here to observe, that the Constitution contains no prohibition upon Congress from legislating on that subject. It can be hardly necessary to say that the prohibitions contained in the tenth section, which are specially made applicable to the states, have no relation to, and in no sense, impair or affect any of the powers of Congress. If these prohibitions were equally binding on Congress, as upon the states, then they were all prohibited to Congress equally. That the framers of the Constitution did not so regard it, is

conclusively shown by the fact that, while they prohibited the states from doing several things, among others, to pass any bill of attainder, *ex post facto* law, or grant any title of nobility, those three things were only prohibited to the Congress, and the reasonable and legitimate deduction from such omission is, that the other things not prohibited to Congress were allowed to be exercised by it, if those matters came within the purview of either the express or implied powers granted. This argument is not weakened by the fact that the Constitution expressly delegated to Congress the power to grant letters of marque and reprisal, and to coin money, and omitted saying anything on the other matters prohibited to the states.

Such would seem to have been the view taken by distinguished members of the house of representatives of the United States in the debate on the bill to incorporate the United States Bank, in June, 1811. Mr. Crawford, of Georgia, afterward Secretary of the Treasury, said: "If the state governments are restrained from exercising this right to incorporate a bank, it would appear, *ex necessitate rei*, that this right is vested in the United States. The entire sovereignty of this nation is vested in the state governments and in the federal government, except that part of it which is retained by the people, which is solely the right of electing their public functionaries." Mr. Alston, a member for South Carolina, said: "In the tenth article, first section, it is said, no state shall coin money, emit bills of credit, or make anything but gold and silver coin a legal tender in payment of debts; the interpretation which I give to it is, that the United States possess power to make anything besides gold and silver a legal tender. If what I conceive to be a fair interpretation be admitted, it must follow that they have a right to make bank paper a legal tender. Much more, then, have they the power of causing it to be received by themselves in payment of taxes." (Elliott's Debates, vol. 4, pp. 367, 368.) These positions do not appear to have been controverted in the debate.

It seems here appropriate to refer to the provision of the particular act of Congress now under consideration. It was

passed on the 25th of February, 1862, and is entitled "an act to authorize the issue of United States notes, and for the redemption or funding thereof, and for funding the floating debt of the United States." The first section authorized the Secretary of the Treasury "to issue, on the credit of the United States, one hundred and fifty millions of the United States notes," and declared that the same "shall be receivable in payment of all taxes, internal duties, excises, debts and demands of every kind, due to the United States, except duties on imports, and of all claims and demands against the United States of every kind whatsoever, except for interest upon bonds and notes, which shall be paid in coin, and shall also be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid."

The question presented for decision in these actions is, has Congress the power, under the Constitution, to make a law declaring treasury notes, issued by the United States, and payable at its treasury, for the redemption of which the credit of the federal government is pledged, and for the payment whereof the entire property of the government and that of each citizen, which may be reached by taxation, is also pledged, a legal tender in the payment of debts, and lawful money of the United States?

Before proceeding to the consideration of this question, it will be instructive to revert to the proceedings of the convention which framed the Constitution.

The second clause of section eight of article first of the Constitution was originally reported in these words: "To borrow money and emit bills on the credit of the United States." This clause coming up for consideration in the convention, Mr. Governeur Morris moved to strike out the words "and emit bills on the credit of the United States," remarking that, if the United States had credit, such bills would be unnecessary—if they had not, unjust and useless. Mr. Madison said, will it not be sufficient to prohibit the making them a tender? This will remove the temptation to emit them with unjust views.

And promissory notes in that shape may, in some emergencies, be best.   Mr. Morris replied, that striking out the words will leave room still for notes of a responsible minister, which will do all the good without the mischief.   Mr. Gorham was for striking out without inserting any prohibition.   He also said, as to· Congress having the power to issue paper money : " The power, as far as it will be necessary or safe, is involved in that of *borrowing.*"

Mr. Mercer was a friend to paper money, and was, consequently, opposed to a prohibition of it altogether.   He said " it would stamp suspicion on the government to deny it a discretion on this point."   The clause was stricken out (Madison Papers, vol. 3,.p. 1343, &c.), *but no prohibition* on Congress was inserted to issue paper money or to make the same a legal tender.

Mr. Madison adds, in a note at page 1346, that the vote of Virginia in the affirmative was occasioned by the acquiescence of Mr. Madison, who became satisfied that striking out the words would not disable the government from the use of public notes, as far as they could be safe and proper, and would only cut off the pretext for a paper currency, and particularly for making the bills a tender either for public or private debts.

Mr. Morris subsequently reported the Constitution to the convention, and the second clause of section eight was reported as it now stands, the words " on the credit of the United States," which had been erased, having been reinserted.   The power was, therefore, given to Congress to borrow money on the credit of the United States, and it would appear to have been the ·understanding of the members of the convention, that such power authorized the issuing of notes or bills by the government.   It is undeniable, that the convention, with its attention particularly directed to the consideration of the question, declined to prohibit their issue, and also declined to prohibit the making of them a legal tender in payment of either public or private debts.   The exigencies of the government at an early day compelled a resort to the power of borrowing money on the credit of the United States, and such power has

been exerted and rendered beneficial in the form of treasury notes, issued by it and on the public credit. On the 30th of June, 1812, the first act was passed authorizing the issue of these notes to the amount of $5,000,000, and the sixth section of the act declared that they should be received in payment of all duties and taxes laid by authority of the United States, and of all public lands sold by its authority. These notes, therefore, became a legal tender for debts of this character due the United States, and the act was approved by President Madison.

Issues of treasury notes have been authorized by acts of Congress of February 25, 1813; March 4, 1814; December 26, 1814; October 12, 1837; January 31, 1842; August 31, 1842; July 22, 1846; January 28, 1847; December 23, 1857.

President Madison, in approving the act of June 30, 1812, entirely overcame the scruple or doubt suggested by him that the bills which might be issued under the authority to borrow money, ought not or could not be made a tender for public debts. That Congress possessed that power is now settled by judicial authority. In *Thorndike* v. *The United States* (2 Mason, 1, 18), STORY, J., said: "By the statutes of the United States, under which treasury notes have been from time to time issued, it is enacted, that such notes shall be receivable in payment to the United States, for duties, taxes and sales of public lands, to the full amount of the principal and interest accruing due on such notes. It follows, of course, that they are a legal tender in payment of debts of this nature due to the United States, and by the very tenure of the acts, public officers are bound to receive them."

We find, therefore, a long continued practice on the part of Congress in the issue of treasury notes on the credit of the United States, and declaring such notes to be a legal tender in payment of certain debts due to the United States, and the legality of such notes sanctioned by all departments of the government, and the power of Congress to issue the same and make them such legal tender, expressly affirmed by the courts. The deductions to be made from such facts will be hereafter

adverted to. It should be observed here, that the power to issue treasury notes, on the credit of the United States, was distinctly conceded on the argument by the learned counsel, who appeared in opposition to the act of Congress now under consideration.

Congress have continuously, since the year 1792, exercised the power of declaring what shall be a legal tender in payment of private as well as public debts, in reference to a metallic currency. Now, it is conceded that there is no express delegation of power to Congress to legislate at all, on the subject of legal tender, and, as has been remarked, neither is there any prohibition in the Constitution, upon Congress, forbidding such legislation, or declaring what it shall or shall not make a legal tender. This scrupulous omission to make any provision in the Constitution, on this subject, was not accidental. The attention of the convention was particularly attracted to it, as we have seen, and we cannot doubt that the members of the convention intentionally omitted inserting any provision on the subject, preferring to leave its exercise to the implied powers delegated to Congress. It is clear, from the remark of Mr. Madison in the convention, already quoted, that in his opinion Congress would have the power to declare bills or notes issued on the credit of the United States, a legal tender, unless prohibited from so doing, by some provision of the Constitution.

Another significant circumstance as indicating the opinion of the convention that Congress had the power to legislate on the subject of legal tender, is found in the fact, that on the 6th of August, 1787, the Constitution, as previously agreed upon in the Convention, was reported by the committee of detail, nearly in the form it was subsequently passed. But article thirteenth of the then proposed Constitution, declared that "no state, without the consent of the Legislature of the United States, should make anything but specie a tender in payment of debts." This proposed clause of the Constitution, therefore, contained a distinct and unequivocal acknowledgment that it would be competent for Congress to give its con-

sent to the legislatures of the several states, to make something else than a specie tender in payment of debts. It is also an explicit admission that such a power was vested in Congress, and that it, by consent, might permit state legislatures to do the same thing. It is an absurdity to say that Congress could consent that the legislatures of the states could do this, and not have the power of doing the thing itself; it of course could not grant to others powers it did not itself possess. On this clause coming up for final consideration, it was amended by making the prohibition upon the state legislatures peremptory and absolute, as the same now stands in the first subdivision of section ten of article first. The fact that the convention made the prohibition positive upon the states, does not militate at all against the argument derived from the conceded admission, that something else than specie could be made a tender for the payment of debts, with the consent of Congress.

This seems an appropriate place to consider the legislation of Congress under the powers conferred upon it to coin money, regulate the value thereof, and of foreign coins. It is to be borne in mind, that no express power is given by the Constitution to Congress to establish, or make anything a legal tender in payment of debts; neither, as has been already observed, is there any prohibition contained in the Constitution forbidding legislation by Congress on that topic, or declaring what it shall or shall not make a legal tender. The framers of the Constitution could not have been ignorant that the power to declare what shall or shall not be a legal tender, or, in other words, lawful money of a country, was a necessary incident of sovereignty, and had ever been exercised by the sovereign power in all civilized nations. They were equally cognizant of the fact, that the colonies had invariably exercised this power; and that the states, on the application of the Continental Congress, and pursuant to its recommendation, had made the issue of paper money by the Continental Congress, for the purpose of carrying on the war of the revolution, a legal tender in payment of debts. This legislation by the states was invoked, because that Congress had no power to legislate.

on any subject, and such legislation could only be had through the instrumentality of the states. Such weakness and defect, in the powers of the Continental Congress, were among the controlling reasons for the formation of the new system, brought into being by the Constitution.

In examining the history of legislation on this subject, we find that the first act of Congress relating to legal tender, is that of April 2d, 1792, establishing "the mint for striking and coining gold and silver coins;" and by section sixteen it was enacted, that all the gold and silver coins which shall have been issued from said mint, shall be a lawful tender in all payments whatsoever. The first issue of silver dollars from the mint was not before October, 1794; and of gold coin not before July, 1795; and the whole amount of metallic money issued from 1793 to 1795, was only $463,541.80 in value. To provide a legal medium of commerce, an act was passed on the 9th of February, 1793, declaring that, from and after the first day of July, 1793, foreign gold and silver coins should pass current as money within the United States, and be a legal tender for the payment of all debts and demands, at the several and respective rates therein mentioned and prescribed. This act embraced the coins of Great Britain, Portugal, France, Spain, and the dominions of Spain. It was practically the first legal tender act ever passed by Congress.

On the 4th of August, 1790, an act was passed by Congress, to provide for the collection of duties, which declared that certain foreign coins, therein enumerated, should be received in payment of duties at prescribed rates of value, but did not declare the same should otherwise be a legal tender. This provision of the act of 1790, was repealed by the act of February 9, 1793, the repeal to take effect July 1, 1793. Subsequently other acts have been passed by Congress, from time to time, changing the value of certain foreign coins and making them a legal tender, for the payment of all debts and demands, sometimes by weight and then again by tale. (Act of April 10, 1806; act of March 3, 1823, making foreign coins receivable in payment of public lands; act of 25th June, 1834, de-

claring certain foreign silver coins to be of the legal value, and to pass current as money within the United States by tale for the payment of all debts and demands; act of March 3, 1843.)

By the act of June 28, 1834, foreign gold coins were directed to pass current as money within the United States, and be receivable in all payments by weight, of the fineness and at the rates therein mentioned. By the act of January 18, 1837, the standard for both gold and silver coins of the United States, was thereafter to be such, that of one thousand parts by weight, nine hundred should be of pure metal and one hundred of alloy, and the alloy of the silver coins should be of copper, and the alloy of the gold coins should be of copper and silver; provided, that the silver do not exceed one-half of the whole alloy. The weight of the gold and silver coins was prescribed, and they were declared to be legal tenders of payment according to their nominal value. And it was further provided in and by said act, that the silver coins theretofore issued at the mint of the United States, and the gold coins issued since July 1, 1834, should continue to be legal tenders of payment for their nominal value, on the same terms as if they were of the coinage of that act.

By the act of 27th February, 1853, the weight of the half-dollar was reduced from $206\frac{1}{4}$ grains to 192 grains, and all the coins of lesser denominations in proportion, and they were made legal tenders in payment of debts for all sums not exceeding five dollars. We thus see that Congress, since the organization of the government, commencing in the presidency of Washington, has exercised plenary power and control over the subject of currency and legal tender laws; it has established the value of certain foreign coins at one time and changed it at another; has made them a tender in payment of all debts, now by weight, and then again by tale; repealed such laws and enacted them again, sometimes making such coins a legal tender in payment of all debts, and at other times limiting them to the payment for public lands or for duties and taxes, also making the evidences of the public debt or stock of the

United States a legal tender in payment for public lands. (See act of March 3, 1797.)

We also see that Congress has changed, from time to time, the standard of value of the coins struck by our own mint, debased them by altering the fineness and weight and the relative value of the gold and silver, and making the debased coins, as well as those of a greater value, not debased, equally a legal tender for the payment of all debts, public and private, at their respective nominal values.

As has been before observed, there is no express grant of power to Congress to make gold and silver or anything else a tender in payment of debts, public or private. It is conceded that Congress may properly say what the United States may receive in payment and discharge of debts due to it, and that it may therefore rightfully say in what currency or metals or things payment may be made of them. Admitting this, it is contended that it does not follow that Congress has the power to say what shall be a tender and discharge of a debt due from one individual to another. Our review of the legislation of Congress has shown us, that under the clause of the Constitution authorizing it to coin money and regulate the value thereof, Congress has uniformly declared that the money so coined, and the value of which has thus been regulated, should be received as a legal tender in payment of all debts, equally whether due to the government or to private individuals, and that under the power to regulate the value of foreign coins, it has so, from time to time, regulated and prescribed their value, and made them a legal tender in payment of all debts. It has made coins of unequal intrinsic value and fineness equally a tender in payment of debts at their respective nominal values.

All these powers have been thus exercised by Congress from the foundation of our government, and so far as my investigations have enabled me to say, they have been unchallenged. We are not furnished with any case where they have been questioned by the courts, and what inference such a uniform course of legislation, acquiesced in by the courts and by the country, should have, would seem to be well established.

The general rule of construction which has been sanctioned is, that contemporaneous and legislative exposition regarding a power furnishes strong proof of the existence of such power.

Judge STORY says, in reference to a question of jurisdiction of the Supreme Court: "This weight of contemporaneous exposition by all. parties, this acquiescence of enlightened State courts, and these judicial decisions of the Supreme Court through so long a period do, as we think, place the doctrine upon a foundation of authority which cannot be shaken without delivering over the subject to perpetual and irremediable doubts." (*Martin* v. *Hunter*, 1 Wheat., 421.) In *Cohens* v. *Virginia* (6 Wheat., 421), Chief Justice MARSHALL observed, that " this concurrence of statesmen, of legislators and of judges, in the same construction of the Constitution, may justly inspire some confidence in that construction." " An uniform course of action, involving the right to the exercise of an important power for half a century, and this almost without question, is no unsatisfactory evidence that the power is rightfully exercised." (*Briscoe* v. *Bank of Kentucky*, 11 Peters, 257.)

" The uniform construction given to a provision of the Constitution by the legislature, with the silent acquiescence of the people, including the legal profession and the judiciary, and the injurious results which would come from a contrary interpretation, are proper elements of a legal judgment on this subject." (Per BLACK, Ch. J., *Moores* v. *City of Reading*, 21 Penn., 188; see also *Norris* v. *Clymer*, 2 Penn., 277.)

MARCY, J., in *People* v. *Green* (2 Wend., 274), says: "Great deference is certainly due to a legalized exposition of a constitutional provision, and especially when it is made almost contemporaneously with such provision, and may be supposed to result from the known views of policy and modes of reasoning, which prevailed among the framers of the instrument expounded." Chancellor WALWORTH, in the case of *The People* v. *Coutant* (11 Wend., 511), said: " Upon a question of real doubt as to the meaning of a particular clause in the Constitution, a legislative construction, if deliberately given

is certainly entitled to much weight, although it is not conclusive upon the judicial tribunals." Many more cases might be cited in maintenance of the same propositions, but they are entirely unnecessary. Applying these rules to the points now under consideration, no doubt can remain that the early and long continued and uniform practice of Congress in passing legal tender enactments was warranted by the Constitution, and the acts thus passed were constitutional and valid. The power to make tender laws by Congress is an implied power, and it may be derived from many of the express powers conferred upon that body. If the power exists, then the government is, what it was intended it should be, sovereign, within its own sphere of action, as much so as if this power had been given in express words; and we have seen that Congress is expressly authorized by the Constitution to make all laws necessary and proper to carry this or any other granted power into execution. The general rules of construction apply here, that when a power is granted in general terms, the power is to be construed as co-extensive with the terms of the grant, nor is it to be restricted to particular cases, because it may be susceptible of abuse.

This point is very ably and conclusively discussed by Judge STORY, in his work on the Constitution, and as this alleged or anticipated abuse of the power has been much pressed upon us in this argument, as a reason why we should hold that the power does not exist, a more particular reference to the suggestions and reasons of this learned and authoritative commentator may be permitted. In section 425 he says: " A power given in general terms is not to be restricted to particular cases merely because it may be susceptible of abuse, and, if abused, may lead to mischievous consequences. This argument is often used in public debate, and in its common aspect addresses itself so much to popular fears and prejudices that it insensibly acquires a weight in the public mind, to which it is in nowise entitled. . . . . But the argument from a possible abuse of power against its existence or use, is in its nature not only perilous, but in respect to governments would

shake their very foundation. Every form of government unavoidably includes a grant of some discretionary powers. It would be wholly imbecile without them. It is impossible to foresee all the exigencies which may arise in the progress of events, connected with the rights, duties and operations of the government. If they could be foreseen it would be impossible, *ab initio*, to provide for them. The means must be subject to perpetual modification and change : they must be adapted to the existing manners, habits and institutions of society, which are never stationary ; to the pressure of dangers or necessities; to the ends in view; to general and permanent operations, as well as to fugitive and extraordinary emergencies. In short, if the whole society is not to be revolutionized in every critical period, and remodeled in every generation, there must be left to those who administer the government a large mass of discretionary powers capable of greater or less actual expansion, according to circumstances, and sufficiently flexible not to involve the nation in utter destruction from the rigid limitations imposed upon it by an improvident jealousy. Every power, however limited, as well as broad, is in its own nature susceptible of abuse. No Constitution can provide perfect guards against it. Confidence must be reposed somewhere ; and in free governments, the ordinary securities against abuse are found in the responsibility of rulers to the people, and in the just exercise of the elective franchise, and ultimately in the sovereign power of change belonging to them, in cases requiring extraordinary remedies. Few cases are to be supposed, in which a power, however general, will be exerted for the permanent oppression of the people, and yet cases may easily be put in which a limitation upon such a power might be found in practice to work mischief, to incite foreign aggression or encourage domestic disorder. The power of taxation, for instance, may be carried to a ruinous excess ; and yet a limitation upon that power might, in a given case, involve the destruction of the independence of the country."

Nothing could be added to the pertinency, cogency or conclusiveness of these views. Mr. Justice JOHNSON, in deliv-

ering the opinion of the court in *Anderson* v. *Dunn* (6 Wheat., 204, 220), uses the following apt and expressive language: "The idea is Utopian that government can exist without leaving the exercise of discretion somewhere. Public security against the abuse of such discretion must rest on responsibility, and stated appeals to public approbation. Where all power is derived from the people, and public functionaries, at short intervals, deposit it at the feet of the people, to be resumed again only at their own wills, individual fears may be alarmed by the monsters of imagination, but individual liberty can be in little danger."

If, then, Congress has the power to establish a legal tender, is there any constitutional reason why the exercise of the power should be restricted to a particular medium? If Congress can coin any metallic substance, under the power to coin money, and stamp it with an arbitrary value, as it is conceded it may, then it follows from the practice of the government, and the rules and principles enunciated, that it can make such stamped metal a legal tender, at any designated value. Intrinsic value of the thing stamped or coined, has nothing to do with the question of power. Such metals, so stamped, are not issued or put in circulation on the faith or credit of the United States government. No pledge is made to redeem them, and they may possess little or no intrinsic value; yet it is not denied, that such pieces of metal so stamped or coined may be lawfully issued, and made a legal tender, and thus become lawful money of the United States. It is difficult to perceive, if this can be done with pieces of metal, why it is not equally within the power of Congress to declare the treasury notes which it may lawfully issue as a circulating medium, and which it may lawfully make a tender in payment of debts due to it, a legal tender also in payment of all debts. These notes are issued on the faith and credit of the whole Union, and the property of which, and of all its citizens, are pledged for their ultimate redemption; and if the metals may be made a tender, why may not notes equally be made a legal tender in payment of all debts, if the exigencies of the government should require

it to be done, and Congress, in its wisdom, should think such necessity existed? That Congress was not confined to the use of the precious metals in providing a currency for the people is apparent from the views expressed by Mr. Madison, than whom no man better understood the powers of Congress, and the necessities and wants both of the government and the people. In his annual message to Congress of December 5, 1815, he says: "The absence of the precious metals will, it is believed, be a temporary evil, but until they can again be rendered the general medium of exchange, it devolves on the wisdom of Congress to provide a *substitute*, which shall equally engage the confidence and accommodate the wants of the citizens throughout the Union. If the operation of the state banks cannot produce this result, the probable operation of a national bank will merit consideration; and if *neither* of these expedients be deemed effectual, it may be necessary to ascertain the terms upon which the notes of the government (no longer required as an instrument of credit) shall be issued upon motives of general policy, *as a common medium of circulation.*"

History informs us that the effect of serious and protracted wars is to produce a hoarding and withdrawal of the precious metals from circulation, and a suspension of specie payments on the part of banking institutions. So inevitable is this result that no legislation is effective to prevent it. The Bank of England, with the assent of the privy council, suspended specie payments in 1797, during the war with France, and such suspension continued, with the assent of parliament, until in 1823. Parliament, by the act of May 3, 1797, sought to give currency to the Bank of England notes, and compelled the use of them in payment of debts, by prohibiting the arrest and holding to bail of any person, unless it should appear, that no offer to pay the sum of money claimed, in notes of the Bank of England, payable on demand, had been made. And the act of 3 and 4 William IV, 1833, declared that the Bank of England notes should be a legal tender in payment of all sums above five pounds.

In the United States, during the war of 1812, the government was compelled to make use of the money of the suspended banks to enable it to carry on the war. The results of that experiment are graphically depicted, by a great statesman of that period, familiar with all the operations of the government, and a principal actor in the events of his day. Mr. Calhoun, in his speech in the Senate of the United States, on the 16th of January, 1840, on the motion of Mr. Benton to strike out the nineteenth and twentieth sections of the Independent Treasury Bill, the clauses which permitted the reception and disbursement of federal paper, after remarking that he was the friend of the final and complete divorce of the government and the banks, and that if the government should have the blindness to repudiate its own credit, it would go far to defeat the policy of the bill, by restoring, in the end, the very union it intended to dissever, said: "The reason is obvious. Paper has to a certain extent a decided advantage over gold and silver. It is preferable in large and distant transactions, and cannot, in a country like ours, be dispensed with in the fiscal actions of the government, without much unnecessary expense and inconvenience, the truth of which would soon be manifest if the government should consent to dispense with the use of treasury drafts. But this is not the only form in which it may be necessary or convenient for it to use its own credit. It may be compelled to use it for circulation in a more permanent form, as the only means of avoiding what I regard a great evil—a federal debt. I am decidedly opposed to government loans. I believe them to be in reality little better than a fraud on the community, if made in bank notes, and highly injurious if made *in large amounts in specie.* I saw enough in the late war to put me on my guard against them. I saw the government borrow the notes of insolvent banks, the credit of which depended almost exclusively on the fact that they were received and disbursed by the government as money. I saw the government borrow these worthless rags—worthless but for the credit it gave them—at the rate of eighty for one hundred, that is for every

eighty dollars it borrowed of these notes, it gave one hundred dollars of its stock, losing six per cent interest. Still worse, I saw the government, with the view of conciliating the notes of the banks, which were fleecing the community, permit them to discredit its own paper, by refusing to receive the treasury notes at par, though bearing six per cent interest, for their own worthless trash, without interest, and thus degrading and risking its own credit below that of insolvent banks. All this I saw.

"Now sir, I hold that it is only by the judicious use of *government credit*, that a repetition of a similar state of things can be avoided in the event of another war. It may be laid down as a maxim, that without banks and bank notes, large government loans are impracticable, and without *some substitute*, such loans, in the event of war, will be unavoidable. The only substitute will be found to be in the *direct use by the government of its own credit*. Now, as I regard the borrowing from the banks, not only as one link in the connection between government and banks, but as inevitably leading to the use of bank notes in the collection and disbursement of the revenue, I also regard *the use by the government of its own credit, in the form of treasury notes*, or some other or better form, *as indispensable* to the permanent success of the policy of this bill. If the government had relied *on its credit*, instead of loans from the banks, in the late war, if it had then refused to receive and pay away bank notes, as this bill proposes, or had had but the manliness to refuse to receive the notes of banks which refused to receive its own at par, I venture little in saying, that the expenses of the war might have been reduced forty millions. For these reasons I cannot assent that the government should repudiate the use of its own credit; nor do I believe that such is the sense of this body. Should there be any one of a contrary opinion, let him submit a direct proposition to prohibit the government from the use of its credit. I would be glad to see the vote on such a proposition. Instead of being unanimous in its favor, as the mover of the

amendment would have us believe, it is far more probable, it would be nearly so the other way."

And in his speech of the 19th of September, 1837, on the bill authorizing the issue of treasury notes, Mr. Calhoun advocated the issue of such notes, without interest, in order to introduce them into general circulation in the place of bank notes. He goes on to state that a paper currency in some form, if not necessary, is almost indispensable in financial and commercial operations of civilized communities, and that paper issued on the credit of the government is less liable to fluctuation in value and abuse, and that bank notes do not possess these requisites in the same degree; that paper money ought to rest on demand and supply simply, which regulates the value of everything else; that nothing but experience could determine what amount and of what denomination might be safely issued, and he concludes by saying: "Believing that there might be a sound and safe paper currency founded on the credit of the government exclusively, I was desirous that those who are responsible and have the power, should have availed themselves of the opportunity of the temporary deficit in the treasury."

It is certainly a matter of great felicitation that, in the present crisis and condition of the country, the government, warned by the evils and the enormous sacrifice attendant upon, and the embarrassments created by the use of the depreciated paper of suspended banks, for the purpose of carrying on the present war waged by the insurgents who are seeking its overthrow, has availed itself of its own credit, and has thus far been abundantly supplied with means to prosecute a war, gigantic in its proportions, and calling for enormous expenditures.

We have abundant authority, if any were needed, for taking judicial notice of the existence of the present war, of its extent, and of the condition of the country. The Supreme Court of the United States, in the recent prize cases, say: "They cannot ask the court to affect a technical ignorance of the existence of a war which all the world acknowledges to be

the greatest civil war known in the history of the human race, and thus cripple the arm of the government, and paralyze its powers by subtle definitions and ingenious sophisms." We take notice of the fact that, to maintain armies and provide a navy for the prosecution of the war, more money is needed annually than all the specie within the United States, and that a resort by the government, to the use of its own credit, was not only a matter of necessity, but the result has demonstrated that it was a measure of prudence and wisdom.

Notwithstanding the vast amounts which have been raised and expended, and the enormous debt created, the credit of the government is now higher than it was at the commencement of the struggle, and a generous and patriotic people are now daily voluntarily pouring into its treasury, millions of money to aid and enable the government to preserve, protect and defend the Constitution and the Union. Fortunate will it be for the government and the people, if, on a careful examination, it shall be ascertained by the courts that these measures which have produced such benign and important results, are in harmony with the letter and spirit of the Constitution, and authorized by it. We have seen that the issue of treasury notes by the government, upon the faith and credit of the nation, is a lawful means of obtaining money. Instead of using these notes, as was done in the war of 1812, to procure in exchange for them the notes of suspended banks at ruinous rates, to be used as a circulating medium, the advantage is apparent, if the government can legitimately use its own notes for that purpose. The slightest reflection will show that they must be more valuable, and entitled to a higher degree of credit than the circulating notes of any banking institution. The bills of the latter have only pledged for their ultimate redemption the property of the corporation issuing them, while those of the government, as already observed, have pledged for their redemption the faith and property and revenues of the nation, and that of its citizens which may be reached by taxation, the extent of which has no limits, provided only that it is uniform. We have seen that the notes

so issued by the government, have been, and lawfully might be made, a tender in payment of all debts due to the government, and that the government lawfully used them in payment of all debts owing by it, and received them in payments of all debts, dues, taxes, excises and imposts collected or received by it or due to it. We cannot fail to see that the government, in making these payments to its soldiers, who are fighting its battles, to its hardy and brave mariners who are maintaining the honor of their country's flag upon the ocean, and to the various and numerous persons who do work for it, and furnish supplies for it, will but imperfectly have made such compensation and payment, if the notes so paid out cannot be used by the recipients for the purpose of discharging debts also due by them. The making such notes, therefore, a legal tender in payment of all debts, gives to them the element of general circulation and credit, and is a means for conferring upon them universal convertibility in payment of all debts.

If Congress possesses this power, we cannot but perceive that its exercise in the present emergency is of incalculable benefit and advantage to the government and the people, whose agent it is. The question then for consideration is, whether the provision in the act of February, 1862, making these notes a legal tender, was a means useful or conducive or adapted to carry into execution any of the powers expressly conferred upon Congress. Those who challenge the validity of the act, must show, that at no time, and under no circumstances which may arise, is such a law useful, necessary or proper to aid in the execution of any or all of the powers expressly conferred upon Congress. Is such a law necessary to carry into effect any specific power given to Congress? Have these means a natural connection with any specific power? Are they adapted to give it effect? Are they appropriate means to an end? Are such means conducive to the exercise of any power granted to Congress? It is believed the doctrine is so well settled by authority upon this branch of our discussion, that it cannot be shaken, and that at this day it is not open for debate. Analogous cases will show the extent

to which the doctrine has been carried. It is known that the United States, from an early day, have claimed and exercised, by virtue of an act of Congress, priority in the payment of all debts due to it by citizens of the several States, over those due to such citizens or to the States. There can be no authority for saying that there is any express grant in the Constitution to Congress to declare such priority, yet it was so declared, and has been uniformly sustained and recognized by the courts. In the case of *The United States* v. *Fisher* (2 Cranch, 358), the power of the United States Congress to declare such priority was ably and instructively discussed by the most eminent counsel of that day, and the opinion of the court by MARSHALL, Chief Justice, unequivocally affirms the power. He says : "In the case at bar, the preference claimed by the United States is not prohibited ; but it has been truly said, that under a Constitution conferring specific powers, the power contended for must be granted or it cannot be exercised. It is claimed under the authority to make all laws which shall be necessary and proper to carry into execution the powers vested by the Constitution in the government of the United States, or in any department or officer thereof.

"In considering this clause it would be incorrect, and would produce endless difficulties, if the opinion should be maintained that no law was authorized which was not indispensably necessary to give effect to a specified power. Where various systems might be adopted for that purpose it might be said with respect to each, that it was not necessary, because the end might be obtained by other means. *Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution.* The government is to pay the debt of the nation, and must be authorized to use the means which appear most eligible to effect that object. It has, consequently, a right to make a remittance by bills or otherwise, and to take those precautions which will render the transaction safe. This claim of priority on the part of the United States will, it has been said, interfere with the right of the State sovereignties respect-

ing the dignity of debts, and will defeat the measures they have a right to adopt to secure themselves against delinquencies, on the part of their own revenue officers. But this is an objection to the Constitution itself. The mischief suggested, so far as it can really happen, is the necessary consequence of the supremacy of the laws of the United States on all subjects to which the legislative power of Congress extends."

The case of *McCulloch* v. *Maryland* (*supra*), claims a more extended and careful examination than it has yet received. No case in the judicial history of the country was ever more carefully and elaborately argued, and the learned and exhaustive opinion of Chief Justice MARSHALL is a model of profound reasoning, evincing an intimate knowledge of constitutional law and a thorough acquaintance with the structure and principles of our government. "*Monumentum œre perenius.*" Well might the eloquent and erudite William Pinckney prophetically say, of this opinion, that he saw in it "a pledge of the immortality of the Union." It is an authoritative commentary upon the Constitution and a judicial exposition of its powers and those of the different departments of the government. As such it is to be received and adhered to.

The question before the court was as to the power of Congress to create corporations. It was admitted that no such express power had been delegated to it by the Constitution. No slight importance was attached to the circumstance that in the Convention which framed the Constitution it had been proposed to confer this power expressly, and that the proposition was negatived. Mr. Webster, in his argument, said: "It was not the intention of the framers of the Constitution to enumerate particulars. The true view of the subject is, that if it be a fit instrument to an authorized purpose, it may be used, not being specifically prohibited. Congress is authorized to pass all laws ' necessary and proper' to carry into execution the powers conferred on it. These words ' necessary and proper' in such an instrument are properly to be considered as synonymous. *Necessary* powers must here intend such powers as are *suitable* and *fitted* to the object; such as are *best*

and *most useful* in relation to the end proposed.   If this be not so, and if Congress could use no means but such as were *absolutely indispensable* to the existence of a granted power, the government would hardly exist; at least it would be wholly inadequate to the purposes of its formation."

Mr. Wirt, the attorney-general, *arguendo*, said, it was not requisite that the particular thing done by Congress " should be *indispensably* necessary to the execution of any of the specified powers of the government.   An interpretation of this clause of the Constitution, so strict and literal, would render every law which could be passed by Congress unconstitutional; for of no particular law can it be predicated that it is absolutely and indispensably necessary to carry into effect any of the specified powers, since a different law might be imagined, which could be enacted, tending to the same object, though not equally adapted to attain it.   As the inevitable consequence of giving this very restricted sense to the word 'necessary,' would be to annihilate the very powers it professes to create; and, as so gross an absurdity cannot be imputed to the framers of the Constitution, this interpretation must be rejected."   In relation to the argument, that all powers to be exercised by Congress were enumerated in the Constitution, Mr. Wirt also observed : " The Convention well knew that it was utterly vain and nugatory to give to Congress certain specific powers, without the means of enforcing those powers.   The auxiliary means, which are necessary for this purpose, are those which are useful and appropriate to produce the particular end; 'necessary and proper' are there equivalent to *needful* and *adapted.*   Such is the popular sense in which the word *necessary* is sometimes used.   That use of it is confirmed by the best authorities among lexicographers.   Among other definitions of the word 'necessary,' Johnson gives 'needful;' and he defines 'need' the root of the latter by the words ' want, occasion.'   Is a law then *wanted*, is there *occasion* for it, in order to carry into execution any of the enumerated powers of the national government, Congress has the power of passing it.   To make a law constitutional, nothing more is necessary

than that it should be fairly adapted to carry into effect some specific power given to Congress. This is the only interpretation which can give effect to this vital clause of the Constitution, and being consistent with the rules of the language, is not to be rejected because there is another interpretation equally consistent with the same rules, but wholly inadequate to convey what must have been the intention of the Convention. Among the multitude of means to carry into execution the powers expressly given to the national government, Congress is to select, from time to time, such as are most fit for the purpose. It would have been impossible to enumerate them *all* in the Constitution; and a specification of some, omitting others, would have been wholly useless. The court, in inquiring whether Congress has made a selection of constitutional means, is to compare the law in question with the powers it is intended to carry into execution; not in order to ascertain whether other or better means might have been selected, for that is the legislative province, but to see whether those which have been chosen, have a natural connection with any specific power; whether they are adapted to give it effect; whether they are appropriate means to an end."

Chief Justice MARSHALL, in the unanimous opinion of the court, said: "Among the enumerated powers of the government we find the great powers to levy and collect taxes, to borrow money, to regulate commerce, to declare and conduct a war, and to raise and support armies and navies. The sword and the purse, and all the external relations, and no inconsiderable portion of the industry of the nation, are intrusted to its government. It can never be pretended that these vast powers draw after them others of inferior importance, merely because they are inferior. Such an idea can never be advanced. But it may be with great reason contended, that a government intrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depend, must also be intrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. It can never be their interest,

Metropolitan Bank *v.* Van Dyck.

and cannot be presumed to have been their intention, to clog and embarass its execution, by withholding the most appropriate means." . . .

"The government which has a right to an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means; and those who contend they may not select any appropriate means, that one particular mode of affecting the object is excepted, take upon themselves the burden of establishing that exception. . . . But the Constitution of the United States has not left the right of Congress to employ the necessary means for the execution of the powers conferred on the government, to general reasoning. To its enumeration of powers, is added that of making 'all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department thereof.' The counsel for the State of Maryland have urged various arguments to prove that this clause, though in terms a grant of power, is not so in effect; but is really restrictive of the general right which might otherwise be implied, of selecting means for executing the enumerated powers. . . . But the argument on which most reliance is placed, is drawn from the peculiar language of this clause. Congress is not empowered by it to make all laws which may have relation to the powers conferred on the government, but such only as may be 'necessary and proper' for carrying them into execution. The word 'necessary' is considered as controlling the sentence and as limiting the right to pass laws for the execution of the granted powers, to such as are indispensable, and without which the power would be nugatory: that it excludes the choice of means and leaves to Congress in each case, that only which is most direct and simple. Is it true that this is the sense in which the word 'necessary' is always used? Does it always import an absolute physical necessity so strong, that one thing, to which another may be termed necessary, cannot exist without that other? We think it does not. If reference

be had to its uses, in the common affairs of the world, or in approved authority, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means without which the end would be entirely unattainable. Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words which, when taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction that many words which import something excessive should be understood in a more mitigated sense—in that sense which common usage justifies. The word 'necessary' is of this description. It has not a fixed character peculiar to itself. It admits of all degrees of comparison; and is often connected with other words which increase or diminish the impression the mind receives of the urgency it imports. A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind will the same idea be conveyed, by these several phrases. This comment on the word is well illustrated by the passage cited at the bar, from the tenth section of the first article of the Constitution. It is, we think, impossible to compare the sentence which prohibits a state from laying 'imposts, or duties on imposts or exports, except what may be *absolutely* necessary for executing its inspection laws,' with that which authorizes Congress 'to make all laws which shall be necessary and proper for carrying into execution,' the powers of the general government, without feeling a conviction that the convention understood itself, to change materially the meaning of the word 'necessary,' by prefixing the word 'absolutely.' This word, then, like others, is used in various senses, and in its construction the subject, the context, the intention of the person using them, are all to be taken into view. Let this be done in the case under

Metropolitan Bank *v.* Van Dyck.

consideration. The subject is the execution of these great powers, on which the welfare of a nation essentially depends.

"It must have been the intention of those who gave these powers, to ensure, as far as human prudence could ensure, their beneficial execution. This could not be done by confining the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate, and which were conducive to the end. This provision is made in a Constitution intended to endure for ages to come, and consequently to be adapted to the various crises of human affairs. To have prescribed the means by which the government should, in all future time, execute its powers, would have been to change entirely the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by inscrutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur. To have declared that the best means shall not be used, but those alone, without which, the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances. . . . This clause, as construed by the State of Maryland, would abridge, and almost annihilate this useful and necessary right of the legislature to select its means. That this could not be intended is, we should think, had it not been already controverted, too apparent for controversy. We think so, for the following reasons:

"1st. The clause is placed among the powers of Congress, not among the limitations on those powers.

"2d. Its terms purport to enlarge, not to diminish the powers vested in the government. It purports to be an additional power, not a restriction on those already granted.

"No reason has been or can be assigned for thus concealing an intention to narrow the discretion of the national legislature, under words which purport to enlarge it. The framers of the Constitution wished its adoption, and well knew that it would be endangered by its strength, not its weakness. . .

The result of the most careful and attentive consideration bestowed upon this clause is, that if it does not enlarge, it cannot be construed to restrain the powers of Congress, or to impair *the right of the legislature to exercise its best judgment, in the selection of measures to carry into execution the constitutional powers of the government.* If no other motive for its insertion can be suggested, a sufficient one is found in the desire to remove all doubts respecting the right to legislate on that vast mass of incidental powers which must be involved in the Constitution, if that instrument be not a splendid bauble. . . But we think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all the means which are appropriate, which are plainly adapted to the end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

We have made these very liberal extracts from this opinion, because the points discussed and decided in it dispose of those principally presented for consideration in the present actions. The attempt would be futile to restate them, in language equally clear, appropriate and forcible. The doctrines of this opinion have been recognized as the law of this country for nearly half a century, and judicial propriety forbids that the points thus deliberately decided should again be opened for discussion and examination. They have lately received the approval of the Supreme Court in the case of *The People* v. *The Tax Commissioners*, (2 Black, 620). The principle settled in this case is decisive, we think, of the present actions. It was there held that Congress, under the power to borrow money, had the power to declare that the stocks or securities issued by the government of the United States, in the execution of that power, although held as property by citizens of the several states, could lawfully be exempted from taxation, under

the laws of the several states. If this immunity can be granted by Congress, to the stocks and securities issued by the United States, under the power to borrow money, it is difficult to perceive why Congress may not, under the same power, make the treasury notes, issued for that purpose, a legal tender, if it thought that so making them was a means for the more readily accomplishing and making effectual the expressly delegated power. If the one is constitutional, it logically follows that the other is also.

We accept these expositions of the powers of Congress by the Supreme Court of the United States as unquestionable, and we concede that upon all questions arising upon the construction of the federal Constitution, the decisions of that court are to be received as authority and final, and they will be followed by the courts of this State, whatever may be their own views upon the question. Such has been the uniform current of authority in this State. (*Hicks* v. *Hotchkiss*, 7 Johns. *Ch.*, 297; *Mather* v. *Brook*, 16 Johns., 233; *People* v. *Platt*, 17 id., 195; *Matter of Wendell*, 19 id., 153; *McCormick* v. *Pickering*, 4 Comst., 276; *Roosevelt* v. *Cebra*, 17 Johns., 108; *Cochran* v. *Van Surlay*, 20 Wend., 365; *Kunsler* v. *Kohans*, 5 Hill, 317; *North River Steamboat Company* v. *Livingston*, 3 Cowen, 713.)

We find, therefore, the law to be settled that, where the power is given to Congress to do a particular thing, the means necessary and proper for its execution are also delegated, and that Congress alone is the judge of the means most proper to be selected to aid in the execution of the power. The end must be legitimate, that is in good faith necessary to execute and make effectual some one of the delegated powers, and thus brought within the scope of the Constitution, then all means, which are appropriate, which tend, or are adapted to the end, and which are not prohibited, but are in harmony with the letter and spirit of the Constitution, were also delegated to Congress, and may constitutionally be adopted by it. It must be seen that this necessarily is so. The Constitution was framed for coming ages and for all time, and for a great country, and for millions of people. It was to render more perfect a

perpetual Union. When framed its constituents were less than four millions. Its benign provisions now afford protection to over thirty millions, and it would be idle to speculate upon the increase, growth and power which the people, sheltered by its ægis, may yet attain. A Constitution, thus framed for an expanding country, increasing in population, in arts, wealth, and national resources, must necessarily be general in the enumeration of its powers; and all means necessary and proper, in execution of those powers, had also to be left to the exigencies of the times, and the wants and necessities of the people, for whose benefit the Constitution was made, and for whose protection it is administered, by their agents. Such an emergency, it is believed, had arisen in the prosecution of a war, forced upon the government by the most formidable rebellion known to history. The Constitution and Union must be preserved, protected and defended. For this purpose armies and navies had to be provided and maintained, and enormous expenditures incurred. It has been settled that the government had the authority to issue treasury notes upon the faith and credit of the United States, to such an amount and in such denominations as it thought expedient and proper. It was not doubted that such notes might be used as a circulating medium, and the government had either to use its own notes as such, or upon the credit of them, as in the war of 1812, borrow the notes of suspended banks at a ruinous sacrifice and loss, and use them in payment of its army and navy, and for the supplies which it needed. Wisely, it is believed, Congress determined to rely upon the means and credit of the nation, and do directly what was heretofore done indirectly, and the ruinous consequences of which were so eloquently depicted by Mr. Calhoun. The notes of the government, being thus to be used, and a lawful tender in payment of all debts due to the United States, were not the powers conferred upon Congress rendered more effectual by making them a legal tender in payment as well of private as of public debts? As a simple question of power, as already suggested, it is not apparent why Congress had not the same power to

Metropolitan Bank *v.* Van Dyck.

make them a legal tender in the one case as in the other. It was certainly never intended by the founders of the government that it was to have a currency for itself and a different one for the people.

The provision that all taxes should be uniform, is indicative of the idea that the currency of the country should be uniform also, and it is not believed that this important and express injunction of the Constitution can be observed unless the currency be uniform throughout the United States. The effect of making our own coins and foreign coins a legal tender in payment of debts, has been to make them of uniform value throughout the United States, and the same result is attained by making treasury notes a legal tender. That which is a legal payment to the soldier in the field, the laborer who toils for the government, or the farmer or mechanic who supplies it with the products of his farm or workshop, is equally available to them to discharge debts which they owe. If this were not so, it is plainly to be seen that the notes of the government must remain in the hands of those to whom they are first paid, or be parted with by them at great loss. To obviate all these inconveniences and difficulties, Congress has declared, when it authorized the issue of these notes, that they should be a legal tender as well for private as public debts, adopting this as a means to give full effect to the power it possessed of borrowing money, and to raise and support an army and navy, and to levy and collect taxes. It cannot be denied that the end sought to be attained is legitimate; that it is within the scope and spirit of the Constitution, and it is for Congress to select the appropriate means, and if they are adapted to the end and not prohibited, they are constitutional. It is not the province of the judiciary to say that the best means have not been adopted, or that those adopted were indispensable. The range of selection of means rests solely in the discretion of Congress, and if that discretion is unwisely exercised, the remedy is by a change of members of that body and a repeal of the law.

A similar principle has been declared by the courts of this State in an analogous case. By section 1 of article 1 of the

Constitution of this State, it is declared that corporations may be formed under general laws, and shall not be created by special act, except in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. By this provision of the Constitution it is left to the legislature to decide whether the objects of a corporation can be attained under a general law. It is well settled in this State that whether a special act, of incorporation is necessary or not, is a matter entirely for the judgment and discretion of the legislature, and that the courts have no power to review this action of the legislature. (*Mosher* v. *Hilton,* 15 Barb., 657; *United States Trust Co.* v. *Brady,* 20 Barb., 119; *People* v. *Bowen,* 30 Barb., 24.) These two last cases have been affirmed in this court. (21 N. Y., 517.)

It must certainly be conceded that the choice of means, in the present case, is more clearly legitimate than those selected by Congress in other instances, in the exercise of its delegated powers, and if such means were constitutional, it is not perceived why those adopted, in the act under consideration, will not stand the same test. We have seen that under the power to coin money and regulate the value thereof, Congress has, unquestioned, since the organization of the government, made the money so coined a legal tender in payment of all debts. So, under the clause to regulate the value of foreign coin, in like manner, it has made such foreign coin a legal tender. In pursuance of the authority to borrow money on the credit of the United States, it issued treasury notes and made them a legal tender in payment of all debts due the United States.

So, in virtue of the authority to pay the debts of the Union, it has been said by the Supreme Court, that Congress might lawfully give to all debts due to the United States a priority of payment over debts due to the States, or to any citizen. For instance, the Constitution confers on Congress the power to declare war. Now the word "declare" has several senses. It may mean to proclaim, or publish. But no person would imagine that this was the whole sense in which the word is used in this connection. It should be interpreted in the sense

in which the phrase is used among nations, when applied to such a subject matter. A power to declare war is a power to make and carry on war. It is not a mere power to make known an existing thing, but to give life and effect to the thing itself. (1 Story Const., § 428, and *Bas* v. *Tingey*, 4 Dall., 37.) And the true doctrine has been expressed by the Su preme Court : " If, from the imperfection of human language, there should be any serious doubts respecting the extent of any given power, the objects for which it was given, especially when those objects are expressed in the instrument itself, should have great influence in the construction." (*Gibbons* v. *Ogden*, 9 Wheat., 188, 189.) No power is given in express terms to Congress, to exact or require an oath from any officer of the government, or any security for the faithful discharge of the duties of an office. Yet we are well aware that such securities have been required by virtue of many acts of Congress, and in numerous instances have been enforced against the sureties. The power vested in Congress, may certainly be carried into execution without prescribing an oath of office. The power to exact this security for the faithful performance of duty is not given, nor is it indispensably necessary. All the powers delegated to Congress may be exercised without requiring an oath of office. It might be argued, with as much plausibility as other incidental powers have been assailed, that the Convention was not unmindful of this subject. The oath which might be exacted — that of fidelity to the Constitution — is presented, and it may be contended that no other can be required. Yet, he would be charged with insanity, who should contend that the legislature might not superadd to the oath, directed by the Constitution, such other oath of office as its wisdom might suggest. (*McCulloch* v. *Maryland*, *supra*.)

So with respect to the whole penal code of the United States. Whence arises the power to punish in cases not prescribed by the Constitution? All admit that the government may legitimately punish any violation of its laws, and yet this is not among the enumerated powers of Congress. The right

to enforce the observance of law, by punishing its infraction, might be denied with the more plausibility, because it is expressly given in some cases. Congress is empowered to provide for the punishment of counterfeiting the securities and coin of the United States, and to define and punish piracies and felonies committed on the high seas, and offences against the law of nations. The several powers of Congress may exist in a very imperfect state, to be sure, but they may exist and be carried into execution, although no punishment should be inflicted in cases where the right to punish is not expressly given. Take, for example, the power to establish post offices and post roads. This power is executed by the single act of making the establishment. But from this has been inferred the power and duty of carrying the mail along the post roads, from one post office to another. And from this implied power has again been inferred the right to punish those who steal letters from the post office, or rob the mail. It may be said with some plausibility, that the right to carry the mail and to punish those who rob it, is not indispensably necessary to the establishment of a post office and post road. The right is, indeed, essential to the beneficial exercise of the power, but not indispensably necessary to its existence. So of the punishment of stealing or falsifying a record or process of a court of the United States, or of perjury in such courts. To punish these offences is certainly conducive to the due administration of justice. But courts may exist and may decide the causes brought before them, though such crimes escape punishment. (Per MARSHALL, Chief Justice, in *McCulloch* v. *Maryland, supra.*)

The case of *The United States* v. *Marigold* (9 How., 560), is an important one upon the point now under discussion. In that case the prisoner was indicted and convicted of the crime of having brought into the United States false, forged and counterfeited coin, in the resemblance and similitude of the gold and silver coins of the United States coined at its mint, knowing the same to be false, forged and counterfeited, with intent to utter, publish and pass the same. This was in vio-

lation of the 20th section of the Crimes Act of 3d March, 1825. Justice DANIEL, in delivering the opinion of the court, says: "Congress are, by the Constitution, vested with the power to regulate commerce with foreign nations; and however, at periods of high excitement, an application of the terms 'to regulate commerce,' such as would embrace absolute prohibition, may have been questioned, yet, since the passage of the embargo and non-intercourse laws, and the repeated judicial sanctions those statutes have received, it can scarcely, at this day, be open to doubt, that every subject falling within the legitimate sphere of commercial regulation may be partially or wholly excluded, where either measure shall be demanded by the safety or by the important interests of the entire nation." He further says: "Whatever functions Congress are, by the Constitution, authorized to perform, they are, when the public good requires it, bound to perform; and on this principle, having emitted a circulating medium, a standard of value, indispensable for the purposes of the community and for the action of the government itself, they are accordingly authorized and bound in duty to prevent its debasement and expulsion." He also says: "We trace both the offence and the authority to punish it to the power given by the Constitution to coin money, and to the correspondent and necessary power and obligation to protect and to preserve in its purity this constitutional currency for the benefit of the nation. While we hold it a sound maxim that no powers should be conceded to the federal government, which cannot be regularly and legitimately found in the charter of its creation, we acknowledge equally the obligation to withhold from it no power or attribute which by the same charter has been declared necessary to the execution of expressly granted powers, and to the fulfillment of clear and well defined duties."

We think it has been demonstrated that, as Congress has the power to issue treasury notes on the credit of the United States, if it be necessary to render such notes effectual for the purposes for which they are issued that they should be made a legal tender in payment of all debts, Congress may, in its

discretion, adopt such means to carry out a delegated and conceded power. That such necessity existed to make the notes so issued, a legal tender, is evidenced by the action of the executive and legislative departments of the government.

It is no unimportant consideration, in support of the act of Congress making the government notes a legal tender in payment of private debts, that such tender insures uniformity in the currency, and puts all creditors on an equality. The soldier, who earns his dues by perilous services, and those who aid the government in furnishing it with labor or materials, are compelled to take this currency, and by this act it is available equally to them in discharge of their debts. Those whose patriotism leads them to serve or trust the government of the country, are not compelled to do so on any less advantageous terms than those who labor for or trust private citizens. If there is any hardship in receiving the notes of the nation, it falls equally on all, and if it be a contribution for the support and maintenance of our liberties, it is equally made by all in exact proportion to the means which each possesses.

Again, it is urged that this act of Congress is unconstitutional and void, as it impairs the obligation of contracts. To arrive at this result, it is argued that, as the bond and mortgage mentioned in the second action, were made before the passage of the act and, by their terms, the amount secured thereby was payable in lawful money of the United States, the obligation is impaired by something being made lawful money which was not such at the time the contract was made. In the bank cases, it does not distinctly appear when the bills, payment of which were demanded in gold and silver, were issued; but assuming that they were issued anterior to the passage of the act, then the same question is presented as that which arises upon the bond and mortgage.

While all must concede that legislation on the part of Congress which should, in effect, impair the obligation of a contract, would be unjust and to be deprecated, yet it is also apparent that there is no constitutional prohibition upon legislation of that character. The prohibition contained in the

Constitution is applicable only to the states. This point was expressly decided by Judge WASHINGTON, in *Evans* v. *Eaton* (1 Peters C. C. Rep., 322). He said there is nothing in the Constitution of the United States, which forbids Congress to pass laws violating the obligation of contracts, although such a power is denied to the states. Congress, in the exercise of its delegated powers, may unquestionably pass laws, the effect of which would undoubtedly be to impair or affect the validity of contracts. An act declaring war would annul a vast amount of contracts, based on a contemplated peace, yet the power to declare war by Congress is undoubted, and the effect its exercise would have on existing contracts could in no manner circumscribe or affect the exercise of the power.

The embargo acts, passed during the administration of Mr. Jefferson, not only impaired but destroyed numerous contracts, entered into upon the assumption that commercial relations were to continue uninterrupted, but the acts were adjudged to be constitutional on the ground that the power to make them was incidental to and a corollary from the right to regulate commerce. The bankrupt act of 1841 impaired the obligation of contracts in the most decided manner, yet the law was held to be constitutional under the general power granted to Congress. In *Matter of Kleim* (1 How. S. C., 277), Judge CATRON said that the reason why the power to pass bankrupt laws was given to Congress was to secure to the people of the United States, as one people, a uniform law by which a debtor might be discharged from the obligation of his contracts, and his future acquisitions exempted from his previous engagements; that the right of debtor and creditor equally entered into the mind of the framers of the Constitution. The great object was to deprive the states of the dangerous power to abolish debts. Few provisions of the Constitution have had more beneficial consequences than this, and the kindred inhibition on the States that they should pass no law impairing the obligation of contracts. In *Kunzler* v. *Kohaus* (5 Hill, 325), COWEN, J., in delivering the opinion of the court, says: "The directly granted power over bankruptcies, however, carries

the incidental authority to modify such obligation, so far as the modification may result from a legitimate exercise of the delegated power. Having satisfied myself that it is plenary, and with a single qualification, viz., uniformity, entirely equal to the power of parliament, I shall devote very little time to the inquiry.what that may be. No one will deny that parliament may modify and discharge the obligation of contracts in exercising the powers over bankrupts and their creditors. Such a power is, indeed, prohibited to the States." See also *Thompson* v. *Alger* (12 Metcalf, 442). It follows, therefore, that if Congress had the constitutional power to pass the act of February 25, 1862, it is not in conflict with the Constitution, and therefore void, for the reason that the effect of the act may be to impair the obligation of contracts.

But it is correctly argued that such is not the legitimate effect of the act, and that the obligation of no contract is, impaired by it. Take, for instance, the contract contained in the bond and mortgage—it is to pay the sum of $8,000 in lawful money of the United States. Now what was lawful money at the time the debt was payable or paid, or tender of payment made, if so used for such purpose, would be a compliance with or fulfillment of the terms of the contract. Such would seem to be the uniform current of decision, and such was the rule of law recognized at a very early period. In the case of *Faw* v. *Marteller* (2 Cranch, 20), where Faw had, in the year 1779 covenanted to pay as rent yearly, well and truly, the sum of twenty-six pounds, Virginia currency, which consisted at that time of paper money, but it was withdrawn from circulation by a law of 1781, and it was claimed that the sum contracted to be paid was paper money and not specie, on the ground that paper money was lawful currency when the debt was contracted. Chief Justice MARSHALL, in delivering the opinion of the Supreme Court, however, said : "This can only mean money current at the time the rents shall become payable. It cannot be contended that he could satisfy the terms of the lease by paying the rents in 1782 in paper currency." He further said : "The position, then, that the value of the

money at the time when the consideration for which it was to be paid was received, is the standard by which the contract is to be measured, is not a correct one."

*Dowmans* v. *Dowmans' Exrs.* (1 Wash. Virg. Rep., 26), was a suit on a bond for £53, payable in Virginia currency, to which the defendant pleaded a tender. The Court of Appeals of Virginia held that the tender must be money current at that time (that is, the time the tender is. made), otherwise it is not money at all. There was no paper money current as money in April, 1790, when this plea was offered, and the tender was held bad, although made in the currency named in the bond. In *Pong* v. *De Lindsay and others* (1 Dyer, 82 A.), in debt on bond for payment of £24 sterling, plea of tender: that at the time of the payment of said sum of money, certain money was current in England in the place of sterlings called pollards, viz., two pollards for one sterling, and that at the day aforesaid, the defendant tendered a moiety of said debt in pollards. The tender was held good, and the note of the case is, that if, at the time appointed for payment, a base money is current in lieu of sterling, tender at the time and place of that base money, is good, and the creditor can recover no other. A case is also cited from the year books (11 H. VII, 5 b.) where one is to pay at such a day five quarters of wheat; at the day of the contract they were worth fifty pounds, at the day of payment five pounds. The judgment shall be, that he recover five quarters of wheat or five pounds. And the defendant may deliver the wheat if he please, but the sum of money ought, of necessity, to be referred to the day of the payment.

Queen Elizabeth, in order to pay the royal army, which was maintained in Ireland for several years, to suppress the rebellion of Tyrone, caused a great quantity of mixed money, with the usual stamps of the arms of the crown and inscription of her royal style, to be coined in the tower of London, and transmitted that money to that kingdom, with a proclamation dated May 24, in the 43d year of her reign, by which she declared and established this mixed money, immediately after

the said proclamation, to be lawful and current money of the kingdom of Ireland, and expressly commanded that this money should be so used, accepted and reputed by all her subjects and others using any traffic or commerce within the kingdom. In April, before the proclamation was issued, when the pure coin of England was current in the kingdom of Ireland, one Brett, a merchant of Drogheda, bought certain goods of one Gilbert, in London, and became bound in an obligation in the penal sum of £200, on condition to pay to said Gilbert, his executors, &c., one hundred pounds sterling, current and lawful money of England, at which day, &c., Brett made a tender of the £100 in the mixed money of the new standard, in performance of the condition of the obligation; and the question before the council was on the petition of said Gilbert to the privy council in Ireland, whether the defendant Brett should now, upon the change or alteration of money within the kingdom, be compelled to pay the said one hundred pounds in other or better coin than in the mixed money, according to the rate and valuation of it, at the time of the tender. And inasmuch as the case related to the kingdom in general, and was also of great importance in consideration and reason of state, the Lord Deputy required the chief-judges (being of the privy council) to confer on and consider the case, and return to him their resolution touching it, who, on consideration of all the points, resolved that the tender of the one hundred pounds in mixed money was good and sufficient in the law to save the forfeiture of the bond, and that the defendant should not be obliged, at any time after, to pay any other money, in discharge of the debt, than this mixed money, according to the rate and valuation it had at the time of the tender; and, thereupon, it was resolved, by the privy council, among other things, that though at the time of the contract and obligation made in the present case, pure money of gold and silver was current within this kingdom (Ireland) where the place of payment was assigned, yet the mixed money being established in this kingdom before the day of payment, may well be tendered in the discharge of the said obligation,

and the obligee is bound to accept it; and if he refuses it and waits until the money be changed again, the obligor is not bound to pay other money or better substance; but it is sufficient, if he be always ready to pay the mixed money according to the rate for which they were current at the time of the tender; and this point was resolved, on consideration of two circumstances, viz.: the time and place of the payment, for the time is the future, viz.: that if the said Brett shall pay or cause to be paid £100 sterling, current money, &c., and therefore such money shall be paid, as shall be current at such future time; so that the time of payment, and not the time of the contract, shall be regarded (Davies Rep., page 28.) To the same point is the case of *Barrington* v. *Potter* (Dyer, 81 b., fol. 67.) After the fall and debasement of money, in 5 Ed. VI, debt was brought against executor of lessee for years, for rent arrears for two years, which fell due at Michaelmas term, 2 Ed. VI. The lease was dated on the 21st of November, in the thirty-first year of Henry VIII. At the time the rent fell due, the shillings, which at the time the action was brought were decried to 6d., were current at 12d. The defendant pleaded tender of the rent, at the days when it was due, in *pecüs monetæ, anglicæ vocat* shillings, and said that every shilling at the time of the tender was payable for 12d., but that plaintiff, nor any one for him, was ready to receive it, and concludes that he is *uncore prist* to pay the currency, *in dictis pecüs vocat* shillings *secundum ratum*, &c. The plaintiff demurred, but afterwards accepted the money *secundum ratum predictum*, without costs or damages. If money be made current by proclamation, at a higher rate than its intrinsic value, a tender in such money, according to its current value, is good. If a foreign coin be made current in this kingdom by proclamation, a tender in such money is good, for it thereby becomes a lawful money of the kingdom. (Bacon Ab., Tender, b. 2, vol. 7, p. 325.) An obligation to payment generally is discharged by a payment in legal currency. (Per MARSHALL, Ch. J., in *United States* v. *Robertson*, 5 Peters, 644.)

In *James* v. *Stull* (9 Barb., 482; affirmed in the Court of

Appeals in 1852), it was held that where a mortgagor author-ized the mortgagee, in case of default, to proceed and sell the mortgaged premises "according to law," it means the law in existence at the time of sale, not that in existence at the date of the mortgage, and that a law, passed after the date of the mortgage, prescribing a shorter time of sale than that existing at the date of the mortgage, was not repugnant to the Consti-tution of the United States, as impairing the obligation of contracts. (See also *Conkey* v. *Hart*, 4 Kern., 22; *Mason* v. *Haile*, 12 Wheat., 370.)

We have arrived, therefore, at the conclusion, that the act of Congress under consideration is not obnoxious to the impu-tation, that it impairs the obligation of contracts. The notes of the respondents, and the bond and mortgage, were each payable in lawful money of the United States, and we have seen by a uniform current of authority that what is lawful money at the time of payment, or at the time of tender of payment, is the lawful money, intended and referred to in the obligation. Such money, thus lawful at the time of payment or tender, can be used to discharge the obligation. It has universally been so held, in all cases, where the coin has been debased or changed intermediate the date of the contracts and the time of payment.

Take the case, so forcibly put by one of the learned coun-sel in this case. It was contended that the bond stipulated for so much gold. It however speaks of a repayment of $8,000 of lawful money of the United States. Let the theory be tested. If a debt was owing of one thousand dollars, and the debtor tendered to his creditor, in payment of this sum ninety-four eagles, struck and coined before 1834, which, as to quantity and value of gold contained in them are equal to one hundred eagles struck and coined after 1834, would this be a legal or lawful tender? If the sufficiency of the tender consists in the fact of the amount of gold tendered, it certainly would, but if it is to be determined by the amount of lawful money, it clearly would not. The court must hold that the debtor contracted to pay the one thousand dollars, lawful

money of the United States, and that such obligation is not discharged by the payment of $940 in gold, though those pieces tendered might contain the same amount and value of gold, as one thousand dollars of lawful money, in coin, contains.

It is the lawful money of the United States, made such by its authority, that can only be effectually used, in payment of debts, without reference to the intrinsic value of the thing tendered or paid. It cannot but be a matter of congratulation that our government, when it had a rebellion to put down, far more formidable than that of Tyrone, in Ireland, instead of imitating the bad example of the British government, by debasing the coin, and issuing mixed money, and making it a legal currency, availed itself of its constitutional right, of issuing money on the faith and credit of the nation, for the redemption of which the whole property thereof is pledged. Such money will ultimately be redeemed by the precious metals on the resumption of specie payments, a day not far distant, we may hope, if we read correctly the auspicious indications of the times..

We have endeavored to bring to the consideration of the question presented in these cases, all the deliberation and care, which its great importance demanded. It has appeared to us, that the great principles which control them have long been settled by the Supreme Court of the United States, and that applying those doctrines to the cases under consideration, the result is inevitable, and not doubtful. Our aid has been invoked, to declare unconstitutional and void, an act of the Congress of the United States, passed after grave deliberation, with the concurrence of some of the most eminent men of the country, passed in a crisis of our national affairs when it was deemed by the legislative and executive departments of the government vital to our national existence. No tribunal can approach such a question without a deep sense of its importance and of the grave responsibility involved in its decision. We must not fail to reflect upon the universality of the rule, that whenever the constitutionality of a law of Con-

gress or of a state legislature is involved, the legal presumption exists in favor of its validity. There is this distinction to be made in considering an act passed by the legislature of the State, and one passed by the Congress of the United States. In reference to a state law, the question of its constitutionality depends upon whether the act falls within any of the express or implied prohibitions of either the state or national Constitutions. In passing upon the constitutionality of an act of Congress, the question is, whether the act is embraced within any of the great powers expressly granted to Congress, or may be included among the more numerous and incidental powers, and the means which are legitimate and appropriate to carry these powers into execution. But in both classes of cases, the obvious and natural intendment must be indulged in favor of the law arising from the fact that it has received the approval both of the legislative and executive departments of the government, the departments charged with the duty of making laws, the incumbents of which have given their sanction to the law, acting under a sense of their official responsibility and the obligations of an oath to support the Constitution. It is, therefore, a well settled rule, prescribed in adjudged cases, for the action of the courts, that a law which has been regularly enacted, must not be set aside by the judiciary rashly, or inconsiderately, or for light causes, or because they may have doubts of its wisdom or necessity, that every doubtful question is to be thrown in favor of the law, and that it can only be adjudged void when its repugnancy to the Constitution is plain and clear. (*Morris* v. *The People*, 3 Denio, 381; *Ex parte McCollom*, 1 Cowen, 564; *Fletcher* v. *Peck*, 6 Cranch, 87; *Ogden* v. *Sanders*, 12 Wheat., 29; *Adams* v. *Howe*, 14 Mass., 345.)

Chief Justice SAVAGE, in *Ex parte McCollom* (*supra*), says: "Before the court will deem it their duty to declare an act of the legislature unconstitutional, a case must be presented in which there can be no rational doubt." And Chief Justice MARSHALL, in *Fletcher* v. *Peck* (*supra*), said: "It is not on slight implication and vague conjecture, that the legislature

is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such, that the judge feels a clear and strong conviction of their incompatibility with each other." Judge LOTT, in the case of *Morris* v. *The People* (*supra*), said: "The presumption is always in favor of the validity of a law, if the contrary is not clearly demonstrated." PARKER, Ch. J., · in *Adams* v. *Howe* (*supra*), said: "We must premise, that so much respect is due to any legislative act, solemnly passed and admitted into the statute book, that a court of law, which may be called upon to decide its validity, will pronounce it to · be constitutional, unless the contrary clearly appears. So that in any case, substantially doubtful, the law will have its force. The legislature is, in the first instance, the judge of its own constitutional powers, and it is only when manifest assumption of authority or misapprehension of it, shall appear, that the judicial power will refuse to execute it. Whenever such a case happens, it is among the most important duties of the judicial power, to declare the invalidity of an act so passed." A legislative act is not to be declared void upon a mere conflict of interpretation between the legislative and judicial powers. Before proceeding to annul by judicial sentence what has been enacted by the law-making power, it should clearly appear that the act cannot be supported by any reasonable intendment or allowable presumptions. (*People* v. *Supervisors* · *of Orange*, 17 N. Y.; 235.)

It is urged by the counsel for the appellant, in the first above entitled cause that, as the Constitution of this State declares that the legislature shall provide by law for the registry of all bills and notes, issued or put in circulation as money, and shall require ample security for the redemption of the same in specie (sec. 6 of art. 8), it is not lawful to redeem the same in anything else than specie. A complete answer to this argument is, that the legislature have never acted under this injunction of the Constitution. As already observed, the provision of law in this state is, that the bills of the banking associations are to be redeemed in lawful money of the United

States, and if the same are redeemed, or offered to be redeemed, in such lawful money, the bank superintendent has no authority conferred upon him by law, to sell the securities deposited with him.   The legislature have never authorized him to sell the securities so deposited, in the event of any banking association refusing to redeem its bills in specie.   It is only in the event of their refusal to redeem in lawful money of the United States, that he is authorized to proceed and sell the securities. If the views hereinbefore stated are sound, it follows, that neither of the respondents in the first above entitled cause has refused to redeem its bills in the lawful money of the United States, and that therefore the bank superintendent has been properly restrained from proceeding to sell the securities of the respondents deposited with him.

For the reasons already stated I arrive at the clear conviction that Congress, under the authority conferred upon it to borrow money on the credit of the United States, had the authority to make the treasury notes of the government, issued for such a purpose, a legal tender, as well in payment of debts due to the United States, as those of a private nature.   I do not wish to be understood as intimating that the same thing could not be done by virtue of the authority conferred upon Congress to levy and collect taxes, duties, imposts and excises; to regulate the commerce of the Union; to coin money and regulate the value thereof and of foreign coin; to raise and support armies, and to provide and maintain a navy; to fulfill the guarantee of the Constitution that each State shall ever have a republican form of government, and shall be protected against invasion and domestic violence, and to enable Congress to discharge the solemn and imperative duty resting upon it, to make all laws necessary and proper for carrying into execution the high trust devolved upon the President, to preserve, protect and defend the Constitution of the United States, and to provide for and furnish him with all the means necessary for that purpose.   It is sufficient for the present discussion, that the power which has been exercised by Congress is believed

to be authorized by the Constitution, and arriving at that result, the cases under review are disposed of.

If my brethren concur in these views, the judgment in the first above entitled cause will be affirmed, with costs, and the judgment in the second above entitled cause will be reversed, and judgment given for the plaintiff with costs, and that the defendant therein deliver up the bond and mortgage mentioned in the case submitted, and acknowledge satisfaction thereof, and discharge the same of record.

BALCOM, J.   The notes tendered were issued under and by virtue of the act of Congress approved February 25, 1862 (Laws of U. S., vol. 12, p. 345), which authorized the Secretary of the Treasury of the United States to issue, on the credit of the United States, $150,000,000 of United States notes, not bearing interest, payable to bearer, at the treasury of the United States, in denominations not less than five dollars; and the act declares that such notes "shall be lawful money, and a legal tender in payment of all debts, public and private, within the United States," except duties on imports and interest on certain bonds of the United States.

The principal point made by the defendant's counsel is, that Congress had no authority to pass this act; and the principal questions in the case are, whether Congress has power to make anything but gold and silver coin a tender in payment of debts, or to pass any law impairing the obligation of contracts.

I agree that Congress does not possess this power, if it is not conferred upon it by the Constitution of the United States; for whatever power or authority it has is granted to it by that instrument.

The Constitution expressly confers power upon Congress "to borrow money on the credit of the United States;" "to coin money, regulate the value thereof and of foreign coin;" "to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water;" "to raise and support armies;" "to provide and maintain a navy;" "to lay and collect taxes, duties, imposts and excises, to pay the

debts and provide for the common defence and general welfare of the United States;" "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes;" "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions;" and "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or officer thereof." (Const., art. 1, § 1.) It declares that "the United States shall guarantee *to every State in this Union a republican form of government*, and shall protect each of them against invasion." (Art. 4, § 4.) Also, that "this Constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land, and the judges in every State shall be bound thereby; anything in the constitution or laws of any State to the contrary notwithstanding." (Art. 6, sub. 2.)

The Constitution authorizes the formation or erection of new States within the jurisdiction of others; and also the formation of new States by the junction of two or more States or parts of States, by the consent of the legislatures of the States concerned as well as of the Congress. (Art. 4, § 3.) All the States (subject only to this exception) must forever remain in the Union in the same shape they were admitted. No right of secession is reserved to any State, or its citizens, by the Constitution, and none can be implied or spelled out from its provisions or history, or by the application of any principle of public law. The Union is indissoluble, except by an amendment of the Constitution, or its abrogation, in a legal manner.

The doctrine, that the Federal Constitution is but a compact between the States, and that any State can lawfully withdraw from the Union by a legislative act of such State, or a resolution of a convention of its people, needs no special notice. It is almost as absurd as the idea that the Constitution of a State is a mere compact between counties, and that a county can

secede from the State Government at the pleasure of the inhabitants of such county.

I have enumerated but a small number of the powers specifically granted to Congress and the Government of the United States by the Constitution. But I have mentioned enough to show that the Constitution provides a strong Government, which has the right of self-preservation against all unlawful combinations or revolutionary proceedings for its overthrow. And no one can doubt that an army and navy, as well as the militia of the several States, are lawful and constitutional means, when others are insufficient, for putting down a rebellion and preserving the Union. The authority to call forth the militia to execute the laws of the Union, suppress insurrections and repel invasions, implies no prohibition against employing the army and navy for such purposes; nor does it imply that the militia cannot be used for suppressing a rebellion as well as a mere insurrection. A contrary doctrine would make the government of the United States almost as feeble as the old Confederation was, which was abandoned by reason of its weakness.

These views are entirely consistent with all legitimate State rights. They only make such rights subordinate to certain great powers that the people granted to Congress and the national government, by the adoption of the Constitution of the United States, in order to form a more perfect union, establish justice, ensure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to themselves and their posterity. (Preamble to Const.)

No State can coin money; emit bills of credit; make anything but gold and silver coin a tender in payment of debts; or pass any law impairing the obligation of contracts. (Art. 1, § 10, sub. 1.) But Congress is not prohibited from doing either of these things, although it is prohibited, as well as the States, from passing any bill of attainder or *ex post facto* law, or granting any title of nobility. (Art. 1, §§ 9, 10.)

The colonies commenced, as early as 1703, to make their

notes a legal tender (see *Briscoe* v. *The Bank of Kentucky*, 11 Peters, 333–338); and there is some authority for saying that tobacco in one colony, and beaver skins in another, were once declared to be such a tender.

Some of the states, under the confederation, made their notes or bills of credit a tender in payment of debts. But such notes or bills of credit were of little value out of the particular state that issued them. (See Story on the Con., § 1371–1372.)

The fair inference from these facts is, that the states were prohibited by the Constitution from emitting bills of credit, or making anything but gold and silver coin a tender in pay· ment of debts, and from coining money, in order to rid the country of every circulating medium or currency which had no intrinsic or legal value beyond the lines of the states that authorized it; and so Congress would provide money, or a currency, that would be of value throughout the Union. And to enable Congress to provide such a circulating medium, for all ordinary purposes, the power was expressly conferred, "to coin money, regulate the value thereof and of foreign coins."

The Constitution does not declare, in so many words, that Congress may prescribe what shall be a tender in payment of debts; but this power is included in those expressly conferred, and especially in the authority "to make all laws which shall be necessary and proper for carrying into execution" the powers enumerated in the Constitution, and the other powers vested by it "in the government of the United States, or in any department or officer thereof." And Congress has exercised such power, in respect to metallic money, from the organization of the government; and that it has rightfully exercised this power, in respect to such money, is not questioned. But has Congress authority to make anything but gold and silver coin such a tender? The inference is very strong that, if the people had intended to deprive Congress of the power to do such an act, they would have expressly prohibited it, as well as the states, from making anything but gold and silver coin such a tender.

The trying times of the revolutionary struggle had taught them the evils as well as the temporary benefits that flow from the use of paper money ; and if they had intended to deprive Congress of the power of making bills of credit or government notes a legal tender at any future time, it is highly probable they would have expressly inhibited such acts in the Constitution. The sagacious statesmen who framed the Constitution probably believed the United States would be one government under that instrument, until the States should contain hundreds of millions of inhabitants; and that there might be times and emergencies when there would not be sufficient gold and silver money for the maintenance of the government and the carrying on of the commercial and other dealings of the people; and that, in certain exigencies, it might be necessary and proper for Congress to make something besides such money a tender in payment of debts in order to carry into execution some of the powers expressly granted to Congress by the Constitution, and therefore omitted to prohibit Congress from doing such an act. This probability is strengthened by the limited amount of the precious metals which had been discovered when the Constitution was framed. And it is much easier to believe, the authors of the Constitution foresaw the certain increase of population in the United States and acted in reference thereto in shaping that instrument, than that they anticipated the discovery of such inexhaustible mines of gold and silver, as would at all times prevent any necessity for a paper currency.

The fact that there is no clause in the Constitution declaring, in so many words, that Congress may make anything besides gold and silver coin a tender in payment of debts, falls far short of establishing that Congress can make nothing but such coin such a tender; for it is very clear that Congress may make something besides such coin a legal tender, whenever necessary and proper for carrying into execution any power that is expressly granted to Congress by the Constitution. But whether there was a necessity for such an act, at the time the one in question was passed, requires consideration.

When this act was passed, the legislatures and conventions in nine States of the Union had adopted pretended ordinances of secession from the Union; and a large portion of the inhabitants of such States, if not a majority of them, were in open rebellion against the government of the United States, and at least three hundred thousand of them were armed and doing all they possibly could to overthrow such government; and their numbers were rapidly increasing.

So formidable a rebellion had never been known; and the means to be provided for its suppression were necessarily greater than any government, ancient or modern, had ever furnished suddenly for any purpose. It forebode the greatest and bloodiest civil war the world has ever seen. The very existence of the Union was imperiled and at stake; and the question that agitated all minds was, can the federal government be maintained, or must it be overthrown by the wickedest and most groundless rebellion ever organized in any age or country.

These facts show that a navy of unprecedented magnitude and an army of at least half a million of soldiers, besides the militia of the several States, were necessary to preserve the government, maintain the Constitution, and execute the laws of the Union.

Congress had the authority, and it was its duty, to provide and maintain such a navy—to raise and support such an army, and to provide for calling forth the militia. But such a navy could not be provided and maintained, or such an army raised and supported, and the expense of calling forth and supporting the militia defrayed, without adequate pecuniary means, and without the expenditure of vastly more money than could have been borrowed in coin in the entire world.

Could Congress have been justified, by the Constitution, if it had permitted the Republic to be overthrown, because enough gold and silver coin could not be borrowed to save it? I answer no; and it seems to me every person must answer this interrogatory the same way who concedes that the national government possesses the right of self preservation.

The Constitution plainly required Congress to pass all laws which were necessary and proper for raising, maintaining and supporting a navy and armies, large enough and powerful enough to put down the rebellion, and preserve the Union and the Constitution. And when Congress could not do all this without making the notes of the United States a legal tender in payment of private, as well as public debts, it was its duty to do that, even though the act impaired the obligation of contracts.

It seems to me to be very plain, that the Constitution authorizes Congress to pass such a law whenever necessary and proper for raising, maintaining and supporting a navy and armies to maintain the Union, preserve the Constitution and execute the laws of the United States. And the Supreme Court of the United States has decided, in *McCulloch* v. *The State of Maryland* (4 Wheat., 316), that the word necessary, in this connection, may mean needful, requisite, essential, or conducive to.

Whether the act in question was necessary and proper at the time it was passed, was for Congress to determine. But I do not doubt that it judged correctly and wisely when it determined this act was necessary and proper in view of the then existing condition of our national affairs. That it judged wisely in passing this act the astonishing success that has attended its execution fully proves. No nation has ever succeeded so well financially, in any great war, as the United States have in this, by reason of this law. All loyal citizens have prospered pecuniarily from the time it was passed. Such a thing as pecuniary distress, in the loyal states, on account of the war, or by reason of the financial measures of the government, has not been heard of.

Without this law there must have been the most terrible distress throughout the land. We should have had the most frightful intestine commotions; anarchy would have taken the place of law and order in our cities and most populous towns. And it is probable the republic itself would have been subverted ere now, or have become too weak to be respected by other nations, if this law had not been passed.

I cannot doubt, as the states only are prohibited by the Constitution from making anything but gold and silver coin a tender in payment of debts, or from passing any law impairing the obligation of contracts, that Congress may enact that the notes of the United States shall be a legal tender in payment of debts, and designate such notes lawful money, and also pass laws impairing the obligation of contracts, whenever such laws are necessary and proper for carrying into execution any of the powers expressly conferred upon Congress, or vested in the government of the United States by the Constitution. And as this act was necessary and proper for carrying into execution powers expressly granted to Congress by the Constitution, to wit, the powers to borrow money, to raise and support armies, to provide and maintain a navy, to provide for calling forth the militia to execute the laws of the Union and suppress insurrections, Congress had power to pass it.

This act is constitutional, because it is a means of carrying into execution the power conferred upon Congress, "to borrow money on the credit of the United States." It provides for the conversion of the notes, issued under it, into bonds of the United States, which are to be paid in coin with interest at six per cent. (U. S. Statutes at Large, vol. 12, p. 345.)

That Congress could pass this act, as a means of carrying into execution the power to borrow money, may properly be inferred from the reasoning of the judges of the federal court, who delivered the opinions in *McCulloch* v. *The State of Maryland (supra)*, and *The People, ex rel. The Bank of Commerce*, v. *The Commissioners of Taxes of the City of New York* (2 Black's U. S. Rep., 620.)

It is not probable such an act as this will ever be deemed necessary or proper in time of peace; and the one in question will undoubtedly be repealed, and the notes under it called in, and a metallic currency restored, as soon after the present rebellion shall have been suppressed, as the interest of the people shall require, or as such a course will conduce to the general welfare.

If this act impairs the obligation of contracts, it is, never-

theless, valid; for Congress may pass laws, having that effect, whenever necessary and proper to carry into execution any power specifically conferred upon that branch of the government. Declarations of war and embargo acts impair the obligation of innumerable contracts; yet they are constitutional. (2 Story on the Con., §§ 1289–1293.)

I will not say this law could not be sustained on the broad ground that the government of the United States has the right of self-preservation, and that it was necessary for that purpose. Nor shall I hold that Congress was not authorized to pass it, by virtue of the power granted to it to coin money and regulate the value thereof. A very able argument has been made by one of the defendant's counsel, to show that this power authorized the passage of this law, in which he quotes from Blackstone, that "money is an universal medium, or common standard, by comparison with which the value of all merchandise may be ascertained; or it is a sign which represents the respective values of all commodities." (1 Blk. Com., 276.) But it is unnecessary to determine these questions and I will not express any opinion respecting them.

This act is not an ex post facto law. For it is well settled that the phrase "ex post facto laws," is not applicable to civil laws, but only to penal and criminal laws. (Watson v. Mercer, 8 Peters' Rep., 89.)

It can hardly be said that this act impairs the obligation of contracts, though it compels creditors to receive notes of the United States in payment of debts which they might have exacted in gold and silver coin if this law had not been passed. It certainly is not in conflict with the constitutional inhibition against depriving persons of property without due process of law. (Amend. Con., art. 5.) It does not deprive any person of property, for it makes the notes issued under it as valuable as gold coin, in the hands of every person receiving them, for all commercial purposes, and for the payment of all debts, except those for duties on imports; and this exception is too insignificant to justify a holding that the act deprives persons of property in any legal sense of the term. I of

course lay out of view the difference created by brokers and speculators between the value of gold coin and such notes, as having no legitimate bearing upon the question.   That difference cannot be regarded, because it is not recognized by law; and all agreements to pay any such difference are utterly void.

A judgment cannot be recovered for more than one thousand dollars, besides interest, for the wrongful conversion of one thousand gold dollars, whatever premium may be paid therefor at the board of brokers in the city of New York or elsewhere; and such a judgment may be paid, dollar for dollar, in notes of the United States.

Each five dollar note, issued under this act, is precisely of the same value, in legal contemplation, as a piece of gold coin of the denomination of five dollars; and if all citizens would strictly observe this law, as they should, any person could obtain five dollars in gold coin for one of these notes at any place where such coin is to be had.

If a promissory note should now be given for one hundred dollars, for a loan of twenty of these notes, and this law should be repealed before the repayment of such loan, the person making the loan could exact one hundred dollars and interest, in gold and silver coin, in satisfaction of the debt.

This law must be judged as if every person lived up to it, and had full faith in the ability and willingness of the federal government to pay these notes in coin, and to maintain itself under all conceivable circumstances; and when it is judged in this manner, it does not deprive any person of property in any legal sense of the term.

I have not deemed it either necessary or expedient to go into the history of the Constitution, or to refer to the debates of the convention that framed it; or to cite many authorities to sustain the foregoing positions or conclusions.   They seem to me to be so clearly correct, and so well grounded in good sense, that such labor is wholly unnecessary.   I will, however, remark, that there is nothing in the history of the Constitution, or in the debates of the convention that framed it, or in any book of authority, in conflict with the views and conclusions

I have expressed. For these reasons I am of the opinion the act of Congress, approved February 25, 1862, is not repugnant to any provision of the Constitution of the United States, and is valid.

It follows that the judgment of the Supreme Court in the first case should be affirmed, and that in the second should be reversed, and one given for the plaintiff, declaring that the notes of the United States, issued under such act, were and are a legal tender in payment of the defendant's bond and mortgage, and that he deliver the same to the plaintiff to be canceled, and acknowledge satisfaction of the mortgage, and cancel the same of record, and that the plaintiff recover the costs of the appeal to this court.

WRIGHT, J. There are minor questions in each case; but the paramount one, common to and decisive of both cases is, the power of Congress of the United States to enact the law of the 25th February, 1862. That act declared, in terms, that the notes issued should be lawful money and a legal tender in payment of all debts, public and private, except duties on imports and interest on United States securities. If Congress could authorize the issue of the notes with the properties imparted to them by the law, it conclusively determines the cases against the defendants. The obligation of the banks was to redeem their circulating notes in "the lawful money of the United States," and if the United States notes were such lawful money, and a legal tender in payment and discharge of the mortgagee's debt, in the second case, the mortgagee was not entitled to recover the difference between the market value of the notes and gold coin.

The government of the United States, as it need hardly again be repeated, is one of enumerated powers. Its powers are also limited, but within their scope and its sphere of action, it is supreme. Emanating from the people, all the powers granted are to be exercised directly upon them, and no state, as such, can control its operations. The government was, also, meant to be perpetual, and the powers with which it

was invested were admirably fitted to maintain, preserve and defend the national existence. All the attributes of sovereignty to be exercised by a nation, in peace or in war, for insuring domestic · tranquillity, providing for the common defence, promoting the general welfare, and securing the blessings of liberty forever, were expressly or impliedly granted in the great ordinance of government. Manifestly the framers of the Constitution, and the people who adopted it, did not put forth the instrument, in the language of Chief Justice MARSHALL, as a "splendid bauble," but as a governmental creation, efficiently endowed with all the powers and capacities to effect the ends and purposes of its being. In a general sense, the government thus created does not possess an omnipotence equal to that of the parliament of Great Britain; but in respect of all the subjects of legislation, specifically enumerated and necessarily implied (where there is no express prohibition or restriction upon its exercise) complete sovereign legislative power was designed to be and is conferred upon Congress; and that body, I think, possesses an omnipotence in these things equal to that possessed by the British parliament, or any other supreme legislative body. The powers expressly conferred in order to constitute and perpetuate the nation are unlimited in every particular.

Among the specified powers are these: 1st. To lay and collect taxes, duties, imposts and excises to pay the debts and provide for the common defence and general welfare of the United States; 2d. To borrow money on the credit of the United States; 3d. To regulate commerce with foreign nations, and among the several states; 4th. To coin money, regulate the value thereof, and of foreign coin; 5th. To provide for the punishment of counterfeiting the securities and current coin of the United States; 6th. To declare war; 7th. To raise and support armies; 8th. To provide and maintain a navy; 9th. To suppress insurrections and repel invasions. These are substantive powers, and if the Constitution were silent on the subject, the power of Congress to carry them into execution would be necessarily implied. When the power is given, in

general terms, to lay and collect taxes, to borrow money, to regulate commerce, to coin money and regulate the value thereof, and to support and maintain armies and navies, it involves the incidental legislative power of adopting and selecting the means and measures to carry into execution the specific power. · But the instrument itself removes all doubt on the subject. Following an enumeration of the substantive powers, is an express grant of authority to make all laws which shall be necessary and proper for carrying the enumerated powers into execution. (U. S. Const., art. 1, § 8.) The specific power is conferred, and the mode of executing or giving effect to it intrusted to Congress. The measure of the legislative authority is not restricted to an enactment indispensably requisite to carrying the specified power into execution, but extends to things that conduce to its exercise. Congress possesses the choice of means of legislation, and may use any means which are, in fact, conducive to the exercise of the power granted. If the means are appropriate and adapted to the end, and are not repugnant to the Constitution itself, they are not invalid. The question whether a thing is necessary and proper under a specific power, or whether it is necessary and proper to execute a specific power, in respect of which there may be a choice of modes and means, in a particular manner, is primarily to be determined by Congress. Possessing an uncontrolled right of selection, and the presumption being that the selection will be made in good faith and with reference to the public exigencies, and not for purposes of usurpation, the exercise of the legislative judgment will not be interfered with, unless it is plain and clear that the means chosen are prohibited or do not consist with the letter and spirit of the Constitution. Whether the means are appropriate or adapted to the end is a fact, and if it be an appropriate measure, not prohibited, the degree of its necessity is a question of legislative discretion, not of judicial cognizance. It is not for the judiciary to determine whether a law of Congress has a direct relation as a means to the execution of an enumerated power. If, in any sense, or in any degree, the

means employed are appropriate or conducive to the exercise of the power—if there be any possible relation of the means to the end—the judiciary is limited to the inquiry whether the use of such means is repugnant to any provisions of the Constitution itself. The judicial department of the government cannot declare that, because, to the judicial mind, Congress, in the execution of a specified power, seems to have employed means not having a direct, but a circuitous, remote and indirect relation to the end of such power, its act is constitutionally invalid. These are the views, in substance, of the federal judiciary. In the case of *The United States* v. *Fisher* (2 Cranch, 358), a law of Congress gave to certain debts due to the United States the preference over all other debts, whether due to the states or individuals. It was claimed that the law was unconstitutional; that the authority to pass it was not expressly given to Congress by the Constitution; that it was not incidental, and that there was a seeming injustice in giving the preference as against the states and individuals in the states. The same argument was substantially urged, as in one of the present cases, that the effect of the law was to impair the obligation of contracts. But Chief Justice MARSHALL said: "Congress must possess the choice of means, and must be empowered to use any means, which are in fact conducive to the exercise of a power granted by the Constitution. The government is to pay the debts of the Union, and must be authorized to use the means which appear to itself most eligible to effect that object." It would be difficult to show how an act giving a preference to certain United States debts over other debts due to states or individuals, bears a direct relation, as a means, to the execution of the power to pay the debts of the Union. The fact is apparent that it was using means to enable Congress to exercise the power of paying the debts of the nation; but there was no direct, obvious relation of the means to the object to be accomplished. Indirectly, the act conduced to the execution of the power. In *McCulloch* v. *The State of Maryland* (4 Wheat., 316), it was held that an act incorporating a bank, was a law made in pursuance of

the Constitution. It was not within any of the enumerated powers. There was no direct relation as of means to an end in the creation of a bank and paying the debts of the government. Creating a corporation put nothing into the treasury. It was no exercise of the taxing power; nor was the government, in any degree, enabled thereby to pay the public debt. All that can be said is, that it furnished the government with a convenient, and, as Congress adjudged, an appropriate instrument, to be used by its executive officers in the collection and disbursement of the public revenues. The creation of a bank was the use of means that were, in a constitutional sense, "necessary and proper," not because a bank stood in the direct relation of means to the ends of collecting the revenue and paying the public debts; but because it was an appropriate instrument, in the judgment of Congress, capable of being advantageously employed in the exercise of those constitutional powers. It was in the sense of an executive agent of the government, that the bank, as a means, conduced to an effectual execution of the power of collecting the revenues and paying the debts of the nation. In the case of *The People, ex rel. The Bank of the Commonwealth,* v. *The Commissioners of Taxes,* the Supreme Court of the United States, at its recent term, held a law of Congress valid which exempted the securities of the United States from taxation under State authority. Such a law could only have been adjudged necessary and proper in the execution of the specific power to borrow money on the national credit. There was no direct relation as means between exempting United States securities from state taxation, and borrowing money on the credit of the United States. But there is no difficulty in perceiving how such an exemption would conduce, indirectly, to an effectual execution of the power. The government goes into the market to borrow money to meet the public exigencies and tenders securities exempt from state taxation. Can there be any doubt that such exemption strengthens the public credit, and imparts an increased value to the security? A bond or note of the government is certainly more valuable, and sold

in the market, would put more money in the national treasury, if exempted from State taxation, than if subject to the taxing power of the States. Thus the exemption, as a means, indirectly conduces to an effectual execution of the borrowing power.

In *United States* v. *Marigold* (9 Howard, 560), the only question involved was, whether Congress could pass a law making it criminal to import spurious coin. The court held that the power existed, and that it was derived from the power to coin money and regulate its value. No argument can be adduced to show that punishing the importation of spurious coin is a means having a direct relation to the end of "coining money and regulating its value."

In executing, therefore, the powers specifically conferred, the government may use all appropriate means, that directly or indirectly conduce to their effectual exercise, unless such means are forbidden by the Constitution itself. It can make no difference, even if the indirect effect of the means, employed to carry into execution a specific power, be to impair the obligation of private contracts. Guided by these rules, the act in question is to be considered and construed.

We are not to close our eyes to the fact that when the law now alleged, in some of its particulars, to be unconstitutional, was passed, a rebellion and civil war existed of such proportions and magnitude as to threaten the destruction of the national government. The exigency demanded the prompt and efficient exercise of all the important and vital functions of that government in maintaining and preserving it. Armies were to be raised and supported, and navies equipped. It was not only within the express power, but the duty of Congress to provide the ways and means for suppressing the widely extended insurrection; and that body would have been recreant to the important trusts confided to it, had it failed to employ all constitutional measures in the attainment of the end. But money was required to raise and support armies, maintain navies, and provide the munitions of war. The money in the treasury, and the ordinary revenues of the

government were utterly inadequate. The imminent nature of the crisis rendered a resort to direct taxation to supply the necessary resources impracticable. The only recourse left was to resort to the borrowing power. Money was to be obtained to meet the wants of the government, if at all, on its credit; and to this power, in the emergency, Congress resorted. It is conceded that Congress had a perfect right to authorize the issue of treasury notes as a mode of borrowing money, and that, indeed, all the provisions of the law of February, 1862, are admitted to be constitutional, except the clause imparting to the notes the quality of money, and making them a legal tender. And why not this, if it would aid or conduce to the effectual exercise of the constitutional powers to borrow money, collect the internal revenue, or pay the public debts, and, as a means, is not prohibited? The government must raise money by borrowing. It requires no argument to prove that any means that strengthen the national credit, and inspire public confidence in its securities, will enable it to borrow more readily, and on more advantageous terms; and if so, the government may use them in effecting the object. It may borrow on its bonds or notes, bearing interest, and payable at a future period; and I know nothing to hinder its borrowing on notes payable on demand, without interest, and with the qualities of a circulating medium attached to them. Pursuing the first mode, the government is driven to dispose of its securities in the market, at rates corresponding with the confidence, at a particular juncture, felt in its credit by capitalists. In the latter way, it is emphatically a popular loan—the whole public are lenders. The individual who holds a legal tender note, is in effect a lender to the government to its amount, whilst an additional value is imparted to it as a security, from the fact that it is endowed with the properties of money. In either mode of borrowing, it is essential to the effectual execution of the power that the security should be made ample; and if by endowing the treasury note with the function of money, that end is attained, it is a means that may be resorted to by the government. It cannot be, that in carrying into

execution the power to borrow money on the credit of the government, means not forbidden by some provision of the constitution, which elevate its credit, preserve confidence in its securities, and make them equivalent to and perform the function of money in effecting exchanges of property, are not within the measure of the legislative authority of Congress. It follows as an inexorable result, that the higher the confidence in the public credit and the more valuable government securities are made, the more promptly and effectually may the borrowing power be exerted. If, as a means of borrowing, notes are issued with qualities to serve the purposes of a currency, and fundable at the pleasure of the holder, in my opinion it is nothing more than the government may do in the exercise of the power. Again, take the power of internal taxation. This embraces the right of levy and collection. As a means for collecting the internal revenue, is it not competent to attach to a note of the government the characteristic of money? It is an instrument which the government sees fit to use in the direct execution of a conceded constitutional power. It cannot be any objection that in collecting the public revenue, Congress deems the use of a legal tender note the most eligible mode of accomplishing the object. So, also, take the power to pay the public debts. May not the government use a treasury note, as money, in paying the debts of the nation, and if so, can there be any real objection to Congress declaring such purpose? It is conceded that the government may pay its debts in what is denominated a paper currency—the million of soldiers and sailors in its service may be paid in legal tender notes, without violating the Constitution. Creating such a currency and using it, is the use of means to effect the object.

The purposes of the act in question were threefold: First, to borrow money; second, to pay the public debts; and third, to collect the internal revenue and other demands of the government. The mode devised for borrowing money was by the issue of treasury notes. It is not denied that Congress possessed the power to use treasury notes; and I think it was

empowered to impart to them such properties as would enable them to be used most advantageously in executing the borrowing power. If a note of the government, having the function of money, among other characteristics, was an eligible and appropriate means for effecting the object, Congress had the right to select those means, unless prohibited in the choice of them by the Constitution. They are not repugnant to the Constitution, unless, as is contended, that instrument was established for the express purpose of creating and maintaining an exclusive metallic standard of value; which proposition, in my judgment, cannot be successfully maintained. It is no objection to the means chosen to execute a constitutional power, that private contracts may be indirectly affected or impaired. This may be the indirect effect of carrying into execution many of the express or implied powers of government. The embargo laws impaired the obligation of numerous private contracts, yet these laws were adjudged to be constitutional. The government may debase the coin, and has done it, yet the obligation of private contracts would be affected precisely as by attaching to a paper currency the quality of money, and subjecting it to the fluctuations of the market. As parcel, therefore, of the means that might be constitutionally used in executing the power to borrow, was a note of the government, clothed with the capacity to circulate, and having the functions of money. It is not denied that Congress may create and use such an instrument, without the money and legal tender clause as to private debts, in the exercise of the borrowing power, or the power of paying the public debts, or of collecting the internal revenue. If it is constitutionally fit and proper in the exercise of those powers to impart to the treasury notes the quality of money for any purpose, it is no objection that they are constituted a medium in which private debts may be paid. The question is, whether they may be lawfully made money at all. If Congress can clothe them with the attributes of money, and as such, use them in payment and discharge of debts due from and to the government, there is no valid reason why they may not be

made to have the same operation in respect to private debts. Individuals are always parties on one side or the other in transactions with the government; and the idea that it is an invasion of private rights even to be compelled in private money transactions to use the same currency, having the same standard of value as that used in transactions between the government and individuals, rests on no just or sensible foundation. It is not true, however, that the direct result of the legal tender clause as to private debts, is to compel the cre-ditor to surrender a portion of his debt to the man who owes it. This effect is only worked out by assuming that the creditor is entitled to have his debt paid in gold or silver coin, and that whatever may be the difference in value in the market between coin and legal tender notes, is so much surrendered to the debtor. But his right is to have his debt paid in lawful money, whether it be coin or paper, and what he loses or gains cannot be estimated by the market fluctuations in value of the medium. A treasury note of the denomination of ten dollars is legally as valuable for the purposes of money as a coined eagle. The value of each is fixed at ten dollars money of account. If a gold eagle be worth more in the market than a ten dollar legal tender note, it is because it is wanted to pay duties and settle balances abroad. Indeed, what is called a demand note of the government, receivable for duties, has a value in the market about equal to gold or silver coin. The market value of gold and demand notes is, therefore, regulated by the demand and supply. This demand for gold may be for legitimate purposes, as suggested, and it may be for speculative or illegitimate purposes; and, unfor-tunately, at the present time, most of the difference in value of gold coin and legal tender notes, is the result of a species of gambling in the metallic medium of circulation, as private or public stocks are gambled with. It cannot be said that a measure of value thus effected by extraneous causes, fluctu-ating in its character, which may be more to-day and less to-morrow, can be any just criterion of what a creditor loses or gains. Applying the test to-day to the private creditor's

contract, he may lose; to-morrow the market difference in value between gold and legal tender notes may be nothing, so that whether he is compelled to surrender anything by the legal tender provision depends upon circumstances fluctuating in their nature, and extrinsic to the action of the government or the creditor. But that the creditor releases anything is more ideal than actual. Take the case of the defendant in one of the present cases. What of value does he, in fact, release by the operations of the legal tender provision? He did not lend gold, nor was the debtor's contract to repay in the specific article. He drew his check for $8,000, and the bank transferred so much of his credit to the borrower. The debtor received $8,000, but not in gold. The medium of dealing between the parties was a bill of credit. But now the creditor claims that he is entitled to be paid so many dollars in gold, stamped and valued at the United States mint, because when the transaction was had such coinage was the only lawful money and a legal tender. Not getting it, however, how can it be said that he has actually released value to his debtor? He receives for his debt as many dollars in money by being paid in treasury notes as if paid in gold eagles. One description of money satisfies the contract equally with the other. Indeed, the paper money discharges the debt by the currency in which it was created. If the creditor surrenders value at all to the debtor, it is because he may dispose of coin in the market at a higher rate than he can a treasury note, and the former is more valuable as a medium of exchange in the commercial world than the latter. In this way, and in no other, can the proposition that the operation of the legal tender provision is to transfer a part of a creditor's property to another, be worked out. It might better be characterized as an attempt to extort from the debtor more than the law justifies or requires.

I am of the opinion, therefore, that the selection by Congress of the legal tender note as a means of carrying into execution the borrowing power, the power of collecting the internal revenue, and paying the debts of the nation, was within the measure

of its legislative authority under the Constitution.    As means, it was not forbidden by that instrument; there is nothing in it expressly prohibiting Congress from creating and using a paper currency in the exercise of its specific constitutional powers, and this is admitted.    But it is said that the Constitution was established for the express purpose of creating and maintaining a metallic standard of commercial and monetary values, and hence the making treasury notes money and a legal tender is the exercise of a power repugnant to the spirit of the instrument.    There is nothing in the letter of the Constitution indicative of a design of its framers or the people that the government should be exclusively a metallic currency government.    It is true, that one of the express powers conferred by Congress was that of coining money and regulating the value thereof, and of foreign coin; but the grant of this power does not show that ours was intended to be an exclusively metallic money government.    Full effect may be given to the coining-money clause without imputing to the great and sagacious men who framed the instrument any such visionary idea.    The same duty and trust in respect to this power was imposed on Congress as in respect to all others of the enumerated powers in the Constitution.    It would be going a great way to argue, from the fact that the power to emit "bills of credit" was proposed to be given to Congress in the first draft of the Constitution and was subsequently stricken out, that the purpose of inserting the coinage clause was to impose on the government a special trust to create and maintain a national metallic currency, to the exclusion of any other.    But the fact has no significance for any purpose.    In the first draft of the Constitution, one of the clauses, in enumerating the powers of Congress, read: "To borrow money and emit bills of credit."    In the progress of the deliberations of the convention, the words "and emit bills of credit" were stricken out; but as the instrument was finally adopted, the clause read: "To borrow money on the credit of the United States."    It is claimed that by striking out the words "and emit bills of credit," the convention evinced the intention that

Congress should not possess the power of creating or issuing a paper currency, or passing laws making anything but gold or silver a legal tender in the payment of debts. The question is, not what the members of the constitutional convention intended, but what was the intention of the people who adopted the Constitution; and this can only be determined from the instrument itself. There is nothing in the Constitution expressly prohibiting Congress from passing laws providing for issuing notes of the government to be used as currency, and making them a legal tender, though the passing of laws making anything but gold and silver a legal tender in payment of debts, was expressly prohibited to the states. This latter prohibition is significant as showing that the subject of tender was not overlooked by the convention or people, and that having it in mind, any restrictions upon the legislative power of the federal government were omitted.

My conclusions are, that the act of Congress, approved on the 25th February, 1862, is not in any of its features unconstitutional. The clause objected to, which makes the notes issued by the government lawful money and a legal tender in payment of public and private debts, was not outside of the measure of the authority given to Congress in the execution of its powers. In carrying into execution the power to borrow money on the public credit (if in the execution of no other specified power), it was fully justified, as a means. There is no prohibition of the use of such means in the Constitution, and Congress, in executing the great governmental powers conferred by that instrument, may use any modes or means, not prohibited, most fit and appropriate in its judgment, whether directly or indirectly conducive to the attainment of the end of the power. That the public exigencies required a resort to the particular means complained of, is most manifest, though that was a question to be determined by Congress. We cannot, however, shut our eyes to the magnitude of the necessity. If the Constitution and the national life were to be preserved, more money was required than had ever been coined at the national mint from the precious metals, and

when the act was passed, four times greater in amount than there was gold and silver in the whole country. This money must be borrowed, and mainly from our own people. We have been admonished of the frightful consequences in the future, to result from an irredeemable paper currency, based on the credit of the nation; but if all the evils so strongly pictured, and which are mainly figments of the imagination, were to occur, how insignificant in comparison with a destruction of the government. If this magnificent governmental structure of ours falls, it will matter little that, in the effort to save it, disorder and ruin were brought on the commercial and monetary interests of the country.

I am in favor of affirming the judgment of the Supreme Court in the first of the above entitled cases, and reversing it in the latter.

EMOTT, J. The magnitude of the interests depending upon the ultimate decision of these cases, and the momentous principles which they involve, justify, in my opinion, an expression by any judge who either concurs in or dissents from the judgments now to be pronounced, of the reasons which may lead him to his conclusion. I will attempt to state my views of the cases with all possible brevity. I consider the question presented to be the same in each of the cases, and that is, simply, whether Congress may, constitutionally, make anything but gold and silver a tender in the payment of private debts, or may prescribe what shall be a tender for the payment of such debts.

It is immaterial that, when the contract in the first case was made, nothing but gold and silver was such a tender, if Congress has power to authorize a tender in a different sort of money. It is said that the act making these government notes, equally with gold, a tender for the payment of this and other debts contracted before its passage, is unconstitutional as impairing the obligation of contracts. The opinion, however, has been expressed, and would seem to be well sustained, that the states only, and not the federal government, are forbidden by

the Constitution to pass laws impairing the obligation of contracts. However this may be, if this act of Congress is open to no other exception, it cannot be successfully impeached for impairing the contracts between debtors and creditors to which it may apply. The contract of the obligor in this bond was simply to pay the amount stipulated, as so many dollars, in the lawful money of the country, that is, in that which should be its lawful money when such payment was due. It was not, either in terms or in effect, a contract for the delivery or the return of so much gold and silver, except as that was involved in the idea of payment of the debt while gold was the only medium in which debts could be paid. Gold and silver coin, and money, are not necessarily convertible terms. The latter word is used in various senses, and has various shades of meaning, according to its employment or connection. It is, generally, the representative of values and the instrument of exchanges. But it is no part of a contract of debt, made at one time for the repayment of money at another, that this representative or instrument should possess the same exchangeable value or the same purchasing power at the time of payment as at the time of incurring the debt. All that the debtor contracts to do is to return to his creditor in dollars and and cents as much as he received; and the advance and repayment are alike to be made in that which, by competent and valid authority, is made the medium of account and payment. The only question here is, whether, under the Constitution of the United States, Congress has the power to make notes or bills issued by the government such a medium and tender in payment of debts.

In the case of *The Metropolitan Bank* and *The Shoe and Leather Bank* v. *The Bank Superintendent*, the same question is presented, between the holders of their notes issued as money and the banks which have issued them, as arises in the other case between creditor and debtor. Each is bound to redeem or fulfill its obligations in that which is the lawful money or medium for the payment of debts; and the superintendent of the bank department cannot require, or be compelled to require,

of a banking association, any more, in respect to its bills, than an individual debtor can be compelled to do by his creditor.

The rights and duties of the superintendent, in applying the peculiar remedy given by the statute for the payment or redemption of this currency, are to be measured by the statute. The Constitution of this State, it is true, declares that the legislature shall require ample security for the redemption of bank bills in specie. (Const., N. Y., art. 8, § 6.) This constitutional provision, however, does not execute itself. It calls for legislation, and must remain inoperative until such legislation is had. The present Constitution of this State was adopted since the passage of the general banking law, containing the provisions to which I have referred. These provisions must be construed according to their plain import, and the remedy which they give can only be pursued in the cases and to the extent specified in the law itself. If these banks have offered to redeem their bills in lawful money of the United States, they have complied with the law, and are not exposed to its inflictions. Lawful money of the United States means in this statute what it means in a bond or obligation—money which is a lawful tender for the payment of debts. Thus the same issue is presented here as in the case of *Meyer* v. *Roosevelt*, to wit, whether the act making government notes a tender for the payment of debts is a constitutional exercise of legislative power. If it is, the judgment of the Supreme Court, in the bank case, must be affirmed, and that in the *Meyer case* reversed. If, on the contrary, this court should be of opinion that Congress had no power to declare treasury notes a legal tender, then the result will be the reverse in each case.

The Constitution of the United States is a grant of powers, and creates a government of limited authority. Although sovereign within the range of its authority, the federal government cannot transcend that range nor exercise any power which is not either expressly or impliedly conferred by the instrument creating it. It is not claimed that the Congress of the United States is expressly prohibited from making anything but gold and silver a tender for the payment of debts.

Metropolitan Bank *v.* Van Dyck.

Undoubtedly, however, it is not sufficient that no such express prohibition exists in the Constitution. There must be authority either expressly given or implied in some express grant of power, and resulting from it as needful to its exercise, to pass such an act or to legislate upon the subject to which it refers. It is not asserted, on the other hand, that power is expressly given to Congress by the Constitution to make the treasury notes of the United States a tender in payment of debts, as indeed no power is expressly given to legislate upon the subject of tender at all. But it is contended that, in the exercise of certain powers which the Constitution does confer upon Congress, it is necessary and proper to issue treasury notes and to make them a legal tender, not only to the government but between individuals.

It has been sometimes said, in the discussion of this subject, and oftener implied or suggested, that the power to regulate the circulating medium, and to establish the currency in which payments and exchange may be made, is a necessary function of every government, and that it is implied or involved in the very creation of the government of the United States, independent of any express grant conferring or involving the power to legislate upon the subject. I cannot, however, yield to a theory which would impute to the federal legislature these indefinite powers. If we were dealing with a government neither constituted nor controlled by a written fundamental law, it would be impossible to deny that such legislation as that which we are considering would be within its proper and ordinary functions. To authorize or direct the issue of paper money by the government, and to make that money a tender in the payment of debts, are acts not foreign to the idea of government abstractly considered, and not unprecedented in the history of other governments. But we are dealing with legislative authority conferred by a written Constitution, and restricted to the measures or the subjects specified in that Constitution. Supreme and sovereign as the federal government is within its scope, and although it is a government of the people, acting upon them individually as

its citizens, and not through the States as a confederacy of separate sovereignties, yet it is, as has been said, a government of limited powers. It can draw to itself nothing as inherent in the idea of government, but must look to the written charter of its existence for the warrant of any act which it seeks to do. It can only exercise the powers granted to it, and a grant of any particular power cannot be presumed from its appropriateness or its supposed necessity to the idea or the existence of a nation. There is no presumption or implication to be indulged as to the powers of the federal government, except that, when a power is expressly given, authority to do whatever is fairly appropriate to its execution is implied in the grant of the power itself.

The Congress of the United States has power, by the eighth section of the first article of the Constitution, "to coin money and regulate the value thereof, and of foreign coin." The term money is used in different places in the Constitution, as it is elsewhere, in somewhat different senses. Here, however, it means, in my judgment, metallic money, gold, silver, and copper, or the metals used for coin, and nothing more. The phrase "coining" cannot, without violence, be applied to the issue of paper money. To coin money is to make, stamp and issue coins as money. Coins are pieces of metal, of a particular weight and standard, and to which a particular value is given in account and payment. The clause which follows, "to regulate the value thereof," evidently means to authorize the regulation of the value of the coin thus issued, or the money coined; and that this is strictly metallic money, appears from the words immediately following, "and of foreign coin." The design was to confer upon Congress the power to regulate the value of domestic and foreign coins, and as the domestic money, whose regulation is thus conferred upon Congress, is the money whose coinage is authorized by the first part of the clause, the inference is irresistible that this money is simply domestic coin or metallic money. The clause confers upon Congress absolute and exclusive power over the circulating coin of the country, domestic and foreign, by regu-

lating the standard and coinage of the former, and the value in account of the latter.

The second subdivision of the same section of the Constitution authorizes Congress "to borrow money on the credit of the United States." Here the meaning of the word "money" is necessarily somewhat different. "Money," says Mr. J. Stuart Mill, in his Principles of Political Economy (vol. 2, book 3, chap. 8, p. 9), "which is so commonly understood as the synonym of wealth, is more especially the term in use to denote it when borrowing is spoken of. When one person lends to another, as well as when he pays wages or rent to another, what he transfers is not the mere money, but a right to a certain value of the produce of the country to be selected at pleasure, the lender having first bought this right by giving for it a portion of his capital. What he really lends is so much capital; the money is the mere instrument of transfer. But the capital usually passes from the lender to the receiver through the means either of money or of an order to receive money; and at any rate it is in money that the capital is computed and estimated. Hence, borrowing capital is universally called borrowing money."

The importance of these observations, and their application to the subject in hand, will be seen in a moment, when we advert to the supposed inconsistency in borrowing money by issuing bills or notes which are themselves to circulate and perform the functions of money. In borrowing money on the credit of the United States, it is obviously not only competent but necessary to issue obligations of some sort, as evidences of the debt, and binding the United States to repayment. It could not be contended that these obligations must be issued only in return for money received, and not for capital or commodities of which money is the representative. As the government requires articles of various descriptions, or the services of men, for its exigencies in war and in peace, it may give, as it constantly has given for these values, its own obligations or evidences of indebtedness, and these are valid and properly issued under the power to borrow money. Such has

been the construction, both practical and theoretical, of every school of our statesmen and jurists, and no one would probably dispute the doctrine at this day. Nor is it essential to the exercise of this power that the contract between the government and the lender, or the obligations issued, should provide for the repayment of the money borrowed at any specific future day, or with interest. This also must be considered to have been settled by general consent and the practice of the government. From a very early day treasury notes, or government bills, payable on demand and without interest, have been issued in payment for property and services. These bills or notes are what were known at the date of the Constitution, and are mentioned in it, as "bills of credit." Their issue is forbidden to the States. (Const., art. 1, sec. 19.) It is not authorized by the federal government, except by the general authority to borrow money. In the case of *Craig* v. *The State of Missouri* (4 Pet., 410), Chief Justice MARSHALL, speaking for a majority of the Supreme Court of the United States, defines bills of credit to be "a paper medium, intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society." In the subsequent case of *Briscoe* v. *The Bank of the Commonwealth of Kentucky* (11 Pet., 257, 314), the same court, by Mr. Justice McLEAN, while expressly adhering to the principles of the case of *Craig* v. *The State of Missouri*, made the definition of a bill of credit, as used in the Constitution, somewhat more exact. "It is," said that learned judge, "a paper issued by the sovereign power, containing a pledge of its faith, and designed to circulate as money." To the same effect Mr. Webster said, in his speech on the currency, in September, 1837: "Any paper issued on the credit of the State, and intended for circulation from hand to hand, is a bill of credit, whether made a tender for debts or not, or whether carrying interest or not." I think it very material to the present question that the issue of treasury notes, which evidently answer this definition and are "bills of credit," should have been, by general consent, considered a constitutional exercise of the

power to borrow money. In May, 1838, Mr. Calhoun said, in the Senate, that the right to issue treasury notes had been exercised from the commencement of the government without being questioned, and, according to his conception, came within the power expressly granted to Congress to borrow money, which meant neither more nor less than to raise supplies on the public credit. Interest was not essential to borrowing, and it would be ridiculous to suppose that the framers of the Constitution intended to authorize the raising of supplies with interest, and to prohibit it without. In 1837–8, at the time of a great financial panic and distress, when the relations of the government to the banks, and consequently of the banks to the community, were changed by the measures of the administration and of Congress, it was proposed to aid the emergency by the issue of treasury notes. Mr. Webster, while not averse to that particular expedient, desired that the treasury notes should be of large amount and bearing interest, so as to make them sought as an investment. Mr. Calhoun, on the contrary, distinctly urged that the treasury notes should be without interest, in order to keep them in circulation. He said: "I am of the impression that the sum necessary for the present wants of the treasury should be raised by a paper which should at the same time have the requisite qualities to enable it to perform the functions of a paper circulation." He added that he objected to the interest to be allowed on the notes proposed to be issued, because it would throw them out of circulation. He proceeded to argue in favor of the issue of government bills, redeemable or payable on demand, and receivable in payment of all public dues, as a sound paper currency, both constitutional and beneficial, in a higher degree than the notes of State banks or of a Bank of the United States. Both he and his great antagonist, as well as all the public men of that day, differing widely from each other upon questions of constitutional power, clearly held that the issue of such bills as a currency would be a constitutional exercise of the power to borrow money.

It may be observed here, that the fact that the Constitution

forbids the emission of such bills of credit by the States was not supposed to furnish any implication that Congress did not possess that power; and it as little results from the prohibition to the States to make anything but gold and silver a legal tender, that Congress may not exercise such a power. No inference either way can be drawn from that prohibition.

It appears from the journal of the convention which framed the Constitution, and from the Madison Papers (volume 3, p. 1343), that the clause authorizing Congress to borrow money was originally reported to the convention with the addition of the words, "and emit bills on the credit of the United States," and that this latter part of the clause was stricken out by the convention. Mr. Madison says that this was done to cut off the pretext for a paper currency, and particularly for making the bills a legal tender. These facts are urged to show that the power now in question was expressly and intentionally withheld. They do undoubtedly show that such was the design of a portion, perhaps of a majority, of the framers of the Constitution. But, on the other hand, the practical and theoretical construction of this part of the Constitution, in the subsequent administration of the government, to which I have referred, shows that one part of this design was not accomplished. Although the authority "to emit bills on the credit of the United States" was expressly struck out and apparently intentionally withheld, it has constantly been recognized, and in this argument was conceded to belong to the government, under its general authority to borrow money. The design of the advocates of the alteration which was made in the draft of the Constitution is not entirely clear to me from Mr. Madison's account of the transaction; but, whatever it may have been, it must yield to the actual and legal construction of the words as they stand in the written instrument itself.

The construction given to the Constitution by its framers and their contemporaries, the discussions in the convention which framed it, and the apparent intention with which certain clauses were added or stricken out in their deliberations, are constantly and justly referred to upon questions of the mean

ing of constitutional provisions. But the arguments derived from such sources are not necessarily final or conclusive. A stronger case, or one more indicative of purpose, could not easily be put than the instance which has been cited, of striking from the Constitution, in its formation, a proposed express power to issue bills of credit; yet it is obvious that, in exchanging bills of credit, or government evidences of debt intended for circulation as currency, for property or labor, the government does borrow money, or the capital of which money is the symbol; and it has, therefore, been seen that, while the power to borrow money remained, the right to emit bills of credit exists, notwithstanding the latter had been in terms expunged. The issue of such notes is an exchange of credit for money or property. All political economists recognize the fact that, in issuing paper promises to circulate as currency, their makers, whether governments or individuals, are in effect borrowing on the credit of these promises whatever of value they receive in exchange for them. In spite, therefore, of what may have been the design of the framers of the Constitution in this particular, the language which they have left in that instrument has been found to bear a construction contrary, it may be, to that design, but conformable to the exigencies of the times and the needs of the country.

It would be subjecting written constitutions to a severe test, as instruments of government, if the opinions, the declarations, or even the intentions of their framers were accepted as final upon questions of their construction, where there is a fair difference of opinion. Wise and far-seeing as the men who framed the Constitution of the United States unquestionably were, it would be attributing to them more than human sagacity to suppose that they contemplated such a history of growth, extension and change, as has been accomplished by this country, or such an emergency as is now trying both its institutions and its people. The element of weaknesss in written constitutions, as in written codes, is their inflexibility and inability to adapt themselves to the ever-changing necessities of history and progress. So far as such constitutions

consist of express grants or express prohibitions, this is inevitable, and it is undoubtedly a part of the security which they offer to the citizen, and even to the government itself, that it should be so. But when we enter the domain of implied or constructive powers, the rules by which we are to be governed must depend somewhat upon additional considerations. Admitting, what no one denies, that the powers and functions of the federal government are limited, yet, in the exercise of those powers and functions, the legislature must be allowed a wide discretion in the means to be employed for that purpose. In the governance of that discretion, upon questions of appropriateness or necessity, the circumstances and exigencies of the time must be more decisive than the opinions or purposes of those who framed the instrument conferring the discretion, without being able to foresee the occasions which the future would bring forth for its exercise.

I am not contending that necessity can confer any additional powers upon such a government as ours, but simply that in the history of the country occasions will arise for the use of means to accomplish the recognized objects of the Constitution, different from what its founders could have anticipated, and perhaps contrary to their expectations, and that in such event the question of constitutional power is to be decided by a fair construction of the Constitution itself, and by the appropriateness of the proposed means to the proposed end, tested rather by the facts of the day than by the judgment of the past or its history.

Taking it for granted that Congress has power to issue treasury notes or bills of credit to circulate as currency, in order to borrow money upon the credit of the United States, the question before us comes to whether Congress may confer upon these notes the character of a legal tender in order more effectually to accomplish the object of borrowing money by or upon them.

The principles upon which the Constitution is to be construed, in cases where the act in question is neither expressly authorized nor expressly forbidden, received, as is well known,

an exhaustive discussion in the case of *McCulloch* v. *The State of Maryland* (4 Wheat., 316). The memorable and masterly judgment of Chief Justice MARSHALL, in that case, leaves nothing to be said upon the abstract questions which lie at the bottom of this and similar disputes. In discussing the meaning of the words "necessary and proper," as used in the general authority conferred to pass laws for carrying into execution the express powers of Congress, the Chief Justice said: "The subject is the execution of those great powers on which the welfare of a nation essentially depends. It must have been the intention of those who gave these powers to ensure, as far as human prudence could ensure, their beneficial execution. This could not be done by confining the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate, and which were conducive to the end. This provision is made in a Constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs. To have prescribed the means by which the government should, in all future time, execute its powers, would have been to change entirely the character of the instrument, and give it the proportions of a written code. It would have been an insane attempt to provide by immutable rules for exigencies which, if foreseen at all, must have been seen dimly, and which could best be provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances." And he gives the rule in language often quoted: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." If the measure proposed is an appropriate means to a legitimate end, the degree of its necessity is to be discussed elsewhere than in a judicial forum. So again the Chief Justice

said in the same case: "When the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and to tread on legislative ground."

We are brought by such considerations, I conceive, to a narrow issue, after all, in this case. It is not denied that making treasury notes a tender between individuals is not in terms prohibited to Congress by the Constitution, although it is to the several States. The question that remains is, whether such a measure is appropriate to the object of borrowing money upon them. I cannot doubt, after long and anxious consideration of the subject, that it is.

It is conceded that Congress may issue these notes in a form and manner to make them readily pass and continue in circulation as currency, in order more easily to borrow or obtain property or value by its use. Nor is it disputed that the power which has been heretofore exercised, of making such notes a tender for dues to the government, is appropriate to the same end. Mr. Calhoun considered it so much so that he supposed that nothing else was needed to make such notes a permanent and perpetual paper currency, and of course to enable the government to obtain, as a loan, without interest, for an indefinite time, the whole amount of that currency. It is sufficiently plain that to make such notes also a tender between individuals must, or at least may, add still more to their use and currency, and so tend to keep a much larger amount in circulation. When the point is established that government has power to issue a currency as a means of borrowing from the people, the inference is irresistible to my mind that it may confer upon such a currency any and all attributes, not expressly forbidden by the Constitution, which will enhance its value and increase the amount likely to be retained in circulation and use.

It does, indeed, at first consideration, appear like a solecism to say that Congress is authorized to issue paper money, as a means of borrowing money. But the confusion arises from

the different senses or shades of meaning in which the word money is used, as a circulating medium, or as a synonym of capital or value. The fact itself is simply an instance of the theory upon which all issues of exchequer bills, bank notes or paper credits, to circulate as currency, are made profitable, to wit, that whoever parts with value, in exchange for such paper credits, in fact lends to the government or the individual which issues them. There is really no solecism or contradiction in the idea of borrowing money, by issuing paper currency. Making the bills of credit which constitute this currency a legal tender, is a measure of the same general nature, and as appropriate to the end to be accomplished by their exercise, as it is to confer upon them any of the other attributes of use or value which have, from time to time, been given to them or to other obligations of the government. It is a means, directly related to that end by a connection which is palpable and distinct. The necessity, or the degree of necessity of such a measure, is a question which belongs to the legislature, and not to the courts. It is enough to forbid our interference that we shall be able to see that the act is not forbidden by the fundamental law, and that it appropriately and properly tends to the accomplishment of one of the material objects of the government, or to the exercise of one of the great powers conferred upon the federal legislature to effect these objects. Of the wisdom of such a measure, or of the necessity which demanded a resort to it, another branch of the government, and not the courts, is the judge, and for the consequences of its use, whatever they may be, others are responsible.

The conclusion thus indicated is not without strong support from decisions of the Supreme Court of the United States in cases strongly analogous to the present. In *Weston* v. *The City of Charleston* (2 Pet., 449), it was held, and the principle has been affirmed and extended in the recent tax case, in which the judgment of this court was reversed, that Congress can exempt from all State taxation the bonds or stocks issued by the United States. No express power to confer such a

right upon government bonds or their owners is contained in the fundamental law, and no other property or evidences of value can be endowed by Congress with such a privilege. The power to make this important exception to the reach of State legislation is derived wholly by implication from the power which the Constitution contains to borrow money on the credit of the United States.

The analogy to the legislation now under consideration is, in one aspect, very exact. It is said that the subject of contracts is left by our system to State legislation exclusively. But the assessment and collection of local taxes is equally within the domain of State power, and no right is more jealously asserted, as an attribute of sovereignty by the several States, than the right to subject all property within their limits to the taxes necessary for the support of their governments. Yet large masses of property and values are abstracted from the reach of State laws by the federal legislation to which I refer—legislation resting wholly upon a power implied from the propriety or advantage of conferring such attributes on federal evidences of debt, in order to aid the federal government in borrowing money.

In all such instances, the incidental consequences to the States or to individuals, however far-reaching, are no answer to the assertion of a power by the general government, if it be appropriate and adapted to an object which that government was expressly authorized to pursue.

It should also be observed that, although the laws of contracts, with their rights and remedies, as between citizen and citizen, do unquestionably belong to the States, and not to the federal government, yet the regulation of the value and denomination of the money or medium in which contracts of indebtedness are to be performed, is within the control of Congress, and with it necessarily the general subject of tender. The money of account and payment in all private as well as public transactions is the money of the United States; and no one has ever questioned the power always exercised by Congress to declare its own or foreign coins a tender in the pay-

ment of debts. The power to declare what shall be such a tender obviously belongs to the federal government, and not to the States; and our inquiries have therefore been limited, in effect, to the question whether this power is restricted to the use of gold and silver only.

By the course of reasoning which I have thus indicated, and which might, of course, be much elaborated, I have been brought to the result that the Congress of the United States possesses the power to make the United States treasury notes or bills of credit lawful money and a tender in the payment of debts, and that judgment should be rendered in these two cases accordingly.

In concluding these observations, which have already been made more extended than I supposed they would or intended they should be, I will only add a single remark. It is, I think, proper for me frankly to say that I approached the consideration of this great question with a desire to sustain the act of Congress, whose validity is called in question. As much as this is due, in my judgment, to any and every act of the supreme legislature of the nation. But this just repugnance to thwart that legislative will or prohibit its exercise is enhanced in the present instance by the consideration of the grave responsibility assumed by any citizen, who, in any way or in any sphere of action, will interpose hindrances or obstacles to the efforts of the government to suppress the great and wicked rebellion, which has brought so much misery upon us—a rebellion as little justified in morals as in legal or constitutional right.

Notwithstanding such considerations, however, the question for us, as judges, is simply one of law; and if our judgments had been adverse to the right of Congress to pass this law, our oaths and our consciences are paramount to all other considerations. In this connection I must also say, that I commenced the examination of this question with serious doubts of the power of Congress to pass this law, and with an impression adverse to its validity. Deliberate examination has removed these doubts, and I give my judgment with a clear

and unhesitating conviction of the power of Congress to make government notes a legal tender, as a pure question of constitutional law, and with the satisfaction which attends a clear belief so carefully reached upon a point of such importance.

MARVIN, J. The questions presented and argued by the appellant's counsel are in this form: "First. Has Congress the power to make the paper promises of the federal government a legal tender in payment of any debts not due to that government? Secondly. If it has this power in respect to any debt, not due to the federal government, can a bank of this state avail itself of such an enactment and tender these federal paper promises in redemption of its bills, and thus estop the execution of the trust by which the state has secured the redemption of those bills out of a fund pledged for the express purpose by solemn provision of law?" It is conceded that Congress has power to authorize the issue of treasury notes, and make them receivable in payment of all debts and dues to the federal government. But the authority of Congress to make them "lawful money and a legal tender in payment of all debts, public and private, within the United States," is challenged and denied.

I shall assume, without stopping to prove what has often been established upon judicial investigation and by judicial decisions by a court having the right to investigate and decide, that the instrument known as the Constitution of the United States, is a Constitution ordained and established by the people of the United States. That it contains certain specified powers and provisions which, when carried into effect, produced a government, possessed of the right to maintain and perpetuate itself for all time. The product of the Constitution is government, and such was the intention of those who ordained and established it. It is not a league, a compact, an alliance of states, but it provided for a government, that should have, by the exercise of the powers therein specified, a right to make laws and compel obedience to such laws. The powers of such government, though limited and

specified, are supreme within their sphere of action, and so also are the powers of the state governments, the latter not being usually specified in the state constitutions.

. There can never, in theory or legally, be any conflict between the two jurisdictions, and we owe allegiance alike to each. There can be no conflict, and there should be no embarrassment touching the question of allegiance; as the Constitution of the United States declares: "This Constitution, and the laws of the United States, which shall be made in pursuance thereof, &c., shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." (Art. 6.) When, therefore, any act of the government is challenged, the sole inquiry and question for decision is, was such act authorized by the Constitution? If the act is done under a law of the United States, the inquiry will be, was such law "made in pursuance of the Constitution." If the question raised is answered in the affirmative, state laws and constitutions in conflict therewith must yield. They are invalid and not binding upon the citizen. If the question is answered in the negative, then the act done was unauthorized and is void. Much has been said and written touching the rules proper to be adopted for the construction of the Constitution; some claiming a liberal, enlarged construction; others, a narrow, strict construction. Governments are established for the benefit of those subject to them. This is emphatically so of republican governments. The state government is for the benefit of the people as well as the United States government, and in times of peace and the harmonious action of both governments, the state government operates upon and affects the interest of the people far more than the United States government. Its jurisdiction embraces vastly more subjects, and affects more interests. As both governments are for the benefit of the people, I apprehend, that when a question of conflict between the two governments arises, the rule that a liberal construction should be applied, because the government is beneficial, can have little application. The

true rule, in my judgment, in such a case, is to consider fairly the provisions of the Constitution of the United States, and ascertain whether the given case is within them, and if not, then to abstain from exercising jurisdiction. It is very important that all the jurisdiction of the states over matters exclusively confided to them, should be carefully preserved, and that the government of the United States should be confined to the limits prescribed by the Constitution to which it owes its existence.

These suggestions do not question the rule of liberal construction, as applied to the subjects which may be embraced in the specific powers conferred upon Congress; and when it becomes a question, whether such powers authorize the doing of certain things, undoubtedly all the attending circumstances are to be taken into consideration, as in the construction of contracts, with a view of determining whether the power fairly embraces the cases. The nature of a constitution, in the language of Chief Justice MARSHALL, "requires that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves." He says: "A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a code, and could scarcely be embraced by the human mind. It would probably never be understood by the public."

The nature of a constitution, then, is to mark the great outlines, and designate the important objects of the government to be established. This is of necessity so; as to all organized bodies, some fundamental canons are enacted defining their creed or specifying their powers.

The Constitution, after specifying certain powers to be exercised by Congress, adds: "And to make all laws that shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department

or officer thereof." In *McCulloch* v. *The State of Maryland* (4 Wheat., 314), this provision underwent a most elaborate examination by Chief Justice MARSHALL, and I shall not attempt to add anything to his masterly exposition of it.

I do not know that I object to the exposition of this provision of the Constitution, as made upon the argument of this case, by the learned counsel (Mr. Curtis) for the appellant. Undoubtedly the law enacted under this provision must sustain a proper relation to the previously granted powers, and must be necessary and proper for carrying into execution some one or more of those powers, or some other power vested in a department or an officer thereof. And I agree that Congress is not necessarily the exclusive judge of such relation, and of the necessity and propriety of making such law. Its decision may be questioned before the judicial power, which may decide that the relation, necessity and propriety did not exist, and thus adjudge the congressional act unauthorized. The judicial power will not be justified in considering the degrees of necessity and propriety, or in instituting comparisons between the measure adopted by Congress and some other measure better calculated, in the opinion of the court, for carrying into execution the granted power. Chief Justice MARSHALL, in the case referred to, sums up the argument by saying: "We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional."

Let us now bring into view some of the "foregoing powers" expressly conferred upon Congress. They are: "to levy and

collect taxes, duties, imposts and excises, to pay the debts, and provide for the common defence and general welfare of the United States;" "to borrow money on the credit of the United States;" "to regulate commerce with foreign nations, and among the several states;" "to coin money, regulate the value thereof, and of foreign coin;" "to declare war, grant letters of marque and reprisal;" "to raise and support armies;" "to provide and maintain a navy." (Art. 1, § 8.) There are some prohibitions. Let us notice them here. "No capitation or other direct tax shall be laid, unless," &c.; "no tax or duty shall be laid on any article exported from any state." (§ 9.) There are some other limitations upon the powers not necessary to be here noticed. There are some limitations of the powers of the states which should be carefully noticed. "No state shall enter into any treaty, alliance, or confederation, grant letters of marque and reprisal; coin money, emit bills of credit; make anything but gold and silver coin a tender in payment of debts; pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

"No state shall, without the consent of Congress, lay any duty or tonnage, keep troops or ships of war in time of peace, enter into any agreement or compact with another state, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay." (§ 10.) Let us add, for the purpose of showing the independent character of the government within its proper sphere: "The executive power shall be vested in the president of the United States of America." (Art. 2, § 1.) The Constitution makes provision for courts in which the judicial power of the United States shall be vested. Some amendments were made, and in article 10 it is declared: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, *or to the people.*" On reading these clauses containing powers and limitations, and certain prohibitions of powers to the States — powers national and common to all nations possessed of independence—of full sovereignty—what impression is produced

upon the mind, touching the character of the government about to be brought into being? Its powers are not numerous, but they are of the vastest importance to the well-being of all the people occupying the country included within the limits of the United States; and the happiness and prosperity of such people was, and is, to depend mainly upon the faithful execution of these powers. The people, through their state organizations, can enter into no treaty, alliance or confederation; they cannot engage in war, nor coin money. These, and some other powers are prohibited to them, and are conferred upon the federal government exclusively. They are prohibited from making anything but gold and silver coin a tender in payment of debts; and unless the federal government has this power it is extinct, and can have no existence among the people who have established the state and national governments. Whatever the emergency, however fatal it may be to the states, to the United States, to the people, that gold and silver coin, under all circumstances, shall be demandable in payment of debts, there is no power to relieve them. The people have annihilated this power, unless it is possessed by the United States government; and they are in a condition unknown to any people that have ever constituted a community, under any form of government known to mankind. The relation of debtor and creditor has, in all ages, in civilized nations, been regarded as a matter of great importance, and has always been subject to the regulation and control of the sovereign legislative power. History informs us of numerous instances in which the legislative power of nations has been invoked to interfere between the debtor and the creditor, and they have interfered for the relief of the debtor, and thereby saved the nation from convulsions, and, perhaps, ruin.

But with us, if the power is gone, whatever may be the condition of the country and its money, though the "gold and silver coin" may have disappeared—though its value, compared with all property, real and personal, may have appreciated an hundred fold—yet the debtor must produce it

in payment of his debt.   In short, the creditor may have the power of appropriating ten or a hundred times as much of his debtor's property as he transferred to his debtor a year or two before, for the very debt he is collecting.   These are not extravagant suppositions ; but whether they are or not, they illustrate my position—that the debtor class in time of national calamity, in the absence of the precious metals, may be ruined, and their property transferred to the creditor class, though there may be as much or more property and real wealth in the country as there had been at any time previous. I repeat that this power of interference by the government, between the debtor and the creditor, has always existed in other nations, and has, in times of emergency, been often exercised ; and a mode for extinguishing debts, other than with the precious metals, has been authorized.   The power has been exercised for the good of the nation as a whole, if not for its very salvation.   I concede, of course, that if this important govermental power is extinguished throughout the limits of the United States, this is an end to the question we are considering.

In my opinion it is not extinguished ; and I will proceed to state some reasons for this opinion :

In giving construction to contracts, wills, statutes—indeed any written instrument—it is important to understand clearly the subject to which the written language was or should be applied.   This rule is emphatically applicable in giving construction to the Constitution.   The meaning of the language used must be understood, and the subject matters to which the language relates, or which may be fairly embraced within the language creating the powers: the condition of things coëxisting with the making of the Constitution, and which might be reasonably anticipated to exist in the future, should be considered in giving construction to the various provisions of the Constitution, and to the Constitution as a whole. There existed at the time thirteen states, and it was understood that this number would be increased.   Each of these states possessed all the powers pertaining to independent nations,

except as modified or restricted by the articles of confederation. They possessed powers common to all independent nations: of regulating their own commerce, and the law of contracts; of making money or declaring what should constitute money; and, of course, what should pay debts. They could emit bills of credit; issue their own paper money, and make it receivable in payment of debts. They could discriminate, in regulating commerce, in favor of their own citizens, and against the citizens of other states or nations. Under such circumstances it was obvious, indeed it was already proved, that there could be no such thing as harmony touching any of those matters. Most of the then states possessed harbors upon the ocean, and were engaged in foreign commerce, and commerce among themselves. There could be no uniformity of regulations touching such commerce.

Some of the States tried to agree upon a system for themselves, and failed. The system of one State would nullify the system of another, or other States. Free importations by one State would render impracticable the system of other States, imposing duties for revenue or for the protection of home industry. Embarrassing and unreasonable regulations, touching commerce between the citizens of one State and other States would be made. Each State might have a moneyed system unlike that of any other State; a system of weights and measures entirely different. Commerce between the citizens of one State and other States might be prohibited and destroyed. The confederacy had no power to derive a revenue from importations, nor had the states practically this power, as they would never be able to agree upon a common system, and owing to their geographical positions, any system other than free trade would be practically nullified by the action of the other States.

This state of things could not last. The people were powerless to protect their interests. A change was necessary, if they were to indulge hopes of future prosperity. This practically powerless condition of the people was an important, if not the most important, reason for making an effort to devise a remedy, and the remedy devised was the Constitution. A

leading object of the Constitution was to get rid of all conflicting commercial interests and, as to commerce, to effect a union of all the people of all the states, great and small, and make them one people, one nation, without divided interests, and without power, as states, to produce divided interests or conflicts. This was a leading idea in favor of the Constitution, and to me it has always seemed the most valuable one.

Was this idea carried into effect by the Constitution? I think it was clearly and fully. It required several provisions to effect the object; some conferring powers upon the new government; others prohibiting the exercise of certain powers to the state governments. Hence were granted the powers: "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." "To establish uniform laws on the subject of bankruptcies throughout the United States;" "to coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures;" and, in addition, the power to make all laws necessary and proper for carrying into effect these powers. The prohibitions upon the states, in connection with commerce, are, that they shall not emit bills of credit, make anything but gold and silver coin a tender in payment of debts, or pass any "law impairing the obligation of contracts." These provisions, I think, accomplish the object intended, viz., the committing to Congress, the common representative and agent of all the people, the exclusive power to establish a uniform system of commerce throughout the United States. All these powers have a very important connection with and relation to commerce, over which the common government was to exercise great, if not exclusive, control for the common benefit of all the people of all the states.

Now what is commerce? I need not stop to look up and quote definitions. We know that it consists in the exchanging of property, or the buying and selling of commodities; the latter as generally understood. As so understood it cannot be carried on without money. In the absence of money it must substantially perish; something called money must exist. It is a neces-

sity to commerce—an aid always attendant upon it; and the power that regulates commerce should, theoretically, be the exclusive power to create money, to say what shall be money, the representation of values, and it should have the power to regulate its quantity: not that such power, by way of changing the quantity, should be often or capriciously exerted. The language of the Constitution is, "to regulate commerce with foreign nations, and among the several States," and "to make all laws which shall be necessary and proper for carrying into execution these powers." It is argued that these powers are not broad enough to embrace the case we are considering: the power expressed is limited to regulating commerce, and this only, "with foreign nations and among the several States:" that Congress can only regulate, not create, and that it cannot even regulate commerce within the states. Commerce was never created by a mere act of legislation. It must have production to supply it with materials to be sold and bought. But legislation may protect the products of labor—may stimulate and encourage labor, and furnish money, making it easy to buy and sell property. It may, by many regulations of commerce, cause industry to take such direction as to produce the materials for commerce. Regulations of commerce with foreign nations may be productive of great individual, and consequently national, wealth or great poverty. And the same effects may follow regulations of commerce among the states. Money is necessary to commerce. And the kind of money, and the quantity, may be, indeed, are, direct regulators of commerce. Without money there would be no commerce; with certain kinds of money, such as Lycurgus established, iron, there would be little commerce. With convenient money, in suitable quantities, commerce may be active and profitable to the people and nation. But it is said that the power to make government promises a tender in payment of private debts has not been granted to Congress, and this is so eo nomine; nor has the power, by name, been given to Congress to do very many things that it has done, some of which have been questioned, others not. Congress has established a military

school; it has enacted criminal statutes touching a variety of subjects; it has chartered banks, &c., &c. If it be shown that money is a necessity to commerce, as well to regulate it as to invite its presence, it will follow that some power must exist somewhere to make money, or make something to perform the office of money. The states clearly have not the power. They cannot coin money and regulate its value. It has been sometimes argued, conceding that the power which regulates commerce should also regulate the money, and that it has, as a legitimate, if not necessary consequence, the right and power to do so, yet, as the Constitution had expressly conferred upon Congress the power to coin money and regulate its value, and the value of foreign coins, that it has no other power over or concerning money: that the maxim, *expressio unius exclusio alterius* applies. The power to coin money, &c., is not a limitation upon the power to regulate commerce. It may be one of the means, but not the only one. If it is, then, as I have already remarked, commerce can never be regulated by any other means, and in the absence of coined money, or a sufficient quantity of it to circulate the vendible commodities, a contingency quite likely to arise, commerce may languish, decline and possibly perish.

But it may be further objected that this power of regulating commerce is limited to foreign nations and to commerce among the states, that is, between the people of one state and another; and that therefore Congress cannot make any regulation touching the commerce in a state, that is, such as may be confined within the limits of a state; and cannot, therefore, do anything affecting such commerce. I apprehend that any attempt to distinguish, so far as commerce is to be affected by money, between commerce in a state, and commerce " among the several states," will always prove a failure. The products of any state enter directly or indirectly into the commerce " among the states." The manufactures of New England are consumed in all the states, and the grains and other productions of the western and middle states find a market in all the other states, and so also of the productions of the south. And

Metropolitan Bank *v.* Van Dyck.

it may be added, that this is mainly owing to the commercial provisions of the Constitution, and the wisdom of the government resulting from it. But it is only necessary to a proper relation between these commercial powers and the necessity and propriety of an act for carrying them into effect, that it appear that such act regulates commerce with foreign nations or among the states. Now, no one will question the position that that which will compulsorily discharge debts, that which in numerical quantities previously ascertained may be tendered in payment of debts of like numerical amount, will be a great and controlling regulator of commerce, and all the commerce of the country.

If the thing be inconvenient for circulation, it will embarass and diminish commerce. Lycurgus understood this when he made iron the money of the Spartans for the purpose of preventing commerce and turning the energies of the people into other pursuits.

If the thing be convenient it may greatly increase commerce by stimulating industry. The paper promises of governments or of banks have, in modern times, been regarded as the most convenient article for an additional circulation, and although these promises refer to some other standard, usually coined money, nevertheless they may perform the office of money, and the sovereign power may declare them money, and make them tenderable in payment of debts. It may be that a like numerical quantity will not purchase as much property as the coined money to which reference is made in the paper promises. And this will always be so when the promise to pay coined money is not at once performed upon demand; for such coined money, if of the precious metals, as is usual, has an intrinsic value as an article of commerce in all the markets of the world, and the paper promises have no such value. But the measure of depreciation, where they circulate, may be greatly affected by the question whether they may be tendered in payment of debts. If they may be, the depreciation will be far less. Hence, though there may be great danger of the issues of government paper, or irredeemable bank paper, in excess, thus

widening the margin between them and coined money, the danger may be much less with government issues made tenderable in payment of debts, than in bank issues not so tenderable. And it is to be kept in mind, that the states can not make the issues of the banks established by them a lawful tender in payment of debts, whereas, as I insisted, Congress may do so, and thus provide a safer and better circulation than the states. The question of danger does not affect the question of power. If the power exists it may be carried into execution, however dangerous it may be. It may be very unwise under some circumstances to exercise the power, and very wise to exercise it under other circumstances—indeed, criminal not to do so. The salvation of the nation may depend upon its exercise, and when the further life and existence of the nation may depend upon the exercise of powers conferred upon Congress, that Congress that should refuse to exercise such power, would be justly chargeable, for all time to come, as participating in the crime of national slaughter, and would be as justly convicted of such crime, as was ever, by municipal law, a felon, of the crime of manslaughter.

This is not the place to justify or assail the expediency of the act of Congress authorizing the issue of treasury notes, and declaring them receivable in payment of taxes, interest, duties, debts and demands due to the United States, and declaring them to be lawful money and a legal tender in payment of all debts, public and private, within the United States. It is the question of power that we inquire about, and being of the opinion that the provisions in the act referred to, have a direct tendency to promote the circulation of the notes authorized to be issued, and preserve them in a degree from depreciation, as compared with coined money, and that they operate directly upon commerce and tend greatly to regulate it among the several states, and also with foreign nations, by stimulating greater productions and facilitating the circulation and exportations of such products, I am quite clear that they are authorized by the provisions of the Constitution already brought under consideration.

Let us pursue the question further.   It is a great question, affecting vitally the prosperity of the nation.

Considering the subject or object of these powers, and the circumstance, the most important, that the people, who were to create and carry on this commerce, were members of other bodies politic, possessing certain powers in common with all independent states, which powers, if exercised by them, would embarrass, derange, and might effectually destroy the common system established by the federal government, it was absolutely necessary to impose certain prohibitions upon these other bodies politic—the states.   Among these prohibitions, I have always regarded, so far as commerce is concerned, and I may add, the peace of the states and the harmony of the systems, those which prohibit the states from making anything but gold and silver coin a tender in payment of debts, and from passing any law impairing the obligation of contracts.   If these powers had been suffered to remain with the states, it is quite obvious that difficulties between the people of the different states would soon have arisen, endangering peace and harmony between them.   Distrust would have existed, and there would have been an absence of that confidence necessary as a base for commerce between them.   Independent nations may protect their merchants and citizens from the frauds of other nations, consequent upon a debasement of the coin or a change of the measures of value in which debts are to be paid, or for a neglect or refusal to pay, by a resort to war.   But the states have no right or power to make war upon each other, and they are prohibited from doing certain things which might be a just cause of war, and the people have intrusted the regulation of commerce among them to a general common government.   Notwithstanding the prohibition I am noticing, many of the states have, from time to time, for the relief and ease of their people, enacted stay laws, valuation laws, &c., &c., all of which, on being brought properly before a court, in which the judicial power of the United States is vested, have been set aside, and the creditor has had his remedies unimpaired,

and peace and harmony between the people of the different states have been preserved.

I am dwelling upon these commercial powers and the system relating to commerce, inaugurated by the creation of the new government—the common umpire—because history informs us that the difficulties which had arisen prior to the adoption of the Constitution, and which would inevitably arise, were a main cause of, and reason for, the establishment of a government that should be vested with the powers necessary for the protection of commerce, and all those engaged in it, and under which industry and enterprise could safely develop the dormant resources of the whole country, protected against the laws of one state, invidiously discriminating in favor of its own citizens and against those of another or other states. (See the proceedings which led to the adoption of the Constitution. Elliot's Debates, v. 1, pp. 122 to 155.) They show the great defects in the articles of confederation, for the want of power to regulate commerce, and from it to derive revenues. Efforts were made to correct the evils arising from conflicting systems and supposed interests of the states. Virginia, January 21, 1786, appointed delegates to meet delegates of other states, "to take into consideration the trade of the United States; to examine the relative situations and trade of the said states; to consider how far a uniform system in their commercial regulations may be necessary to their common interest and their permanent harmony, and to report to the several states such an act relative to this great object, as when unanimously ratified by them, will enable the United States in Congress assembled, effectually to provide for the same." (Id., 149.) New York, New Jersey, Pennsylvania and Delaware, appointed delegates who met the delegates of Virginia at Annapolis, in September, 1786. This convention made a report recommending a convention of all the states, the powers of the deputies to be extended "to other objects than those of commerce." Congress concurred in the recommendation, and resolved that it was expedient that such convention be held, and appointed a time and place for holding it.

It was held in 1787, and produced the Constitution of the United States. Thus it is seen that the difficulties arising from the conflicting commercial systems of the states, was the principal cause of the calling of the convention.

Now, although it was absolutely necessary for the success of this commercial system, that the states should not possess the power to pass laws impairing the obligation of contracts, or to make anything but gold and silver coin a tender in payment of debts, there was no necessity that the government, common to all, should be deprived of these powers, nor any reason why Congress should not possess them. On the contrary, there was every reason, in the nature of things, why such general government should possess these powers, and should fully exercise them for the common benefit of all the people—the nation, under circumstances that might arise; powers, as I have already said, possessed and exercised by all civilized independent nations, and, without which powers, a nation would be unable to protect itself from the greatest and most dangerous convulsions, and a large portion of its subjects from ruin. All independent governments have a vital interest in the prosperity of all their subjects, and in the increase of their wealth; and all wise governments are constantly vigilant in observing the operation of their laws of trade and commerce, changing, modifying and improving them, for the better protection of industry and the development and protection of wealth. The most favorable results, as experience has shown, generally follow from stability in the laws which have long established the relations between money and property, contracts or promises to pay money, and the money as it was when the promise was made. Hence, the depreciation of the coin, change in the mode of paying debts, and the thing in which the debt may be paid, have always been regarded as evils, or as an evidence of great national embarrassment, a calamity. And such changes are, by the moral code, unjustifiable, except in great emergencies. But the power to make such changes is not, for these reasons impeached. On the contrary, occasions do arise, when there

is a necessity for the exercise of the power, that commerce may not be destroyed; that the great mass of the people may not be ruined; that the resources of the nation may not waste away and perish. All the people interested in the government, and the government, have a common interest in the prosperity of the people and the resources of the nation.

In my opinion, the provision objected to in the act in question, has a direct, legitimate and pertinent relation to the powers vested in Congress over commerce. That the provision declaring the treasury notes authorized to be issued "lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid," had, and has, a great effect upon the commerce of the country, no one will question. Indeed, the complaint is that its effect was to appreciate values, thus extinguishing the previous relation between commercial property and the precious metals. It is not denied that its effect has been to stimulate industry and thus increase production, and impart greater activity to commerce. And, I think, it cannot be successfully denied that in the absence of such a provision, under the circumstances then and now existing, the commerce of the country would have received a withering blow; industry and production, instead of being active, would have languished.

. Creditors insisting upon the discharge of their debts in something that could not be procured from, or even by, the banks, universal insolvency must have ensued; and production, and therefore, commerce, must have been, to say the least, greatly diminished. Even danger of these consequences. is sufficient for my argument. I am examining the question of the power of Congress, not whether the power was wisely exercised. It will not be denied, that in the absence of such provision, property would have greatly depreciated in value, as compared with "gold and silver coin," and that commerce would have been thereby greatly affected. Certainly such results might have been reasonably apprehended; and although Congress possessed the powers I have referred to, over com-

merce, it is claimed that it had no power to prevent such results, but that the previous law must have its course, whatever the consequences might be, though Congress was the author of such law, having provided coined money and regulated its value by declaring how much of the precious metals should constitute a dollar, and having regulated the value of foreign coins, taking the dollar as the standard, its powers are exhausted, and that its action was final. It is not, however, denied that Congress may reconstruct the dollar, and make it, though nominally the same, of far less value, as compared with a given quantity of the precious metals. The precious metals, it is said, possess a real, intrinsic value in the estimation of all civilized nations, and that they are generally used as the representative of values as money. And all this is so. Still the precious metals are a mere article of commerce between nations and among the people or subjects of such nations, until the nation, by an act of legislation, gives to them a different character, by taking certain portions and impressing upon them the stamp of the government, and giving them names which the people may use in their contracts; and also declaring that the damages for the breach of all contracts shall be estimated in the stamped precious metals according to their denominations, and shall be satisfied by them. This system is very convenient and important. But does it, of necessity, supersede all other systems, though in truth, it may have been once established? Certainly not. Systems of money have been adopted by nations for the purpose of developing the industry of the people, and protecting the produce of such industry; for the purpose of creating and protecting commerce; as a means of producing national wealth and enabling the people to pay taxes in something called money, and which has a certain numerical, denominational value, aside from the general value of the metals comprising it as an article of commerce. The precious metals are made money for the convenience of, and as an aid to, commerce. Commerce is the principal thing on account of which money is created by any nation. A people or community, if such a

case may be supposed, having no commerce, have no need of money. Now, although a nation has once established a system of money composed of the precious metals, as an aid to commerce, it does not follow that it may not change that system, or, indeed, wholly abrogate it, and substitute something else as the representative of values, classifying it by numerals, and giving them names. The nation may and ought to do so, if, in its judgment, it has discovered a better system for the development of its industry, and the encouragement and protection of commerce. Commerce is the subject, the object to be protected; the thing called money, the standard referred to in the making of contracts, is simply a means of creating, stimulating and protecting commerce.

Now the United States government possesses as full and ample powers touching commerce as any nation that ever existed—certainly as to regulating it with foreign nations and among the several States; and this power is sufficiently ample to justify Congress in declaring what shall be receivable in the payment and discharge of debts. This power exists nowhere else in this country. The power over commerce with other nations and among the States is confined to Congress. It, of necessity, includes the power to prescribe the thing which shall be the common representative of commercial values. It is its duty so to prescribe for the common benefit of all the people who produce the means of, or things used in, commerce, and who are engaged in it.

As to commerce, the people of the United States are substantially one nation. Their State governments have little or no jurisdiction over it. They must look to Congress for protection. They have agreed that Congress shall regulate their commerce with foreign nations and among the States, and they have prohibited the States from enacting certain laws which would conflict with the fair and legitimate exercise of the power confided to Congress, the prohibition embracing all debts and all contracts.

The fact that Congress may establish "uniform laws on the subject of bankruptcies throughout the United States" sup-

ports, instead of detracting from, the argument. It is one of those powers directly connected with commerce, and it embraces all bankruptcies, whether arising from obligations entered into in foreign or domestic commerce; in short, all cases of bankruptcy. It excludes, necessarily, the States from the exercise of the power, or rather no State could have exercised the power "throughout the United States;" and our State insolvent laws are only operative upon contracts made after their enactment, upon the principle that such contract is made in reference to the existing law, which enters into and constitutes a part of the contract. A general bankrupt law, to operate upon existing contracts, passed by a State legislature, would infringe the provision prohibiting the passage of any law impairing the obligation of contracts. Congress may impair the contract and discharge the debtor. I refer to this as showing the ample powers that it was intended Congress should have over commerce "throughout the United States," and not as a power, for the carrying into execution of which the legal tender provision in question was authorized. This power touching bankruptcies does not interfere with the power to declare in what debts may be paid, thus preserving commerce in full vigor and preventing bankruptcies.

As we have seen, there are some express limitations upon the powers of Congress; those relating to commerce are, that "no tax or duty shall be laid on articles exported from any State; no preference shall be given by any regulation of commerce, or revenue, to the ports of one State over those of another; nor shall vessels bound to and from one State, be obliged to enter, clear or pay duties in another." These limitations do not affect the question we are considering. I conclude this view of the powers of Congress relating to commerce, by again referring to the rule in *McCulloch* v. *State of Maryland*, deduced from a consideration of the provision authorizing laws to be made to carry into execution the powers granted, viz., that the Constitution allows to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will

enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate—let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, and which are not prohibited, but are consistent with the letter and spirit of the Constitution, are constitutional. In my opinion, the measure adopted by Congress, in making treasury notes a legal tender in payment of debts, comes within the tests here laid down.

I have thus far considered the question under the commercial powers of Congress. I will consider the question briefly under the power to borrow money on the credit of the United States. This power does not mean literally the borrowing and receiving the thing called money. It is not denied that Congress may issue treasury notes and compel their acceptance by the creditors of the government. Borrowing money means neither more nor less than raising supplies on the credit of the government. The issuing and paying out of treasury notes may be a forced loan to the government. But if they are issued and sold in the market, as stocks are, for the purpose of raising supplies, may not the government, in addition to its promise to pay them, give to them a character and qualities which will command for them a higher price in the market? As to stocks, it may increase the interest, prolong the time for payment or redemption, exempt them from taxation, by itself or the States, and all for the purpose of enhancing their value, and thus increasing the supplies.

And so, I apprehend, Congress may, for the like purpose, make the treasury notes receivable in payment of public dues, and in payment of all debts, public or private. Such qualities will give them greatly increased value. They will impart to them negotiability, circulation. All persons, and especially those owing debts, will accept them for property which the government needs, because they can be used not only in purchasing property, but in payment of debts, whether contracted before or after the enactment of the law authorizing their issue. This quality of satisfying debts, undoubtedly imparts

to them very great additional value, and without it they would, at once, depreciate greatly below their present value as compared with coin, and the government might be compelled to issue a far greater quantity of them, and thus increase the national debt to be hereafter paid by levying and collecting additional taxes.

Call the issuing of these treasury notes borrowing money or a forced loan, and the quality in them, making them receivable in payment of all debts, enhances their value and enables the government to realize from them a greater amount of supplies. The question is not, is this just or unjust to the people, or a certain class of the people. About this some may differ. The answer to such question is, the power being conceded, that it was submitted to Congress, and Congress decided it, and may reconsider it, and again decide. The courts only inquire and decide concerning the power.

Banks in this state are organized, and become incorporated under general laws, and the Constitution prohibits the legislature from passing any law sanctioning the suspension of specie payments by them. The legislature is empowered to require by law ample security for the redemption, in specie, of all bills or notes issued or put in circulation as money by such banks. The legislature had provided a system of security by deposits of bonds and mortgages, and State or United States stocks, with a superintendent of the banking department, and for the sale of such securities and the redemption of such bills and notes when payment is refused by the banks in the "lawful money of the United States." It is argued that the system results in a trust, and the creation of a trust fund, for the benefit of the billholders—the *cestui que trusts;* and that Congress cannot interfere with such trusts and the rights of the beneficiaries under it. It may be conceded that Congress cannot interfere with trusts so as to deprive beneficiaries of the enjoyment of the property charged with the trust, except as the taxing power may reach it in common with all other property. I speak of trusts generally. But may there not be trusts which Congress may affect and make void by legis-

lation? Suppose property is charged with a trust to be converted into specie, the precious metals, and then to be coined into money, and the money to be paid over to the beneficiaries. Such a trust would be void as to the coining. Suppose the trust to be valid when created, but it conflicts with a valid act of Congress subsequently created, will it not cease to be a valid trust? It will make no difference whether the trust had its origin in a State law or State Constitution, as the laws of Congress passed in pursuance of the United. States, are the supreme law of the land.

Now, if I am right in the position that Congress could make the treasury notes in question a legal tender in payment of all debts, public· and private, when a bank tenders such treasury notes in payment of its circulating notes, it at once discharges its debts, and there will be nothing for the trust to operate upon, or rather the power of the trustee to dispose of the trust property will be suspended.

Assume that the object of the securities is to secure the payment of the bank notes in specie, or rather in coined money (for this is the meaning of the word "specie," as used in the Constitution), and the securities are brought to a public sale, and the purchaser bids a certain number of dollars, he will owe the superintendent that number of dollars, which debt may be discharged by a tender of treasury notes. It may be said that he will, as a trustee, only be authorized to make sale of the securities for specie dollars; that is, that he may exchange a certain amount of securities for a certain number of specie dollars. It must be literally an exchange, for if he takes the·bid or promise to pay a certain number of dollars in specie, such promise may be satisfied by tendering a like number of dollars in treasury notes.

It is to be noticed, that the legislature does not grant charters in this State annexing conditions to the grant, but the banks are organized under general laws, containing certain requirements with which the banks in this case complied, thus giving them a corporate existence. They also complied with the requirement of the legislature to furnish security for the re-

demption of their bills and notes. But a failure to redeem such bills in specie is no where made a condition to their continued corporation existence. The law, however, provides what may be done in case of a failure to redeem such bills in "lawful money of the United States." And the doing of what is prescribed, touching the securities, may not necessarily arrest the business of the bank. In short, its existence as a corporation does not depend upon the performance of a condition to redeem its bills in specie. And, as Congress has provided that it may pay its debts in treasury notes, the law of Congress takes precedence of the State law requiring redemption in something else, if so construed, authorizing and directing the bank superintendent to convert the securities for the purpose of raising the means of paying the bills, which have been already paid. In other words, the debt being paid, the superintendent has no jurisdiction to proceed and convert the securities into money.

I concur in the opinions of my brethren, touching the power to borrow money upon the credit of the United States, and refer to their more full and complete arguments upon that power.

ROSEKRANS, J., concurred with the majority of the court, on the ground that the principle involved in the cases had been determined in favor of the validity of the act of Congress by the Supreme Court of the United States, in *McCulloch* v. *The State of Maryland* (4 Wheat., 316), and the late case of *The People, on the relation of the Bank of Commerce,* v. *The Commissioners of Taxes of the City of New York* (2 Black U. S., 620.)

DENIO, Ch. J. (dissenting.) The subject of private contracts, embracing the manner in which they may be made, and in which they may be discharged, lies within the domain of State legislation. The States were distinct political communities at the formation of the Constitution, retaining, notwithstanding the confederation under which they associated during the

revolutionary contest, nearly all the powers of municipal gov-
ernment and local administration. It was not the system of
the Constitution to abolish or materially abridge these powers
of the State governments, though they were subjected to some
important restraints and qualifications, all of which, however,
assume, so far as private contracts between citizen and citizen
are concerned, the general jurisdiction of the States over the
subject. Contracts when once made in conformity to the laws
of the State, cannot, according to a provision of the Constitu-
tion of the United States, be impaired by state legislation.
But it may be done by Congress incidentally. Under the
power to establish a uniform system of bankruptcy, for exam-
ple, debtors may be discharged from their obligations, through
the agency of the general government. Nor is this all. Many
express powers of great importance, and which were considered,
and were in fact, necessary to the existence and perpetuation
of the national government, were conferred upon Congress;
which was, moreover, invested with the power to make all
laws which should be necessary and proper for carrying these
powers into execution. In exercising these federal powers, it
has sometimes happened, and it may occur again in more
ways than can be enumerated or anticipated, that the pecuniary
and business arrangements of citizens may be interfered with,
and their contracts, though lawfully valid when made, may
be annulled or modified. Under the power to regulate com-
merce, and to declare war, acts may become impossible or
unlawful, which were before legitimate subjects of business
stipulations, and in respect to which such stipulations had
been actually entered into. These are the necessary results
of another provision of the Constitution which declares, in
effect, that itself, and the laws of the United States made in
pursuance of it, and public treaties, shall be the supreme law
of the land, and shall prevail against the State constitutions
and laws, when in conflict with them. But with these quali-
fications the whole subject of private property, its acquisition
and forfeiture, its mode of enjoyment and transmission be-
tween living persons, and its devolution by will and upon

intestacy, and all executed and executory contracts respecting it, are to be regulated wholly by the laws of the respective states.

It seemed necessary to state these principles, for, although no question has been made respecting them, they have an important bearing upon the controversy which we are called upon to decide, and, indeed, form the basis of all just reasoning, upon the powers of the general government. The mortgage executed by Bowne and his wife to the defendant, the alleged payment of which was in question in this case, was a lawful contract, by which real estate in this State was conveyed to the latter to secure the payment of a certain amount of money. It is stated to be payable in lawful money of the United States of America, but I lay no stress upon that expression. It was a security for the payment of money, and that is all which seems to me important. The lands thus conveyed by way of mortgage have been transferred to the plaintiff subject to the lien; and he claims a right to pay the debt and redeem the incumbrance, by giving to the creditor, the defendant, an amount equal to the principal and interest, in the treasury notes of the United states, issued pursuant to the late act of Congress. The defendant refuses to accept these notes as payment, and the question is, whether he is compellable by law to do so. The contract was a valid one under the laws of this State, and it calls for the payment of a certain sum of money. The question as to what shall amount to payment or performance, is, *prima facie*, one which is to be determined by the State laws. The federal Constitution, which is a part of the law of the State, prohibits anything being made a tender in payment of debts, by State authority, but gold and silver coin. It is clear, therefore, that the offer of the treasury notes was not a lawful tender of payment, unless the act was a legitimate measure for the execution of one or more of the powers which the Constitution has conferred upon Congress. That act declares in express terms that the treasury notes of the class which were offered to the defendant, shall be lawful money and a legal tender for all debts, public and

private, within the United States, except duties on imports and interest on government bonds and notes. (39th Cong., 2d Sess., ch. 33, § 1.) The single question in this case is, whether Congress had the constitutional right to enact this law; and that depends upon a comparison of its provisions with the powers with which the Constitution has clothed Congress. The problem to be determined is, whether the relation of means and end exists between them. I shall confine myself to that feature of the law which provides for forced payment of private debts; for it is not doubted by any one that the government may declare its own obligations receivable in payment of debts due itself.

It has been argued that there is no warrant in the Constitution for the issue of federal securities for the purpose of being used as a currency, though unaccompanied with a provision making them a legal tender among individuals. If this position could be established, the notes which were tendered in this case being illegal, would be ineffectual for any purpose. In the view I have been compelled to take of the principal question, this subordinate one is not necessary to be considered. It is proper, however, to say that it could scarcely become a judicial question in any case. The right to issue the obligations of the government for money borrowed, or for property or services furnished for national purposes is not and cannot be questioned. The form and denomination of such securities are matters which belong to the discretion of the government making them; and if an issue could be raised upon the intent to have them circulate as the representative of money, I should still think that it would be legally unobjectionable to so accommodate them to the business wants of the community, as to make it the interest of successive holders to continue them in circulation, and thus benefit the treasury by deferring the time of their presentment for payment. It has been urged that such issues of paper would be an emission of bills of credit, as understood at the time the Constitution was framed, and that the making of them was expressly forbidden to the States, and not committed to Con-

gress. In support of this view it is shown that an express authority to issue such paper was at one time inserted in the draft of the Constitution, in connection with the power to borrow money, but was stricken out on the motion of a deputy from New York. Upon an examination of the extract from the debates which was referred to in the argument, I am of opinion that it cannot be affirmed that this change was made from an intention positively to prohibit the issue of such obligations, but that it was done from the apprehension that if the power to make them was expressly conferred, the legislature might, under the idea of declaring their effect, have engrafted upon them the quality of a legal tender. If the authority was left as an incident to the power to borrow money, purchase property, or pay debts, no such consequence, it was thought, would follow. If it had been designed to prohibit their issue, under any circumstances, by the government of the Union as well as by the States, it is presumed that a similar prohibition would have been applied in terms. If the effect of this debate was different from what I conclude it to be, I should still hesitate to allow it any considerable weight in construing the Constitution. The only safe way, in my opinion, to deal with that instrument is to look at its language in connection with its contemporaneous history and the known circumstances of the times, and to attach such meaning to it as we conceive the people who adopted it would have given. I shall assume, therefore, that there does not exist any constitutional objection to the currency which was issued under the act of Congress, which we are considering; and that the only question which we can entertain arises upon the mandate that the notes shall be a legal tender in the payment of private debts.

The express power committed to the general government " to coin money, regulate the value thereof, and of foreign coin," and the denial of that power to the States, may be considered as a further qualification of the State jurisdiction over private contracts. Without these provisions the right to determine what should constitute money in transactions between

citizens, would have remained, along with the mass of general legislation, in the several State governments. But the incon·venience which had arisen from the different denominations of money which were in use in the several States, and which had grown out of their separate existence as colonies, and the desire to establish a system of coined money upon the decimal principle, which should accurately represent the money of account, led to the vesting of the power over the subject of coined money in the new government.

I shall spend no time in proving that the coining power referred to relates, and is limited, to the fabrication and regulation of coins properly so called. I have carefully considered the ingenious argument on that subject, which has been submitted orally and in writing by one of the counsel who maintain the validity of the legal tender provision; but those suggestions have not created in my mind the slightest doubt that the language is to be understood in its most obvious and natural sense. Coins are, in our language, pieces of metallic money; and the coining of money is the formation of such pieces by such mechanical means as are appropriate to such an operation. There is not the smallest reason to suppose that the word was used in the Constitution in any non-natural, recondite or figurative sense.

The language is, to my mind, so distinct and precise as not to admit of reasoning. But if it were in any manner equivocal, the connection in which it is found in the several places where it is used in the Constitution would determine its meaning to be such as I have mentioned. In the principal clause the value of the coin to be made is to be regulated by Congress; but this could not be predicated of the obligations of individuals or of governments, the value of which is either the absolute amount stipulated to be paid, or their worth, arising out of the fluctuating considerations of the pecuniary means and ability of the promisors, and the interest to be paid, and the time of payment of the principal—the last of which circumstances must vary every day by the efflux of time. The value of foreign coin is also to be regulated,

but it is impossible to suppose that this could refer to securities executed in foreign countries. Then in the clause referring to the punishment of counterfeiting, a sharp distinction is apparent between the public securities and the current coin of the United States; and in the clause prohibitory of the power of the States, it is forbidden to them to coin money and to emit bills of credit, which plainly shows that these are separate and distinct acts; and in the same sentence, where the prohibition is inserted against making anything but the precious metals a tender, it is called gold and silver coin. If the determination of the case depended upon the meaning of the express power to coin money, I should not, as I have mentioned, be able to entertain the smallest doubt that it does not embrace the obligations of the general government in whatever form they may be issued.

Let us then consider whether the power to make these notes a legal tender results from any of the express powers conferred on Congress. Among the attributes expressly conferred is the very extensive power to regulate commerce; and the enactment of the legal tender provision has sometimes been referred to that clause. But it has no bearing upon the transactions of citizens, which are limited to a single State; the power relating only to commerce with foreign nations, and among the several States, and with the Indian tribes. This enactment does not propose to regulate foreign or inter-state commerce, or to be in any sense a regulation of that subject. It compels the citizens in all places, and at all times, and under all circumstances to receive the treasury notes in payment of debts, whether these debts had any connection with a commercial transaction, or were wholly foreign to and independent of it. Whether a law introducing the treasury notes into foreign and inter-state commerce, and compelling their reception as money when offered in connection with transactions of that nature, could be sustained, will perhaps depend upon some considerations, to which I shall presently advert.

It may be said that any measure which tends to promote internal traffic and facilitate domestic exchanges would inci-

dentally influence foreign commerce. The same may be said respecting the whole subject of private exchanges and contracts. But to embrace all these subjects within the power to regulate commerce, would be to break down all distinctions between the national and state governments, and commit the whole subject of internal government to the discretion of Congress.

I concede that it is not incumbent upon those who argue for the validity of the legal tender clause to select any one express power and to maintain that the provision is a legitimate execution of that power. They may group together any number of these grants of legislative authority, and if the right to enact that provision is fairly deducible from any or all of them — their position is established. The power to raise money for raising and maintaining a public force by land and by sea, to pay the public debts, and indeed nearly all of the enumerated powers, require or at least suppose the necessity of the obtaining, possessing, managing and disbursing moneys to a large and indefinite amount. No idea can be formed of the government of a great country, though the power of legislation should be restricted to external affairs, which would not require such government to be an immense dealer in money and commodities of almost every kind. The strong public necessity for obtaining pecuniary means to carry on the government and to effectuate the great purposes for which it was established, have not been and cannot be overstated, whether we advert to the imminent crisis which is this day upon us, or consider it in its usual condition of peace and tranquility. It was quite appropriate to advert to the present condition of the country to show that the necessity for obtaining funds may be so sudden, fluctuating and spasmodic that the public needs will not wait upon the regular receipts of revenue, but must sometimes be met by extraordinary exertions, and entail pecuniary sacrifices upon the public and individuals. Still the Constitution furnishes the measure of the national authority, in war as in peace; and, as judges, our duties are limited to the construction of that instrument, according to our best judgment

Metropolitan Bank *v.* Van Dyck.

of its actual meaning. The immediate question is, therefore, as has been stated, whether the various powers committed to Congress which require, in order to their due execution, the acquisition and use of large and often fluctuating amounts of money, empower the national government to annex to the notes, which I concede it has a right to issue, a quality which shall compel individuals to receive them in payment of debts against their will.

It is a circumstance connected with the inquiry, though not material to the view which I take, that by the arrangements of the act the notes are not payable in coin; for the quality which makes them receivable for all public and private debts, authorizes the government to redeem them in other notes of the same kind, so that they are to constitute a medium of payment and exchange which is to be quite distinct from gold and silver money and not convertible into it, and which, by the well known laws of currency, will displace the latter from circulation, and will cause it to depreciate, in comparison with that standard, in proportion to the amounts which may be issued. To force them upon the creditor as payment contrary to the general laws of the States, which do not authorize debtors thus to discharge their obligations, is to enter into the domain of the State legislature and to supersede, to that extent, the operation of the State laws. This is not necessarily a fatal objection, for if the provision annexing the quality of legal tender to the notes is a necessary and proper law for carrying into execution the powers expressly conferred upon Congress, and is not forbidden by any part of the Constitution, it changes or abrogates, by virtue of the pre-eminence attributed to federal legislation, when constitutional, all State laws and constitutions so far as the exigency of the case may require.

We are to consider, then, whether the provision in question is necessary and proper to the execution of the various enumerated powers which require the obtaining and disbursement of moneys for national purposes. And we observe, in the first place, that certain means are specifically provided by the Constitution for obtaining funds for public objects. Congress

is empowered to levy and collect taxes, duties, imposts and excises, to an extent limited only by the public purposes to which moneys may be applied; and to borrow money to the like extent, on the credit of the United States. In addition to these means, it may dispose of the territory and other property of the United States, and of course may receive the equivalent for such disposition in money. I do not, at this moment, inquire whether the controverted provision is within any of these last mentioned express powers, namely, those of taxation and borrowing, but whether, under the other delegations of authority which require for their execution the possession of pecuniary means, it was competent for the government to oblige the citizen to accept these notes as cash, for the purpose of gaining, by means of the circulation which such a quality would give them, additional pecuniary resources for the purposes of the government. I am of opinion, that this would be quite too far removed from the delegation of power to be considered an enactment framed for its execution. I think, moreover, that the Constitution did not contemplate and does not admit of the raising of moneys from the people, except by taxation and by borrowing, or by the sale of the public lands and property. Pecuniary means gained by the circulation of paper not bearing interest, are the profits which bankers acquire by their peculiar business. It is a well known pursuit in which individuals may engage, by government license when that is required by law, and without it when it is not exacted by some legal requirement. I think that so far as the immediate question is concerned, the government has an equal right to authorize the national treasury to embark in any other of the pursuits of business by which money is acquired, as in this of making profits by the forced circulation of its notes, under this legal tender clause. Hence I conclude, that the disputed measure cannot be justified as an execution of any of the powers requiring the possession and authorizing the expenditure of money.

Then as to the express power to borrow money on the credit of the United States, which is the delegation of authority

principally relied on. The ordinary operation of effecting public loans is sufficiently simple and obvious, and I have already said that I perceive no valid objection to arranging the securities in such a form as that the lenders, and those who may take such securities by transfer, shall be willing to hold or circulate them, instead of immediately presenting them for redemption. The power to borrow money implies the giving of obligations for its repayment. The form of these is matter of convention between the parties to the loan, and is an incident of the principal power. To the extent which they will circulate upon the credit of the government, the incidental advantage is legitimately obtained.

But it is a step far beyond this to require that all persons shall receive them in payment of all manner of obligations. This has no natural relation to the contract of borrowing. The parties who are thus obliged to receive the borrower's obligations are not parties to the loan, and have no necessary connection with it. True, they are subjects, for some purposes, of the same political sovereignty which is the borrowing party, and if that sovereignty was universal in its objects, and was not restrained by constitutional limitations, the duty of receiving the obligations could be rightfully imposed like any other burden created by legislative authority. But private contracts and the manner in which they are to be performed and discharged or enforced are, as has been stated, embraced in the reserved rights of the States, and Congress has no general legislative power over the subject. If they have any power whatever, it is not direct, but oblique or collateral. If, in the execution of the enumerated powers, it becomes necessary and proper to enter upon the domain of State legislation, the State laws must yield. This may be made more plain by cases which may be supposed. The States have the general right to regulate the interest upon money loaned. Suppose a State legislature to enact that none of its citizens should loan money to any party, private or public, at a rate of interest above five per cent, and that Congress, considering the rate too low, should provide by law that seven per cent might be lawfully

required of any borrower by any lender. Such an act, of course, would be void, as an attempt to legislate upon a subject not committed to the general government, but reserved to the States. Yet there could be no objection to a statute of Congress which should authorize the borrowing of money upon the credit of the United States at any rate, however excessive, which it was thought expedient to allow and at which citizens might be willing to lend. This would necessarily change and modify the State law *pro tanto*, but it would be sustained, because it would be a law made to carry into effect a power expressly conferred upon Congress, namely, the power to borrow money, which would embrace all the usual incidents of loans. Then suppose, that with a view to facilitate federal loans, and to give the public bonds a ready reception, Congress should attempt to subject all individual borrowing in the States to a low rate of interest, while the federal treasury was allowed to contract at a higher rate. This would bear some resemblance to the law which is now questioned, and yet it would be preposterous to consider it a law passed in the execution of the power to borrow money on the credit of the United States.

The question how far an act of Congress could be considered to have been passed in the execution of an enumerated federal power has been discussed in a variety of forms as particular laws or projects of laws have come under consideration in the administrative, legislative and judicial branches of the government. The discussions most material to be considered, because they are absolutely authoritative with us, are the judgments of the Supreme Court of the United States. The debates in these cases have usually turned upon the words "necessary and proper," as used in the Constitution. To a certain extent the necessity and propriety of an enactment must rest in the discretion of the legislature. But to hold that the exercise of that discretion is final and not subject to the examination of the judiciary would be to break down all limitations upon the power of the general government. Accordingly, I think that no judge has ever intimated the existence of any such extreme doctrine. On the other hand

the question whether a given measure is the most suitable or efficient for the execution of an enumerated power must of course be left to the discretion of Congress, and that discretion cannot be reviewed by the courts. The difficulty lies in determining in a particular case whether the disputed enactment has such a relation to the power which it is said to be passed to carry into execution, that it can be affirmed to be necessary and proper for that purpose. The most thorough examination of the subject was that which was had on the several occasions when the constitutionality of the Bank of the United States came before the Supreme Court. (*McCulloch* v. *The State of Maryland*, 4 Wheat., 316; *Osborn* v. *The United States Bank*, 9 id., 738.) The act was sustained on the theory that it was a necessary arrangement for carrying on the financial operations of the government. It was not supposed to be absolutely necessary, but to be so in the sense of being appropriate and directly convenient and useful. That judgment is to be accepted by the state tribunals as a true exposition of the Constitution on this point; but the resemblance in principle between the legislation then in question and that which we are considering, is not so striking as to afford much aid in the present difficulty. The principles, however, announced by the eminent chief justice, seem to me to be irreconcilable with the validity of the legislation in question. It was conceded that the powers of the government were limited, and that those limits were not to be transcended; but it was maintained by a course of reasoning which cannot easily be controverted, that the national legislature possessed a discretion in the adoption of the means by which the powers conferred by the Constitution were to be carried out. It was conceded that the means must be such as were appropriate and were plainly adapted to the end authorized to be accomplished. In another part of the opinion it was intimated that the means, in order to be legitimate, and to fall within the qualifying words, necessary and proper, must be such as were either needful, requisite or conducive to the principal object embraced in the delegated power. Was it ever before supposed

to be incident to the contract of loan, that the rights of other persons, strangers to the transaction, were to be controlled or affected? Either the borrower or the lender may insist upon any stipulation to which the other will consent, and when the former is a sovereign State it may agree to any concessions on its own part not inconsistent with its constitutional limitations, and insist upon imposing any terms upon the lender which it may be thought expedient to require and to which he will consent. The arrangement of these mutual stipulations embraces all which is material or which can be appropriately attached to the contract of loan. A provision which is to control other parties not connected with the transaction, to their loss though to the advantage of the lender, cannot be appropriate, for it is foreign to the nature of the transaction and has never before been employed in connection with such arrangements. A consolidated government might annex such terms to the contract, for it has plenary authority over all its citizens when not constitutionally restrained. As to being needful, requisite or essential, it is not so in any sense which would enable the government to impose on the citizens who should have business relations with the holders of the securities, conditions which would only conciliate such holders.

The power which the Constitution confers upon the government to affect loans, is not one to be exercised *in invitum*, like the taxing power. It requires only a party willing to advance the funds upon the terms which may be offered, and it does not imply anything coercive as to any one. It requires a consenting party only; unlike the taxing power which implies legal coercion, and does not seek the consent of any other party.

But for a single authority, which I will now mention, I should think it very plain that the power to borrow money on the credit of the United States, did not authorize Congress to compel individuals to accept treasury notes in discharge of private debts payable in money.

In *Weston* v. *The City Council of Charleston* (2 Pet., 449), it was held that the power to borrow money on the credit of the

United States contained in itself a prohibition to tax the securities given upon the loan by State authority. The tax, which was held illegal, was laid upon certain stock of the United States, *eo nomine*, and this court was of opinion that the case might have turned upon that circumstance, and that money invested by our citizens in federal loans was yet taxable along with the mass of the property of the citizens, under the laws of this State, which laws tax all property alike. (*The People* v. *The Commissioners of Taxes, &c.*, 23 N. Y., 192.) On a writ of error to the Supreme Court of the United States, our judgment was reversed, that court disallowing the distinction on which we proceeded, and holding that the federal bonds were exempt from taxation in any form under State authority. An act of Congress had been passed, declaring in terms that the scrip of the public debt of the United States should not be subject to taxation by the states. *A fortiori*, a State tax imposed upon stock issued since the declaratory act mentioned, cannot be sustained in the Supreme Court. The principle has some analogy to the one we are examining. The laws of the States, on the subject of taxation for State purposes, are as fully within the reserved rights of the States, as those which relate to private contracts and the payment of individual debts. The general government has no jurisdiction respecting the legal arrangements which the States may make on either of these subjects; and yet it has been held, that the power to borrow money alone confers upon the securities given for loans a quality which no other property has, by exempting them from taxation. I hope it will not be attributed to an unreasonable pride of opinion that I feel compelled to say, that I have not been able to appreciate the reasons upon which that conclusion was reached. I, however, fully acknowledge the duty of following the adjudication of the supreme tribunal; and, since the judgment referred to was pronounced, we have conformed our decisions in similar cases to the rule laid down, and shall continue to do so. I think the law exempting the federal bonds from State taxation was as foreign to and as unconnected with the power to effect

federal loans, as that which declares the treasury notes a legal tender in the payment of debts, and I acknowledge the analogy which exists between the cases. But the judgments of the Supreme Court did not proceed upon reasons which would justify the legal tender clause. Those judgments, according to the published opinions, regarded the public bonds as instruments or means employed by Congress to carry out the power to make loans, and as of the same general nature as the Bank of the United States. It clothed them with an immunity, but did not propose to render them instruments of coercion. Finding this distinction to exist, I do not think it proper to act upon the analogy which I have conceded. I am, therefore, of opinion, that the clause in the act making the notes a good tender in the payment of private debts, cannot be sustained under the power to borrow money, nor under any other of the express powers conferred upon Congress.

But I am of opinion that the legal tender clause is repugnant to express provisions of the Constitution. I refer to the prohibition imposed upon the States to make anything but gold and silver coin a tender in payment of debts, and to the provision which confers upon Congress the power to coin money and regulate the value thereof, and of foreign coin. These provisions are in *pari materia*, and must be considered in connection with each other, and I think the result of both is, that it was the settled determination of the convention, that compulsory payments should be made only in coin. This position is entirely distinct from the topic which I have thus far considered. If it were conceded that declaring the notes to be a legal tender was an allowable means for borrowing money upon them, still it could not be done if the fair result of other constitutional provisions were that coins of the precious metals were the only medium in which compulsory payments could be made. I have already considered the coining power in connection with the argument that it embraced in terms the power to fabricate money other than metallic coins, properly so called, and have nothing to add on that point. But it was the object of that provision to enable and to require

the general government to cause coins to be manufactured which should be impressed with the stamp of the national authority, should be received throughout the Union as absolutely authentic, and which should be deemed and taken in all transactions whatever, as money of the precise value indicated by the stamp of the national mint; and that they should in like manner prescribe the value of such foreign coins as they should think proper to have circulated as money. This provision belongs to the class to which I have referred as to some extent militating against the general system, which left to the State governments the regulation of private pecuniary dealings and contracts. That system, if unqualified, would allow the States to exclude any medium of payment not established by their own authority; but they cannot, consistently with the provision, disallow the absolute authenticity of the federal coins. But the power to create money does not extend beyond the fabrication of coins.

Hence, I am unable to find the ground for further intrusion into the field of State legislation respecting the money to be used in private transactions. The federal legislation respecting coined money is absolutely binding upon all the people of the Union, and, in my opinion, it is exclusive of any power, residing anywhere, to make any other description of money. The subject with which the convention was dealing was that of money which was to be authentic and authoritative everywhere throughout the Union. It prescribed coins, to be made by federal authority as such money, and was silent respecting any and every other kind of currency. The argument *expressio unius exclusio alterius* applies, and would be of great force if there were no other, but a reason equally strong to my mind is, that the convention was acting upon a subject belonging generally to State jurisdiction, and cannot, with propriety, be understood as going beyond the provision actually made. The prohibition upon the State governments to coin money affords an invincible inference that the coins to be struck under the authority of Congress, were to be the only authentic money to be used in the United States. Certainly

there is an unavoidable implication, that nothing shall be done by any authority in the nation, which shall destroy the value and usefulness of this federal money. But can it be used for regulating exchanges and making payments, if another thing of less or even of different value is declared money ? There cannot, in the nature of things, be two standards of value. If the treasury notes are of less value than the gold and silver coins, the latter will be superseded and become absolutely unavailable for all purposes for which money is required to be used; for no one will make use of a gold eagle, when with that coin he can purchase twelve or fifteen dollars, each of which will answer his purpose precisely as well as one-tenth of the eagle. The legal tender provision practically nullifies the coining power. For all practical purposes it converts the federal coins fabricated in obedience to the Constitution, into mere bullion. This appears to me plainly to conflict with the provision for the striking of such coins.

But the prohibition upon the States against making anything but gold and silver coin a tender in payment of debts, seems to me also conclusive upon the subject. The restraint, it must be remembered, is upon the sovereignty to whose jurisdiction this subject of debts and their payment belongs. The general government, as I have shown, had no power over that subject, except as it may be deduced incidentally from some express power. It should be further borne in mind, that the prohibitory mandate is not addressed to the State legislature alone, but to the judges as well. No authority of the States, legislative or judicial, can, by the terms of this clause, admit anything but coin fabricated from the precious metals to be a valid payment. It is to be observed also, that the inhibition is not limited to values created by State authority. That subject was provided against by the language forbidding the States to emit bills of credit. The word "anything" embraces all imaginable subjects of which payment might be predicated, irrespective of their material substance and of the authority by which they were created. To constitute payment there must be coins, that is, stamped pieces of

metal, and they must be composed of the precious metals. When the State legislatures, which are to establish the legal principles respecting payments, and the courts which are judicially to determine what shall be payments in any given instance, are forbidden by paramount and supreme authority to make anything but coins struck from the precious metals a payment, the natural, and I think, the inevitable result is, that nothing except such coins can be adjudged to be payment in any case whatever. And when, in connection with such inhibition, we find ample provision made by the same supreme authority, for the supply of such coins by fabrication, and by the adoption of those coming from abroad, I cannot doubt that it was the persistent design of the Constitution, which contains these mandates, to require as a fundamental policy the exclusion of everything else than the coins indicated from the attribute of compulsory payments. We are to-day asked, by our judgment, to make the treasury notes of the United States a payment of the debt owing to the defendant. Our answer ought, I think, to be that we are forbidden by the supreme law of the Union to do it. That law has no regard to the value of the thing offered as a substitute, or to the authority by which it was created. It is forbidden absolutely and under all circumstances.

An argument has been somewhat pressed upon us, arising out of the action of Congress upon the subject of legal tender. After providing for the establishing of the mint and regulating the amounts of pure gold and silver to be contained in, and the value of the various coins to be struck, the legislature has, at various times, from an early period of the government, declared those coins to be a legal tender for the payment of all debts and demands. The argument is, that there is nothing in the Constitution expressly enabling Congress to declare any thing to be a legal tender, and yet that body has, with universal public acquiescence, passed the several acts referred to. Hence it is insisted, that the power of establishing a legal tender has been universally conceded to exist, and if the power exist, it is within the legislative discretion to determine

as to what shall be made such tender. In point of fact, the coins which have been declared a tender are such as were composed of gold and silver, with sufficient of alloy of baser metals to give them the requisite consistency for convenient use. My opinion upon this point is, that the power to coin money and regulate its value, is an authority to make money which shall be legally such in every part of the Union and for every purpose for which money shall be required or needed to be used. The coins to be struck are national coins and money, and so of those which are adopted, and the value of which is declared, and where any law, State or national, or any other lawful exigency calls for the payment of money as such, this national money is the thing indicated.

The word money, as used in the Constitution, *ex vi termini*, implies all that is expressed by the words legal tender, and without the use of these words in the acts of Congress, the coins struck at the national mint, and the foreign coins, the value of which has been regulated by Congress, could be used in forced payments in all cases. The express provisions respecting legal tender are employed for the purpose of explanation, and are only declaratory of the effect of the national currency when offered for the purpose of payment. In reference to what had been said respecting the ability of Congress to debase the national currency, I am of the opinion that the several clauses respecting coining and what may be made a legal tender by the States, together amount to a direction that the money to be created under the clause respecting coining, shall be composed of the precious metals, as a principal ingredient, and that coins not composed of these substances cannot constitutionally be made national money or legal tender.

I have examined this question, and have come to a conclusion upon it, as though it involved no other consequences than the recovery or the failure to recover the small sum of money claimed by the defendant, and I do not know of any other method of considering a judicial question involving pecuniary considerations. The extended and very able discussion at the bar, in which considerations of a public character have been

largely pressed upon us, have had the effect, to which they were certainly entitled, of inducing caution and very mature deliberation upon the legal points involved, but they cannot legitimately have any further influence.

I shall be well* satisfied if a majority of my brethren, and the federal court in which our decision will ultimately be reviewed, can reconcile the legislation which the defendant challenges with a reasonable interpretation of the Constitution of the United States. It is not to be denied that it constitutes a part of a plan of public finance which, whether wisely organized or not, it is extremely important in the present crisis to maintain if it can properly be done. If my sense of duty would allow me to decide the case, as I should wish the law under the circumstances of this moment temporarily to be, I would unite in a judgment which should establish the validity of these legal tender notes; for the preservation of the federal Union, which is said to be involved, is the most ardent, I may say passionate desire of my heart; and no one, I think, can honestly pretend that this can be accomplished except by the vigorous employment of the armed force of the nation. To that purpose, the realization and expenditure of immense pecuniary resources are plainly indispensable. No man can have a stronger sense of the absolute causelessness, nay, the utter wickedness of the insurrection than that which I entertain—or of the duty of every citizen, whether in public office or a private station, to yield to the constituted authorities upon all questions of policy or expediency, not only implicit obedience, but a sincere and generous confidence and coöperation.

But we are placed here to determine the law as we understand it to be, in the controversies which are brought before us, and I should forfeit my own self-respect if I could unite in a judgment affirming the constitutional validity of the legislation in question, believing, as I must, that its provisions are repugnant to the letter and spirit of the Constitution.

SELDEN, J., concurred in the conclusions of DENIO, Ch. J.

Judgment affirmed in the first case,<br>and reversed in the second.